# EXHIBIT B

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JOHN D. RIESENBERG (CABN 232839)
Trial Attorney, U.S. Department of Justice

MAUREEN C. BESSETTE (CABN 165775)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    Fax: (510) 637-3724
    Maureen.bessette@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF DONALD KOLLMAR | CASE NO. 4:19-MJ-70677 |
| | UNITED STATES' MEMORANDUM IN SUPPORT OF EXTRADITION |
| | July 11, 2019 at 10:30 a.m. |
| | Hon. Kandis A. Westmore |
| | Courtroom: #4 |

U.S.' MEMORANDUM IN SUPPORT OF EXTRADITION

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

I.    BACKGROUND ................................................................................................................2

      A.    Procedural Background............................................................................................2

      B.    Factual Background .................................................................................................2

II.   DISCUSSION .....................................................................................................................5

      A.    The Documentary Evidence Submitted by Canada Supports Certification; the
            Fugitive May Only Submit Explanatory Evidence .................................................6

            1.    Canada's Written Submissions Are Sufficient and Admissible ...................6

            2.    Kollmar's Right to Introduce Evidence Is Limited......................................7

      B.    The Requirements for Certification Are Satisfied ..................................................8

            1.    This Court Has Authority Over the Proceeding............................................8

            2.    This Court Has Jurisdiction Over Kollmar ..................................................9

            3.    The Relevant Treaty Is in Full Force and Effect.........................................9

            4.    The Charged Crimes Are Covered by the Treaty .......................................9

            5.    Canada's Evidence Establishes Probable Cause that the Fugitive
                  Committed the Charged Offenses ..............................................................14

III.  CONCLUSION..................................................................................................................17

# TABLE OF AUTHORITIES

Cases

*Afanasjev v. Hurlburt*, 418 F.3d 1159, 1162-63 & 1116 (11th Circ.), cert. denied, 546 U.S. 993 (2005)................. 6

*Austin v. Healey*, 5 F.3d 598 (2d Cir. 1993), cert. denied, 510 U.S. 1165 (1994) ...................................... 9

*Bingham v. Bradley*, 241 U.S. 511 (1916) ...................................................................................... 6

*Bovio v. United States*, 989 F.2d 255 (7th Cir. 1993) ................................................... 6, 8, 15, 16

*Bozilov v. Seifert*, 983 F.2d 140 (9th Cir. 1992) ........................................................................... 1

*Caplan v. Vokes*, 649 F.2d 1336 (9th Cir. 1981) ...................................................................... 10

*Castro Bobadilla v. Reno*, 826 F. Supp. 1428 (S.D. Fla. 1993), aff'd 28 F.3d 116 (11th Cir. 1994)................. 14, 15

*Collins v. Loisel*, 259 U.S. 309 (1922).............................................................................. 14, 15

*Cucuzzella v. Keliikoa*, 638 F.2d 105 (9th Cir. 1981)................................................................ 10

*Eain v. Wilkes*, 641 F.2d 504 (7th Cir.), cert. denied, 454 U.S. 894 (1981) .......................................... 8

*Factor v. Laubenheimer*, 290 U.S. 276 (1933) ........................................................................ 11

*Fernandez v. Phillips*, 268 U.S. 311 (1925)........................................................................... 14

*Gerstein v. Pugh*, 420 U.S. 103 (1975)................................................................................. 14

*Glucksman v. Henkel*, 221 U.S. 508 (1911)............................................................................. 12

*Gonzalez v. O'Keefe*, 2014 WL 6065880 (N.D. Cal. Nov. 20, 2014)...................................................... 14

*Grin v. Shine*, 187 U.S. 181 (1902)................................................................................ 9, 12

*Hilario v. United States*, 854 F. Supp. 165 (E.D.N.Y. 1994)......................................................... 11

*Hooker v. Klein*, 573 F.2d 1360 (9th Cir.), cert. denied, 439 U.S. 932 (1978)........................................ 7

*In re Extradition of Figueroa*, 2013 WL 3243096 (N.D. Ill. June 26, 2013) ........................................ 14

*In re Extradition of Howard*, 996 F.2d 1320 (1st Cir. 1993) ......................................................... 9

*In re Extradition of Kirby*, 106 F.3d 855 (9th Cir. 1997)............................................................ 9

*In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277 (S.D. Fla. 2011) ......................................... 15

*In re Extradition of Shaw*, 2015 WL 3442022 (S.D. Fla. May 28, 2015)............................................. 8, 14

*In re the Extradition of Kyung Joon Kim*, 2005 WL 6399831 (C.D. Cal. Oct. 21, 2005) ............................... 16

*Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962), cert. denied, 373 U.S. 914 (1963) ........................ 7

*Kamrin v. United States,* 725 F.2d 1225, 1228 (9th Cir.), cert. denied, 469 U.S. 817 (1984) ...................... 13

1  *Kastnerova v. United States*, 365 F.3d 980, cert. denied, 541 U.S. 1090 (2004) .........................................9

2  *Koskotas v. Roche*, 931 F.2d 169 (1st Cir. 1991) ...........................................................................................12

3  *Manta v. Chertoff*, 518 F.3d 1134 (9th Cir. 2008) ....................................................................................6, 7

4  *Martin v. Warden*, 993 F.2d 824 (11th Cir. 1993) .....................................................................................1, 13

5  *Matter of Extradition of Kraiselburd*, 786 F.2d 1395 (9th Cir. 1986), cert. denied, 479 U.S. 990 (1986)........ 13, 14

6  *Matter of Extradition of Mainero*, 990 F. Supp. 1208 (S.D. Cal. 1997) ...................................................12

7  *Matter of Extradition of Murphy*, 1998 WL 1179109 n.3 (N.D.N.Y. Jun. 30, 1998), aff'd 199 F.3d 599 (2d Cir. 1999) ........................................................................................................................................................11

8

9  *Matter of Extradition of Noeller*, 2018 WL 1027513 (N.D. Ill. Feb. 23, 2018), aff'd 922 F.3d 797 (7th Cir. 2019) 8

10  Matter of Extradition of Ricardo Alberto Martinelli Berrocal, 2017 WL 3776953 (S.D. Fla. Aug. 31, 2017) ....... 16

11  *Neely v. Henkel*, 180 U.S. 109 (1901)....................................................................................... 11, 13, 15

12  *Nezirovic v. Holt*, 779 F.3d 233 (4th Cir. 2015) ..........................................................................................11

13  *Oen Yin-Choy v. Robinson*, 858 F.2d 1400 (9th Cir. 1988), cert. denied, 490 U.S. 1106 (1989).............................7

14  *Pettit v. Walshe*, 194 U.S. 205 (1904)........................................................................................................9

15  *Prasoprat v. Benov*, 421 F.3d 1009 (9th Cir. 2005), cert. denied, 546 U.S. 1171 (2006) .......................................1

16  *Quinn v. Robinson*, 783 F.2d 776 (9th Cir.), cert. denied, 479 U.S. 882 (1986) .................................8, 14

17  *Santos v. Thomas*, 830 F.3d 987 (9th Cir. 2016) .......................................................................................8

18  *Sayne v. Shipley*, 418 F.2d 679 (5th Cir. 1969), cert. denied, 398 U.S. 903 (1970) ...................................6

19  *Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir. 1973)...................................................................................5

20  *Simmons v. Braun*, 627 F.2d 635 (2d Cir. 1980) .......................................................................................6

21  *Theron v. U.S. Marshal*, 832 F.2d 492 (9th Cir. 1987)...........................................................................10, 11

22  *United States ex rel. Oppenheim v. Hecht*, 16 F.2d 955 (2d Cir. 1927), cert. denied, 273 U.S. 769 (1927) ...........11

23  United States v. Duarte-Acero, 296 F.3d 1277 (11th Cir.), cert. denied 541 U.S. 1090 (2004) ..............................9

24  *United States v. Fernandez-Morris*, 99 F. Supp.2d 1358 (S.D. Fla. 1999).............................................8

25  *United States v. Johnson*, 2014 WL 5685522 (D. Minn. Nov. 4, 2014) ..................................................16

26  *United States v. Wallace*, 550 F.3d 729 (8th Cir. 2008), aff'd 848 F.3d 872 (8th Cir. 2017) ................................16

27  *United States v. Wathne*, 2008 WL 4344112 (N.D. Cal. Sept. 22, 2008) ...............................................12

28  *United States v. Zanazanian*, 729 F.2d 624 (9th Cir. 1984)................................................................6, 8

U.S' MEMORANDUM IN SUPPORT OF EXTRADITION

iii

*Wright v. Henkel*, 190 U.S. 40 (1903) .................................................................................. 10

Statutes

18 U.S.C. § 1170 .................................................................................................................. 13

18 U.S.C. § 2243 .............................................................................................................. 2, 13

18 U.S.C. § 2244 .............................................................................................................. 2, 13

18 U.S.C. § 3184 ........................................................................................................... passim

18 U.S.C. § 3186 .................................................................................................................... 5

18 U.S.C. § 3190 .................................................................................................................... 7

Cal. Penal Code § 261 ..................................................................................................... 2, 13

Cal. Penal Code § 261.5 .................................................................................................. 2, 13

Cal. Penal Code § 264 .......................................................................................................... 13

Cal. Penal Code § 288 ..................................................................................................... 2, 13

Criminal Code of Canada § 143 ...................................................................................... 2, 12

Criminal Code of Canada § 144 ...................................................................................... 2, 12

Criminal Code of Canada § 149 ...................................................................................... 2, 12

Other Authorities

*Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988,* S. Treaty Doc. No. 101-17 (1990) and *Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001,* S. Treaty Doc. No. 107-11 (2002) ("Treaty") .................. passim

NDCA Local Rule 7-1(b)(13) ................................................................................................ 9

U.S' MEMORANDUM IN SUPPORT OF EXTRADITION

## MEMORANDUM OF POINTS AND AUTHORITIES

On May 1, 2019, the United States filed a complaint for the provisional arrest of Don Kollmar ("Kollmar") to extradite him to Canada, at the request of the Government of Canada, pursuant to the Treaty on Extradition Between the United States of America and Canada.[1]

On June 27, 2019, Canada submitted its formal request for extradition through diplomatic channels.[2] Canada submitted the appropriate documents to the U.S. Department of State. *See* Attachment A, Extradition documents submitted by Canada, at bates 65-69 (Declaration of Katherine Fennell, U.S. Department of State, Attorney Adviser). Pursuant to 18 U.S.C. § 3184, this Court must now hold a hearing to consider the evidence of criminality presented by Canada and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."

The United States respectfully submits this memorandum to set forth the procedural and factual background of the case and to explain the legal standards and protocols that govern extradition proceedings under Section 3184. As detailed below, the evidence submitted by Canada fulfills the Treaty requirements. The Court should therefore "certify the same" to the Secretary of State, who will decide whether to surrender the fugitive "according to the treaty." *Id.*[3]

///

///

///

---

[1] *See* U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, as amended by the Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), and the Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002) (collectively the "Treaty").

[2] *See* Memorandum of Law in Opposition to Bail at 1 in which the U.S. government explained that Canada's timely submission of its formal request to the U.S. State Department satisfies Article 11 of the Treaty. *See Bozilov v. Seifert*, 983 F.2d 140, 144 (9th Cir. 1992) ("Extradition is facilitated by validating extradition requests received by the American Embassy. Extradition requests received by an authorized diplomatic authority within the Treaty's time limit are sufficient.").

[3] After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not." *Id.*; *see also Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) ("[T]he Secretary of State's exercise of discretion regarding whether to extradite an individual may be based not only on considerations individual to the person facing extradition but may be based on foreign policy considerations instead.") (internal quotation marks omitted), *cert. denied*, 546 U.S. 1171 (2006).

U.S.' MEMO IN SUPPORT OF EXTRADITION

1

## I.   BACKGROUND

### A.   Procedural Background

Kollmar is wanted by Canada for trial on charges of Rape and Indecent Assault, in violation of sections 143, 144, and 149 of the Criminal Code of Canada.[4]  These offenses correspond to violations of various U.S. criminal statutes, including 18 U.S.C. §§ 2243, 2244, and Cal. Penal Code §§ 261, 261.5, 288.

Canadian authorities first issued a warrant for Kollmar's arrest on November 17, 1997. Attachment A at bates 30.  Subsequent warrants were issued on November 28, 2018, December 24, 2018, and June 7, 2019.  *Id.* at bates 31.  The most recent warrant "is in full force and effect in Ontario[, Canada]."  *Id.* at bates 6.

On May 1, 2009, the United States filed a complaint pursuant to 18 U.S.C. § 3184 seeking Kollmar's provisional arrest with a view toward his extradition based on the Canadian authorities' request.  On May 3, 2019, Kollmar was arrested in the Northern District of California.  A hearing in this extradition matter is scheduled for July 11, 2019.

### B.   Factual Background

In 1974, the then 12-year old complainant (born October 13, 1962)[5] and her family became involved with a group called "Students of Light."  Attachment A at bates 23.  Through her involvement with this group, the complainant met Kollmar.  *Id*.  Kollmar (born July 29, 1951) was then 23-years old and a spiritual advisor and minister to the Students of Light, as well as chief assistant to the group's leader, John Hanas ("Hanas").  *Id*. at 23, 31.  Kollmar expressed an interest in the complainant, informing her and her parents that she was an extremely special and sensitive child.  *Id*. at 23.

The complainant lived in Sudbury, Ontario; Kollmar was originally from the Buffalo, New York area, and spent time in Toronto, making monthly trips to Sudbury.  *Id*.  During these trips to Sudbury, Kollmar visited the complainant and initiated time alone with her.  *Id*.  While he and the complainant

---

[4]  The Canadians are no longer pursuing charges of sexual assault of a female aged 14-16.  *See* Attachment A at bates 6 and 31.

[5]  The criminal complaint in this matter refers to the alleged female victim as "B.B."  This memorandum refers to her as the "complainant," consistent with the language used in the formal materials submitted by Canada in support of extradition.

were alone, Kollmar would tell her how he was unique, significant, and chosen to do special work. *Id.* at 24. He also told her about his spiritual and psychic powers, and his direct relationship with God. *Id.* Kollmar emphasized the complainant's specialness and stated that she could only realize her spiritual potential through his teachings. *Id.*

Kollmar further told the complainant about what he described as his pure and unique love for her. *Id.* Kollmar stated that he had intended to wait to approach her physically until she turned 16 years old, but that he could not wait any longer. *Id.* Instead, he began touching her in a sexual manner when she was 13 years old and continued to do so until she was 16 years old. *Id.* at 26. These incidents included four or five occasions, starting after she had turned 14 years old, in which Kollmar penetrated the complainant's vagina with his penis. *Id.* at 28.

Kollmar told the complainant that she should not tell anyone else about their physical relationship because others would be jealous and unable to understand the spiritual and special nature of their connection. *Id.* at 24. Instead, she should tell other people that she and Kollmar were just close friends. *Id.* Kollmar said that she had been chosen for him by God and that it was her responsibility to live with him as his wife. *Id.* In turn, the complainant understood that she needed to "turn my will totally and completely over to him so he could mold and shape me into a spiritual being that could best serve God and humanity." *Id.* Similarly, he told her that her own will and desires were not valid and instructed her that if she didn't love or want to marry Kollmar, then those feelings would be contrary to God's plan. *Id.* at 25. Moreover, when they were alone, Kollmar criticized the complainant's family members and told her that she should separate and isolate herself from them, most importantly her mother. *Id.* at 24.

As time progressed, Kollmar became increasingly controlling and abusive. *Id.* Often, Kollmar only allowed the complainant three hours or less sleep per night. *Id.* On several occasions when she started to fall asleep, Kollmar slapped her face and told her not to be lazy. *Id.* at 25. He controlled when she used the bathroom, showered or bathed, brushed her teeth and hair, and how she wore her hair. *Id.* He also repeatedly verbally assailed her and then held up his hand in a motion threatening to strike her, telling her that she angered him so much that he could barely restrain from hitting her. *Id.* Several times Kollmar grabbed and twisted the complainant's wrist causing her pain. *Id.*

U.S.' MEMO IN SUPPORT OF EXTRADITION

3

In response to this verbal and physical abuse, the complainant lived in "severe anxiety and terror, never knowing what would trigger his rage . . . abid[ing] by everything he did and said, always feeling like [she] was walking . . . a tight rope, ensuring that [she] never gave him 'just cause' to be upset with [her]." *Id.* From the complainant's perspective, Kollmar engaged in "constant punishment and humiliation" of her, and never allowed her to "experience[] a moment free from fear, intimidation, and oppression." *Id.*

During her relationship with Kollmar, she stated that he sexual abused her in the following ways:

- When she was 13-years-old, she attended a weekend retreat with Kollmar in Buffalo, New York.  On the trip, Kollmar told the complainant to remove her clothes and then gave her a "therapeutic massage," during which he massaged her breasts.  In response, the complainant felt "sickened inside" and "unbearably uncomfortable, embarrassed, and confused." *Id.* at 26.

- While in Sudbury, Kollmar arranged to spend time alone with the complainant, including in his van that he had converted into a "mini home."  Kollmar told her to lie down in the van.  He then placed his arm around her and fondled her breasts over her clothes. *Id.* at 27.

- When meeting Kollmar in Toronto, on numerous occasions, the complainant would stay in a room maintained by the Students of Light.  Kollmar would come to her room and bring her to his van, where he would have the complainant lie beside him.  He would then put his hand under her clothes and fondle her breasts.  Eventually, he took off her clothes and lay on top of her while kissing her, fondling her breasts and genitals, and rubbing his groin against her.  He also forced the complainant to massage him while they were both naked, including the area around his genitals.  When she tried to avoid touching his penis, he demanded that she do so using oil to massage his genitalia.  He then got on top of her while fully nude, fondled her breasts, and put his fingers inside her vagina. *Id.* at 27-28.

- On Mother's Day weekend in 1977, when the complainant was 14 years old, Kollmar penetrated her vagina with his penis.  He only "partially" penetrated her and did not do so more deeply because he wanted her to remain a virgin until he married her.  He did this on four or five occasions.  After the 1977 Mother's Day incident, Kollmar began masturbating the complainant and became very angry when she was unable to reach orgasm, which he saw as willfully punishing and denying him pleasure.  Kollmar also had her masturbate him and ejaculated on several occasions when she did so. *Id.* at 28.

According to the complainant, "99% of the time" these incidents were preluded by Kollmar "verbally humiliating and demoralizing" her. *Id.* at 29.  The verbal assaults took a ritualistic bend, with Kollmar spending up to two hours yelling and criticizing her before the sexual abuse. *Id.*  This included

U.S.' MEMO IN SUPPORT OF EXTRADITION

4

Kollmar telling her that she was "stupid, "a piece of shit," "worthless," "fat and ugly," and other words and phrases of similar effect. *Id*. He also told her that she "must submit [her] will to him." *Id*.

As of June 1979, Kollmar and the complainant were still scheduled to marry. *Id*. The complainant's parents were unaware of the abuse and the complainant believed she was still following God's plan. *Id*. However, after the complainant was hospitalized with stomach pains, her mother realized the "oppression" from which the complainant was suffering. *Id*. Although up to that point, the complainant had not told her parents about Kollmar's behavior – because he had insisted that no one would believe her if she did – she told her parents that she didn't want to be with Kollmar anymore. *Id*. Thereafter, she ended their relationship and ceased contact with Kollmar. *Id*. at 29-30

Over time, the complainant disclosed more specifics of Kollmar's sexual and other forms of abuse to her parents, and to group leaders and members, including Hanas. *Id*. at 30. While her parents were very upset, the group members told her that she had a "weak case" and that the abuse was her fault. *Id*. Eventually, on February 25, 1997, the complainant provided a statement to Canadian police making the above-referenced allegations. *Id*. at 23. She provided audio-video and written statements, which were used to support the 1997 warrant for Kollmar's arrest. *Id*. at 23, 30.

## II.    DISCUSSION

Through the hearing prescribed by 18 U.S.C. § 3184, the Court must determine whether to certify to the Secretary of State that the evidence submitted by Canada is "sufficient to sustain" the charges against Kollmar. If any evidence is offered by Kollmar, the Court should rule on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought. *See Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit Kollmar to the custody of the United States Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. §§ 3184, 3186. The Secretary will then decide whether to surrender Kollmar to Canada.

U.S.' MEMO IN SUPPORT OF EXTRADITION

5

As discussed below, Canada's evidence satisfies the requirements of the Treaty and supports a finding that Kollmar's case is extraditable on the offenses of Rape and Indecent Assault. Accordingly, this Court should certify as such to the Secretary of State.

**A.  The Documentary Evidence Submitted by Canada Supports Certification; the Fugitive May Only Submit Explanatory Evidence**

"The procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation," including "[u]nique rules of wide latitude [that] govern reception of evidence" when offered by the requesting state. *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted), *cert. denied*, 398 U.S. 903 (1970).

**1.  Canada's Written Submissions Are Sufficient and Admissible**

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916). Thus, hearsay evidence is admissible at extradition hearings and may properly support a finding of extraditability. *See id.* (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *see also, e.g.*, *United States v. Zanazanian*, 729 F.2d 624, 626-27 (9th Cir. 1984) (unsworn written statements may properly form the basis for extradition); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same). Accordingly, a finding of extraditability may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Manta v. Chertoff*, 518 F.3d 1134, 1139-40, 1145-47 (9th Cir. 2008) (upholding probable cause determination based on investigation report written by prosecutor); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1162-63 & 1166 (11th Cir.) (upholding probable cause determination based on unsworn 106-page bill of indictment prepared by a foreign investigator summarizing witness statements and other hearsay evidence), *cert. denied*, 546 U.S. 993 (2005*); Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993) (Swedish investigator's statement sufficient to establish probable cause).

The certification of documents introduced during an extradition hearing is governed by the Treaty and by 18 U.S.C. § 3190.  Article 9 of the Treaty lists the documents the Government of Canada is required to submit when it makes a request for the extradition of a fugitive charged with a crime. Section 3190 provides that "properly and legally authenticated" documentary evidence including "depositions, warrants, or other papers or copies thereof . . . *shall be received and admitted.*"  18 U.S.C. § 3190 (emphasis added); *see also Manta*, 518 F.3d at 1146; *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406 (9th Cir. 1988), *cert. denied,* 490 U.S. 1106 (1989).

Proof that the authentication is proper exists if the documents are accompanied by the certificate of an appropriate U.S. diplomatic or consular officer in the requesting country attesting that the documents would be admissible for similar purposes in that country.  18 U.S.C. § 3190.  The documents filed in this case are accompanied by such a certification by Kelly Craft, Ambassador of the United States of America to Canada, attesting to the authenticity of the foreign official's signature.  Attachment A at bates 1.  Accordingly, the documents are properly authenticated and thereby admissible in this proceeding.  *See* 18 U.S.C. § 3190; *see also* Declaration of Katherine C. Fennell at bates 65-69 ("Documents submitted by the Government of Canada in support of its extradition request were certified . . . in accordance with Title 18, United States Code, Section 3190.").

### 2.    Kollmar's Right to Introduce Evidence Is Limited

Kollmar's opportunity to challenge the evidence introduced against him is heavily circumscribed.  "The accused is not entitled to introduce evidence which merely goes to his defense but he may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal."  *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962), *cert. denied,* 373 U.S. 914 (1963); *see also Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir.) ("[T]he extraditing court properly may exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity. . . . Because of the limited function of an extradition proceeding and the limited participation permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case."), *cert. denied,* 439 U.S. 932 (1978).  "[A]s has been said time and again, an extradition hearing must not allow

U.S.' MEMO IN SUPPORT OF EXTRADITION

1   to become a trial on the merits." *Matter of Extradition of Noeller*, 2018 WL 1027513, at *8 (N.D. Ill.

2   Feb. 23, 2018), *aff'd*, *Noeller v. Wojdylo*, 922 F.3d 797 (7th Cir. 2019). It is axiomatic that "[f]oreign

3   states requesting extradition are not required to litigate their criminal cases in American courts," *Santos*

4   *v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc), and that "the person whose extradition is sought

5   is not entitled to a full trial at the magistrate's probable cause hearing," *Eain v. Wilkes*, 641 F.2d 504,

6   508 (7th Cir.), *cert. denied,* 454 U.S. 894 (1981).

7           This allowance of "explanatory evidence" and prohibition on "contradictory evidence" is rooted

8   in the fact that an extradition judge may not weigh conflicting evidence and determine what to credit,

9   "but, rather, determines only whether there is competent evidence to support the belief that the accused

10  has committed the charged offense." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir.), *cert. denied*, 479

11  U.S. 882 (1986). "Testimony that merely gives the opposite version of the facts does not destroy the

12  probability of guilt" and thus is inadmissible. *United States v. Fernandez-Morris*, 99 F. Supp.2d 1358,

13  1361 (S.D. Fla. 1999). Similarly, evidence (or argument) regarding the credibility of the requesting

14  country's witnesses must be disregarded. *See, e.g.*, *Bovio*, 989 F.2d at 259 (rejecting evidence that

15  major witness lied during the investigation because "issues of credibility are to be determined at trial");

16  *In re Extradition of Shaw*, 2015 WL 3442022, at *8 (S.D. Fla. May 28, 2015) ("Defendant has

17  consistently attempted to contradict the case brought against him in [the requesting country]. . . . This

18  the Defendant cannot do.").

19          **B.      The Requirements for Certification Are Satisfied**

20          The Court must certify a fugitive as extraditable where: (1) the judicial officer is authorized to

21  conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable

22  treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the

23  applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each

24  charge for which extradition is sought. *See*, *e.g.*, *Zanazanian*, 729 F.2d at 625-26. Each of these

25  elements are met in this case.

26          **1.      This Court Has Authority Over the Proceeding**

27          The extradition statute authorizes proceedings to be conducted by "any justice or judge of the

28  United States, or any magistrate judge authorized so to do by a court of the United States, or any judge

U.S.' MEMO IN SUPPORT OF EXTRADITION

8

of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," *In re Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1997), but is rather acting in a "non-institutional capacity by virtue of a 'special authority,'" *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993). It is well settled that both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993), *cert. denied*, 510 U.S. 1165 (1994). This Court is therefore authorized to conduct the hearing in this case. *See id.*; *see also* Local Rule 7-1(b)(13) (authorizing magistrate judges to "[c]onduct proceedings for extradition").

### 2. This Court Has Jurisdiction Over Kollmar

It is also well settled that the Court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged."); *Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *Grin v. Shine*, 187 U.S. 181, 185-86 (1902). Kollmar was arrested in this jurisdiction on May 3, 2019. Accordingly, this Court has jurisdiction over him.

### 3. The Relevant Treaty Is in Full Force and Effect

Section 3184 provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States. *See id.* In this case, Katherine C. Fennell, Attorney-Advisor in the Office of the Legal Adviser for the Department of State, has provided a declaration attesting that the Treaty in full force and effect between Canada and the United States. Attachment A at bates 65, ¶ 2. The Court must defer to the Department of State's determination in this regard. *See, e.g.*, *Kastnerova v. United States*, 365 F.3d 980, 986 (11th Cir.) ("[E]very other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination."), *cert. denied,* 541 U.S. 1090 (2004); *cf. United States v. Duarte-Acero,* 296 F.3d 1277, 1282 (11th Cir.) ("[T]he State Department's interpretation of a treaty is entitled to great deference."), *cert. denied,* 541 U.S. 1090 (2004).

### 4. The Charged Crimes Are Covered by the Treaty

Article 1 of the Treaty provides for the return of fugitives charged with, or convicted of, an extraditable offense. Offenses are extraditable if they are "punishable by the laws of both Contracting

U.S.' MEMO IN SUPPORT OF EXTRADITION

9

1  Parties by imprisonment or other form of detention for a term exceeding one year or any greater

2  punishment."  Treaty, art. 2.

3       The dual criminality requirement is met where the description of criminal conduct provided by

4  Canada in support of its charges would be criminal under U.S. federal law, the law of the state in which

5  the hearing is held, or the law of a preponderance of the states, if it had been committed here –

6  regardless of whether the Canadian and U.S. crimes are identical.  *See, e.g.*, *Cucuzzella v. Keliikoa*, 638

7  F.2d 105, 107 (9th Cir. 1981); *Caplan v. Vokes*, 649 F.2d 1336, 1334 n.16 (9th Cir. 1981); *Theron v.*

8  *U.S. Marshal*, 832 F.2d 492, 496 (9th Cir. 1987) (abrogated on other grounds).

9       In *Wright v. Henkel*, 190 U.S. 40, 58-59, 61 (1903), the Supreme Court unequivocally held that

10  U.S. state law could be used as a basis for dual criminality:

11              As the state of New York was the place where the accused was found and,
                in legal effect, the asylum to which he had fled, is the language of the
12              treaty, "made criminal by the laws of both countries," to be interpreted as
                limiting its scope to acts of Congress, and eliminating the operation of the
13              laws of the state?  That view would largely defeat the object of our
                extradition treaties by ignoring the fact that, for nearly all crimes and
14              misdemeanors, the laws of the states, and not the enactments of Congress,
                must be looked to for the definition of the offense . . . [W]e rule it now . . .
15              that when, by the law of Great Britian, and by the law of the state in which
                the fugitive is found, the fraudulent acts charged to have been committed
16              are made criminal, the case comes fairly within the treaty[.]

17  Similarly, in *Cucuzzella*, the Ninth Circuit examined the language of the same extradition treaty at issue

18  in this case, the U.S.-Canadian extradition treaty, and held:

19              To be extraditable Article 2 requires that each offense be "punishable by
                the laws of both Contracting Parties by a term of imprisonment exceeding
20              one year." . . . Article 2 refers to "the laws of both Contracting Parties."
                The "Contracting Parties" are the United States and Canada.  *We therefore*
21              *look to proscription by similar criminal provisions of federal law or, if*
                *none, the law of the place where the fugitive is found or, if none, the law of*
22              *the preponderance of the states.*[6]

23  638 F.2d at 107 & n. 3 (emphasis added) (analyzing federal and Hawaii's criminal laws when reviewing

24  for dual criminality and holding that consideration of both federal and state law in the dual-criminality

25

26  _____
[6]  As a 1981 decision, *Cucuzzella* analyzed the 1971 version of the Treaty.  Subsequently, the first Protocol (1988)
27  amended Article 2 of the Treaty to eliminate the Treaty's list of extraditable offenses, and made the definition of
    an extraditable offense based strictly on its dual criminality and maximum punishments in the respective
28  countries.  However, the Treaty's reference to the "laws of both Contracting Parties" remained unchanged by the
    amendment.  Therefore, *Cucuzzella*'s holding remains applicable and controlling in this case.

U.S.' MEMO IN SUPPORT OF EXTRADITION

context was appropriate: "[t]his broad interpretation also comports with the principle that treaties should be construed to enlarge the rights of the parties [to the treaty]") (citing *Factor v. Laubenheimer*, 290 U.S. 276, 293-294 (1933) (extradition treaties are to be liberally construed in favor of extradition); *see also Theron*, 832 F.2d at 496 ("Because Theron was arrested in California, we will first evaluate the laws of the United States and then, if necessary, the laws of California.").[7] Therefore, the Court may look to both U.S. federal and state law when evaluating whether Kollmar's conduct is dually criminal.

Furthermore, when analyzing a fugitive's extraditability, courts "look to the law in place at the time the extradition request was made, not the law in effect when [the fugitive] allegedly committed the offense." *Nezirovic v. Holt*, 779 F.3d 233, 238 (4th Cir. 2015), *citing United States ex rel. Oppenheim v. Hecht*, 16 F.2d 955, 956–57 (2d Cir. 1927), *cert. denied*, 273 U.S. 769 (1927) and *Hilario v. United States*, 854 F. Supp. 165, 176 (E.D.N.Y. 1994). It is well-established that the Ex Post Facto Clause of the U.S. Constitution is not applicable to extradition proceedings, which are not criminal cases. *Id*.; *Neely v. Henkel*, 180 U.S. 109, 122 (1901) (ex post facto principles have "no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country").

These firmly-rooted principles apply in the dual-criminality context, and dictate that extradition courts analogize to those U.S. federal and state laws in effect at the time of the foreign country's extradition request. "Although the relator argues that the court must apply the law in force at the time of the incident in determining whether there is analogous law in the United States, it is clear that in determining dual criminality, the court may apply the current American law . . . . The law pertinent to the question of extradition is the law in force *at the time of the demand*." *In Matter of Extradition of Murphy*, 1998 WL 1179109 at *5 n.3 (N.D.N.Y. Jun. 30, 1998) (emphasis in original), *aff'd* 199 F.3d 599 (2d Cir. 1999); *Hecht*, 16 F.2d at 956 (fugitive's conduct was not criminal in the United States at the time of the incident but was criminal "at the time of demand"; Second Circuit found dual criminality

---

[7] The *Theron* court drew a clear distinction between an extradition court's statute of limitations analysis (pursuant to "lapse-of-time" provisions contained in some extradition treaties) where U.S. statute of limitations may be applicable, and an extradition court's dual criminality analysis. Unlike in the dual-criminality context, when extradition courts examine an applicable U.S. statute of limitations, they look to the relevant federal statute of limitations only. *Id.* at 498-99. In this case, there is no U.S. statute of limitations to apply, since the Treaty provides that only the statute of limitations of the "Requesting State" (*i.e.*, Canada's statute of limitations) may provide a fugitive with a potential defense to extradition. *See* Treaty, art. 4(1)(II).

U.S.' MEMO IN SUPPORT OF EXTRADITION

where the extradition treaty required that the conduct was "made criminal by the laws of both countries," holding that because "[e]xtradition proceedings are not in their nature criminal . . . all talk of ex post facto legislation, or of the niceties of common law on the criminal side . . . is quite beside the mark"), *citing Glucksman v. Henkel*, 221 U.S. 508 (1911) and *Grin*, 187 U.S. 181 (1902).

*United States v. Wathne*, 2008 WL 4344112 (N.D. Cal. Sept. 22, 2008) is inapposite. *Wathne* is not a case involving the extradition of a fugitive from the United States to a foreign country. *Wathne* instead involved an U.S. criminal defendant and his argument that his voluntary-return agreement with U.S. prosecutors, which stated that he retained any rights pursuant to the U.S.-India extradition treaty, provided him protection under the treaty's dual-criminality provision. *Id*. at *3. The defendant averred that India's interpretation of that provision provided him this protection because India (not the United States) would have declined to apply it retroactively when considering whether to extradite him pursuant to its law, where Indian law did not prohibit the defendant's misconduct at the time he committed it. *Id*. at *8-13. *Wathne* has no bearing on cases such as Kollmar's, in which the United States is the Requested State, and does not purport to contradict the universally held proposition in U.S. extradition law that ex post facto principles have no place in U.S. extradition proceedings involving fugitives sought by foreign countries.

Therefore, dual criminality is satisfied if Kollmar's conduct would have violated either U.S. federal or state laws in effect at the time of Canada's request for his extradition. Based on his alleged conduct, Kollmar is charged in Canada with violating sections 143-144 (Rape)[8] and section 149 (Indecent Assault)[9] of the Canadian Criminal Code.[10] Accordingly, Kollmar could be charged in the

---

[8] Section 143 provides that "A male person commits rape when he has sexual intercourse with a female person who is not his wife, (a) without her consent, or (b) with her consent if the consent (i) is extorted by threats or fear of bodily harm, (ii) is obtained by personating her husband, or (iii) is obtained by false and fraudulent representations as to the nature and quality of the act." Attachment A at bates 8. Section 144 carried a maximum punishment of life imprisonment for rape under the statute in effect at the time of the alleged offense in this case, which was later amended to provide a 14-year maximum punishment if the victim is under the age of 16 years old. *Id.* at 8, 11.

[9] Section 149 provides that "Every one who indecently assaults a female person is guilty of an indictable offence and is liable to imprisonment for five years. . . ." *Id.* at 12. The Canadian prosecutor's affidavit explains that Indecent Assault may be committed through a perpetrator's non-consensual touching of a victim in a sexual way (*id.* at 9-10), and that the definition of consent is the same for both Rape and Indecent Assault (*id.* at 10).

[10] It is appropriate for a Requesting Country to modify or add charges and provide additional evidence in a formal request that follows a fugitive's provisional arrest. *See*, *e.g.*, *Koskotas v. Roche*, 931 F.2d 169, 174-75 (1st Cir. 1991) (rejecting fugitive's procedural due process challenge to Greece's supplementation of its request for provisional arrest to "encompass new charges and additional evidence"); *Matter of Extradition of Mainero*, 990 F.

U.S.' MEMO IN SUPPORT OF EXTRADITION

12

United States with a variety of federal and state sexual offenses, including 18 U.S.C. §§ 2243 (Sexual Abuse),[11] 2244 (Abusive Sexual Contact),[12] and Cal. Penal Code §§ 261 (Rape),[13] 261.5 (Unlawful Sexual Intercourse),[14] 288(a), (c) (Bigamy, Incest, and the Crime Against Nature).[15]

Furthermore, in *Kamrin v. United States*, Ninth Circuit rejected any notion that an extradition treaty's reference, such as that in Article 8 of the Treaty, to the "remedies and recourses" of the Requested State provided a fugitive found in the United States to protection under the Due Process clause of the U.S. Constitution or to any speedy trial rights. 725 F.2d 1225, 1228 (9th Cir.) ("[I]t has long been settled that United States due process rights cannot be extended extraterritorially," *citing Neely*, 180 U.S. 109), *cert. denied,* 469 U.S. 817 (1984); *Matter of Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986) (same), *cert. denied,* 479 U.S. 990 (1986); *see also Martin*, 993 F.2d at 829 ("Even if a treaty states that 'the person whose extradition is sought shall have the right to use all remedies and recourses provided by [the law of the Requested State],' as does the treaty between the

---

Supp. 1208, 1215 (S.D. Cal. 1997) (following provisional arrest "the later supplementation of the record and supplementation of Mexico's request for extradition, with additional charges, [were] not inconsistent with the Treaty or its provisions"). Likewise, in this case, modification and inclusion of additional charges is not inconsistent with the Treaty or the extradition statutes.

[11] Making punishable by 15 years' imprisonment conduct committed by persons within federal jurisdiction who "knowingly engage[] in a sexual act who another person who [] has attained the age of 12 but has not attained the age of 16 years," as long as the offender is at least four years older than the victim.

[12] Making punishable by two years' imprisonment conduct committed by persons within federal jurisdiction who "knowingly engage in or cause[] sexual contact with or by another person, if to do so would violate . . section 2243 of this title had the sexual contact been a sexual act."

[13] "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances . . . Where it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." Cal. Penal Code § 264 makes this offense punishable by up to 11 years imprisonment where the victim is a 14-year-old child.

[14] "Unlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor. For the purposes of this section, a 'minor' is a person under the age of 18 years and an 'adult' is a person who is at least 18 years of age . . . Any person 21 years of age or older who engages in an act of unlawful sexual intercourse with a minor who is under 16 years of age is guilty of either a misdemeanor or a felony, and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years."

[15] "[A] person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years . . . A person who commits an act described in subdivision (a) with the intent described in that subdivision, and the victim is a child of 14 or 15 years, and that person is at least 10 years older than the child, is guilty of a public offense and shall be punished by imprisonment in the state prison for one, two, or three years, or by imprisonment in a county jail for not more than one year."

U.S.' MEMO IN SUPPORT OF EXTRADITION

13

1    United States and Canada, the defendant does not have a right to a speedy extradition." *quoting*

2    *Kraiselburd,* 786 F.2d at 1398; *Gonzalez v. O'Keefe*, 2014 WL 6065880, *3 (N.D. Cal. Nov. 20, 2014)

3    (relying on *Kamrin* and *Kraiselburd* to reject fugitive's argument that the relevant extradition treaty's

4    "lapse of time" provision incorporated the right to a speedy trial).

5        **5.    Canada's Evidence Establishes Probable Cause that the Fugitive Committed
           the Charged Offenses**

6

7        The standard of proof to find the evidence "sufficient to sustain the charge . . ." pursuant to

8    Section 3184 is the familiar domestic requirement of probable cause.  The Court must conclude there is

9    probable cause to believe that the crimes charged by Canada were committed and that the person before

10   the Court committed them.  *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993), *aff'd*

11   28 F.3d 116 (11th Cir. 1994).  The evidence is sufficient, and probable cause is established, if it would

12   cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense."

13   *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted); *see also*

14   *Collins v. Loisel*, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine

15   whether there is competent evidence to justify holding the accused to await trial, and not to determine

16   whether the evidence is sufficient to justify a conviction."); *Fernandez v. Phillips*, 268 U.S. 311, 312

17   (1925) ("Competent evidence to establish reasonable grounds is not necessarily competent evidence to

18   convict.").

19       The extradition judge's probable cause determination is "not a finding of fact 'in the sense that

20   the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the

21   narrow function of indicating those items of submitted evidence on which the decision to certify

22   extradition is based.'"  *Quinn*, 783 F.2d at 791 (citation omitted).  Accordingly, probable cause in an

23   extradition proceeding may not be defeated when a fugitive alleges that the evidence submitted by the

24   requesting country contains inconsistencies.  *See, e.g.*, *In re Extradition of Shaw*, 2015 WL 3442022, at

25   *7-11 (S.D. Fla. 2015) (finding probable cause despite fugitive's arguments that the evidence against

26   him was "unreliable, contradictory, inconsistent, unbelievable, and inadmissible"); *In re Extradition of*

27   *Figueroa*, 2013 WL 3243096, at *8 (N.D. Ill. June 26, 2013) ("In sum, although we agree with [the

28   fugitive] that the evidence that Mexico has provided is by no means perfect, the issue before us is not

whether [he] should be convicted of the crime…. Although there may be some inconsistencies in the record, we do not believe that these are so compelling as to negate a finding of probable cause."); *Castro Bobadilla*, 826 F. Supp. at 1434 (upholding probable cause finding despite "contradictions in the evidence [that] may create a reasonable doubt as to [the fugitive's] guilt"). This principle accords with the fact that an extradition hearing is only preliminary in nature and is not a determination of guilt; accordingly, the resolution of any inconsistencies in the record, as well as the weighing of inculpatory with exculpatory evidence, are tasks that are properly left to the courts in the requesting country. *See, e.g.*, *Collins*, 259 U.S. at 316; *Neely*, 180 U.S. at 123; *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1282 (S.D. Fla. 2011).

The facts summarized above and set forth in great detail in Canada's extradition request easily establish probable cause. Canada's evidence is straightforward: the complainant provided Canadian authorities with both audio-video and written statements, summarized in the extradition request, which explained the circumstances of Kollmar's sexual abuse of her when she was a child between the ages of 13 and 16 years old. Attachment A at bates 23 and 30. She further identified a photograph of Kollmar from his website, "indicating that with 100% certainty that this photo was of the person who assaulted her."[16] *Id*. at 32.

This is classic extradition evidence "sufficient to sustain the charge." Even in cases in which the facts have not been so well sourced, or in which the requesting country has relied on multiple levels of hearsay, probable cause has been found. *Bovio* is highly instructive. 989 F.2d 255. There, the extradition magistrate found that probable cause existed based solely upon the affidavit of a Swedish investigator. 989 F.2d at 258. The fugitive contested that finding in the Seventh Circuit arguing that:

> (1) [the investigator's] statements do not indicate how he obtained the information on which the statements are based, whether witnesses were under oath, and whether there are any original notes or recordings of witness interviews; (2) all the evidence implicating Bovio is hearsay; (3) there is no physical evidence implicating Bovio; and (4) the major witness relied upon by the Swedish government, Perttunen, has admitted lying

---

[16] The person arrested in this case has not specifically contested identity; namely, that he is, in fact, the fugitive, whom the complainant identified and who is wanted for trial in Canada. Moreover, the person who has appeared before this court strongly resembles the person in the photographs of the fugitive provided by Canada. Accordingly, there is probable cause to believe that the person before the Court is the same person alleged to have committed the offenses charged in Canada.

U.S.' MEMO IN SUPPORT OF EXTRADITION

15

1      during the investigation, and there is otherwise no corroboration of her
       account.
2

3    *Id.* at 259.  The Seventh Circuit rejected all of these arguments, noting that a fugitive has "no right to

4    attack the credibility" of witnesses in an extradition hearing, as "issues of credibility are to be

5    determined at trial," and that "hearsay testimony is often used in extradition hearings."  *Id.* at 259-60.[17]

6         Furthermore, here, Canadian authorities have explained in depth not only the factual nature of

7    the allegations against Kollmar, but how those allegations establish probable cause to believe "that the

8    complainant did not provide genuine consent to sexual activity" for purposes of both the Rape and

9    Indecent Assault charges.  Attachment A at bates 16.  As the Canadian prosecutor cogently explained:

10            [T]he relationship of domination, the constant threat of assault for
              disobeying Kollmar's will, her fear of incurring Kollmar's rage, and the
11            position of authority that existed between Kollmar and the complainant are
              all relevant in determining whether the complainant genuinely consented
12            to any sexual activity.  In the context of this abusive, dominating
              relationship, any possible indication of consent was not freely given as
13            required to constitute genuine consent . . . .  The complainant lived in fear
              of Kollmar, who controlled every aspect of her life, physically assaulted
14            her on several occasions, and threatened to assault her on other occasions.
              Kollmar was in a position of authority to the complainant, a vulnerable
15            child.  The complainant subjectively did not want the sexual touching to
              occur, and described feeling "tormented when Kollmar touched her, and
16            holding herself "unbearably stiff."  In these circumstances the complainant
              did not provide genuine and free consent to sexual touching.
17

18   *Id.* at bates 16-17.

19        Accordingly, there is probable cause to believe that Kollmar committed the Canadian offense of

20   Rape for those incidents in which he had sexual intercourse with the complainant, and the Canadian

21   offense of Indecent Assault, for his other acts of alleged sexual activity with her.

22

23   _____

24   [17]  It is well-established that the statement of a sexual assault victim, even if uncorroborated, can support probable
     cause – just as it can support the far greater standard to convict of beyond a reasonable doubt.  *See, e.g.*, *United
     States v. Johnson*, 2014 WL 5685522, *1 (D. Minn. Nov. 4, 2014) ("First, as the Magistrate Judge and the
25   Government note, the uncorroborated testimony of a sexual assault victim, alone, can support probable cause."),
     *citing United States v. Wallace*, 550 F.3d 729, 734 (8th Cir. 2008), *aff'd* 848 F.3d 872 (8th Cir. 2017).  This
26   principle has even more force in the extradition context, where the contents of the Requesting State's materials
     submitted in support of extradition cannot be contradicted and must be assumed as true.  *See, e.g.*, *Matter of
27   Extradition of Ricardo Alberto Martinelli Berrocal*, 2017 WL 3776953, at *35 (S.D. Fla. Aug. 31, 2017) ("courts
     'must accept as true all of the statements and offers of proof by the demanding state'"); *In re the Extradition of
28   Kyung Joon Kim*, 2005 WL 6399831, at *11 (C.D. Cal. Oct. 21, 2005) ("For purposes of extradition proceedings,
     the extradition magistrate properly accepts as true the offers of proof from the demanding state.").

U.S.' MEMO IN SUPPORT OF EXTRADITION

## III.     CONCLUSION

For the foregoing reasons, the elements for certification of extradition are met in Kollmar's case. Therefore, the United States requests that the Court hold a hearing pursuant to 18 U.S.C. § 3184 and certify to the Secretary of State that his case is extraditable to Canada on the charges for which his extradition is requested.

Dated:  July 9, 2019                                                Respectfully submitted,

                                                                    DAVID L. ANDERSON
                                                                    United States Attorney


                                                                    _____/s/_____
                                                                    JOHN D. RIESENBERG
                                                                    Trial Attorney, U.S. Department of Justice

                                                                    MAUREEN C. BESSETTE
                                                                    Assistant United States Attorney
                                                                    Northern District of California

# ATTACHMENT A

Embassy of the United States of America

## Certificate to be Attached to Documentary Evidence Accompanying
## Requisitions in the United States for Extradition

## AMERICAN FOREIGN SERVICE

Ottawa, Canada, June 24, 2019

I, Kelly Craft, Ambassador of the United States of America at Ottawa, Canada, hereby certify that attached to this Certificate is authenticated documentation presented by Canada in support of the request for the extradition of Donald KOLLMAR who stands charged in the Province of Ontario with one count of indecent assault, contrary to section 149 of the Criminal Code and one count of rape, contrary to sections 143 and 144 of the Criminal Code are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Canada, as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed this 24th day of June, 2019.

_Kelly Craft_
Kelly Craft
Ambassador of the
United States of America

Form 36- Foreign Service

EXT-KOLLMAR-00001

 

Department of            Ministère de la Justice
Justice                  Canada
Canada

Ottawa, Canada
K1A 0H8

## <u>CERTIFICATE OF AUTHENTICATION</u>

IN THE MATTER OF the request for the extradition of **Donald
KOLLMAR** from the United States of America to Canada

I, Véronique Rousseau, Counsel, International Assistance Group, Department
of Justice of Canada, do hereby certify:

THAT attached to this Certificate is authenticated documentation presented
by Canada in support of the request for the extradition of **Donald KOLLMAR**
who stands charged in the Province of Ontario with one count of indecent
assault, contrary to section 149 of the *Criminal Code* and one count of rape,
contrary to sections 143 and 144 of the *Criminal Code*.

THAT the documentation attached to this certificate is composed of:

-       the Affidavit of Law of Erin Nicole Rivers, Prosecutor, Ministry of the
        Attorney General of Ontario; and

-       the Affidavit of Fact of Detective Constable Robert Speakman, peace
        officer with the Toronto Police Service to which is appended:

        -       as appendix "D", a copy of the Information No. 19-15003954
                sworn by Justice of the Peace P. Liu on June 5, 2019; and

        -       as appendix "E", a copy of the warrant for the arrest issued by
                Justice of the Peace B. Hudson on June 7, 2019.

THAT Vallery Bayly, whose original signature appears at the end of the
Affidavit of ERIN NICOLE RIVERS, is a Barrister & Solicitor and a
Commissioner of Oaths for the Province of Ontario, having been duly
commissioned and duly authorized by the laws thereof to administer oaths
and to take affidavits within the said Province.

- 2 -

THAT Christina Mei Lien Chan, whose original signature appears at the end of the Affidavit and exhibits thereto of Detective Constable ROBERT SPEAKMAN, is a Commissioner of Oaths for the City of Toronto, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

The Seal of the Minister of Justice of Canada is hereby affixed this 21st day of June, 2019.

Véronique Rousseau
_____
Véronique Rousseau

| CANADA | ) | HER MAJESTY THE QUEEN |
| | ) | |
| PROVINCE OF ONTARIO | ) | v. |
| | ) | |
| TORONTO REGION | ) | DONALD KOLLMAR |

IN THE MATTER of a request by Canada for the extradition of DONALD KOLLMAR from the United States of America with respect to offences under the *Criminal Code* of Canada.

---

## AFFIDAVIT OF ERIN NICOLE RIVERS

---

I, **Erin Nicole Rivers,** of the City of Toronto, in the Toronto Region, in the Province of Ontario, **MAKE OATH AND SAY AS FOLLOWS:**

### A. QUALIFICATIONS

1.      I am a citizen of Canada.  I reside in the City of Toronto in the Province of Ontario, Canada. I received a Bachelor of Laws degree from the University of Toronto in June 2017 and was called to the Bar of the Province of Ontario in June 2018.  Since then, I have been a member in good standing of the Law Society of Ontario and, as such, I am entitled to practice law as a barrister and solicitor in the Province of Ontario.

2.      From June 2018 until the present time, I have practiced law in the employment of the Ministry of the Attorney General for the Province of Ontario.  During that period I have held the position of Counsel with the Crown Law Office - Criminal, of the Ministry of the Attorney General, at the Ministry's offices, located at 720 Bay Street, Toronto, Ontario, Canada.

3.      The Crown Law Office – Criminal is a branch of the Criminal Law Division of the Ministry of the Attorney General for the Province of Ontario.  At present the Crown Law Office - Criminal is comprised of approximately 90 lawyers, each of whom specialize in criminal law.

4.      The main responsibility of the Crown Law Office – Criminal involves the representation of the Crown in all criminal appeals in indictable matters arising in Ontario.  Such appeals are heard by the Court of Appeal for the Province of Ontario and, in certain cases, by the Supreme Court of Canada.  The Crown Law Office – Criminal also prosecutes serious crimes involving such matters as complex fraud, corruption, and organized crime.  This office also handles other responsibilities relating to the administration of criminal justice in Ontario, including the preparation of material in support of mutual legal assistance requests and applications for the extradition/temporary surrender from foreign jurisdictions, to Canada, of persons who have been charged with criminal offences in Ontario.

5.      From June 2018 until the present time, in my capacity as Counsel in the Crown Law Office – Criminal, I have represented the Crown in criminal matters, including motions and appeals, before the Court of Appeal for Ontario.  I have also had carriage of applications under the *Mutual Legal Assistance in Criminal Matters Act* involving Canada and various foreign jurisdictions.  As a result of my training and experience, I am knowledgeable about criminal procedure and jurisprudence arising from both the *Criminal Code* of Canada and the common law in Canada.

6.      In this case, I have been in contact with the Deputy Crown Attorney who has carriage of this matter, John Scutt, and the police officer in charge of the case, Detective Constable Robert Speakman from the Toronto Police Service. I have reviewed all the materials submitted with this request and I am familiar with the facts of this case.  I have an expertise in criminal law such that I am able to attest to the sufficiency of the case and the jurisdiction in Canada to prosecute these offences.

## B. <u>OVERVIEW OF EXTRADITION REQUEST</u>

7.      Canada is seeking the extradition of KOLLMAR so that he may be prosecuted on charges of indecent assault and rape, laid against him in Ontario, Canada under the *Criminal Code* of Canada.

8.      Under Canadian law, a person is formally charged with a crime when an Information is sworn before a justice (such as a Justice of the Ontario Court of Justice or a Justice of the Peace). The charge is formally instituted when a person, usually a peace officer, swears under oath that he

2

or she has reasonable and probable grounds to believe that an accused has committed the offence(s) detailed in the Information. Following the laying of an Information, a warrant for the arrest of the accused person may be issued where the Justice considers that a case for doing so is made out.

9.    An indictment is a formal charging document used for indictable offences in the Superior Court of Justice, setting out the offence with which an accused person is charged. This is a formal court document forming part of the court record. Endorsements of the court are recorded on the indictment, and constitute an official record of Orders made by the judge.

10.    In the present case, charges of indecent assault and rape, and sexual intercourse with a female aged 14-16, were laid against KOLLMAR by the swearing of an Information by Detective Constable Robert Speakman on November 28, 2018, before Justice of the Peace A. Costa in Toronto, Ontario. A replacement information was sworn by Detective Paul Cargill on June 5, 2019 before Justice of the Peace P. Liu, charging KOLLMAR with only indecent assault and rape. The Crown is no longer pursuing charges for sexual intercourse with a female aged 14-16. A copy of each Information is attached as an exhibit to the Affidavit of Detective Constable Robert Speakman, the officer in charge of this case, which accompanies Canada's request for the extradition of Donald KOLLMAR. In addition, a warrant for KOLLMAR's arrest on charges of indecent assault and rape was issued by the Honourable Justice of the Peace B. Hudson on June 7, 2019. Justice of the Peace Hudson is a judicial officer and competent authority with jurisdiction to issue warrants of arrest for persons accused of criminal offences under the *Criminal Code of Canada*. This warrant is attached as an exhibit to the affidavit of DC Speakman. This warrant is in full force and effect in Ontario.

11.    I have reviewed DC Speakman's Affidavit, which accompanies this request and the information contained therein identifying KOLLMAR as the offender. I have also reviewed the material DC Speakman submitted with this request. Accordingly, I am familiar with the allegations and the police investigation that has taken place in this case. As a result, I verily believe that KOLLMAR has been charged with indecent assault and rape arising from conduct between January 1, 1975 and December 31, 1979. I have been informed and I believe that KOLLMAR has not yet been arrested in Canada in relation these charges.

EXT-KOLLMAR-00006

## C. *Criminal Code* Provisions

12.     The offences with which KOLLMAR is charged are alleged to have occurred between January 1, 1975 and December 31, 1979.  The broad date range in the information reflects the fact that while the complainant recalls her ages at the time of each incident, she was not certain about the year.  In this case, KOLLMAR is alleged to have touched the complainant in a sexual manner on many occasions, and to have had sexual intercourse with the complainant.  These incidents are alleged to have occurred when the complainant was between the ages of 13 and 16 years old.

13.     Prosecution for these offences is governed by the statute in force at the time of the offences. At the time of these offences, the applicable statute was the *Criminal Code of Canada*, Revised Statutes of Canada, 1970, chapter C-34.  At the time of the alleged offences, this statute contained the law relating to criminal offences for all of Canada, and it therefore applied to Ontario.  The *Criminal Code* sets out the definitions of offences, and the permissible sentences for those offences.

14.     Under Canadian law, criminal offences are divided into three categories:
   (a) Indictable offences;
   (b) Summary conviction offences; and
   (c) Hybrid offences (offences that are, at the election of the prosecution, either indictable or summary conviction).

15.      Generally speaking, indictable offences are more serious offences carrying more severe penalties whereas summary conviction offences are generally less serious offences that carry less severe penalties.

16.     In this case, the offences of indecent assault and rape are both indictable offences.

17.     The *Criminal Code* that was in force at the time of these offences codifies the offences with which KOLLMAR is charged: indecent assault and rape.  Those provisions were duly enacted and proclaimed into force and will be applicable in the event of a trial for these offences.

18.     These provisions are set out below.

4

*i.*     ***Rape – s. 143-144***

19.     Between 1975 and 1979, rape of a female was an indictable offence prohibited by section 143 of the *Criminal Code*, in force between 1970 and 1983.[1]

20.     The offence and prescribed penalty were set out in the *Criminal Code* as follows:

> 143.  A male person commits rape when he has sexual intercourse with a female person who is not his wife,
>> (a) without her consent, or
>> (b) with her consent if the consent
>>> (i) is extorted by threats or fear of bodily harm,
>>> (ii) is obtained by personating her husband, or
>>> (iii) is obtained by false and fraudulent representations as to the nature and quality of the act. 1953-54, c. 51, s. 135.
>
> 144. Every one who commits rape is guilty of an indictable offence and is liable to imprisonment for life and to be whipped. 1953-54, c. 51, s. 136.

21.     To obtain a conviction for rape under section 143(a), the prosecution must establish that the male person (1) had sexual intercourse (2) with a female person who is not his wife; and that this occurred (3) without her consent.

22.     To obtain a conviction for rape under section 143(b), the prosecution must establish that consent was either (i) extorted by threats or fear of bodily harm; (ii) obtained by personating the complainant's husband; or (iii) obtained by false and fraudulent representations as to the nature and quality of the act.

23.     The offence of rape can be proven by any of the means identified in section 143. However, the prosecution intends to rely primarily on subsection (a). As a result of KOLLMAR's abusive and controlling behaviour and his position of authority over the complainant, any consent ostensibly given was not freely provided so as to constitute valid consent. Nevertheless, as KOLLMAR is charged under section 143 of the *Criminal Code*, the Crown can rely on any of the

---

[1] This provision was repealed by the *Act to amend the Criminal Code in relation to sexual offences and other offences against the person and to amend certain other Acts in relation thereto or in consequence thereof*, S.C. 1980-81-82-83, c. 125, which was proclaimed into force on January 4, 1983. In 1983, the rape provision was replaced by the modern "sexual assault" provision, which encompasses conduct previously covered under the "rape" provision.

5

bases in subsection (a) or (b), depending on the facts established at trial.

<u>        s. 143(a) Rape Established by Sexual Intercourse Without Consent</u>

24.      Under paragraph (a) of section 143, rape occurs where a male person has sexual intercourse with a female person who is not his wife, without her consent.

25.      Sexual intercourse is established by evidence of "penetration of the labia, either *majora* or *labia minora*, no matter how little, even though the hymen was never touched nor is there any penetration of the vagina."[2]

26.      To obtain a conviction, the prosecution must establish that the complainant was a female, and was not the wife of the accused at the time of the alleged incident.

27.      For the purpose of historical offences, the presence or absence of consent is determined subjectively with reference to the state of mind of the complainant. As Hamish Stewart, describes in *Sexual Offences in Canadian Law*, "for both historic offences and the current offence of sexual assault, the complainant's lack of consent is established if 'she, in her mind, did not want the sexual touching to take place'." In *R. v. Sazant*, 2004 SCC 77, the Supreme Court of Canada considered historical sexual offences alleged to have occurred between 1981 and 1982. Justice Major writing for the majority of the Court stated at para. 19:

> There is no dispute that Moore J. erroneously concluded that there was "absolutely no evidence of non consent". <u>The absence of consent is subjective and 'the actual state of mind of the complainant is determinative'</u>: see *R. v. Ewanchuk*, [1999] 1 S.C.R. 330, at paras. 26-27. [...] As the Court of Appeal pointed out, at para. 21, the fact that the complainant testified that he did not want to take part in the sexual activity with the respondent constitutes direct evidence of lack of consent. [emphasis added]

28.      As stated by the Supreme Court of Canada in *R. v. M.(M.L.)*, (1994) 89 C.C.C. (3d) 96, a complainant is not required to offer "a minimal word or gesture of objection"; lack of resistance must not be equated with consent.

29.      The presence of threats or fear of bodily harm is also relevant to determining whether the complainant genuinely consented.  In *R. v. Hindle*, [1978] 39 C.C.C. (2d) 529, Justice Branca of the British Columbia Court of Appeal stated:

---

[2] *R. v. Johns*, (1956) 116 C.C.C. 200 (B.C. County Court), at p. 202; See also Hamish Stewart, *Sexual Offences in Canadian Law*, Chapter Two, "Historic Offences" at 2:200.10.10, "Sexual Intercourse".

6

A consent at law must be a genuine consent in order to lift the act of sexual intercourse from s. 143. In my judgment facts adduced in evidence which show or tends to show that the complainant submitted to the act of intercourse because of fear or threats of violence are perfectly relevant to the question of a genuine consent. If the facts show that a consent is not a genuine consent, freely and voluntarily given by the complainant as a free agent, then the intercourse cannot be with her consent and the Crown may prove lack of consent to the charge laid under s. 143(a) in that way.

The consent, as I have said, is one that the female person must give as her free and voluntary act and not induced by threats or fear of bodily harm or fraudulently obtained. If the consent is not so freely given then a defence of consent must fail.

The circumstances then under which it is alleged that consent was given must be explored to see whether or not in the circumstances in which it was given, it was free and voluntary and, therefore, an effective avenue of defence to the charge of rape. I can see circumstances which tend to establish that a consent which the defence alleges was given, was in fact, not a true consent at law and a defence on consent should fail. (at p. 532)

30.     In addition, a relationship of authority between the perpetrator and the complainant is a factor relevant to determining whether the complainant genuinely consented. In *R. v. O'Connor*, (1998) 123 C.C.C. (3d) 487, at para. 42, the British Columbia Court of Appeal considered historical offences of rape and indecent assault committed between 1965 and 1968. The Court held after reviewing the case law on this issue:

These cases establish that: (1) consent means an active will in the mind of the complainant to permit the doing of the act, and (2) if a relationship of authority exists between the accused and the complainant it is a circumstance which may be taken into account in determining whether the complainant consented to the acts complained of, and, if she did not consent, to explain the lack of resistance.

  *s. 143(b) - Rape where Consent is Obtained by Threats*

31.     The other route to a conviction for rape is pursuant to section 143(b). This subsection lists three factors that can vitiate a complainant's consent to sexual intercourse. The three factors are (i) threats or fear of bodily harm; (ii) personation of husband; or (iii) false and fraudulent representations as to the nature and quality of the act.

32.     To vitiate consent, a complainant's fear of bodily harm must be reasonable. For example, in *R. v. Sansregret*, the accused broke into his ex-girlfriend's house, damaged her property, struck her on the mouth, and threatened her with a knife. The victim agreed to have sex with him to calm him down. The victim's apparent consent was in that case obtained through threats or fear of

7

bodily harm.[3]

_____  *Mens rea*

33.      The mental element for a conviction of rape under section 143-144 involves knowledge that the complainant did not consent, or recklessness or willful blindness as to whether the complainant is consenting.  Where consent was given but vitiated by one of the factors in s. 143(b), the mental element requires knowledge that consent was given because of that factor, or recklessness as to whether consent was given on that basis.[4]

_____  *Sentencing for Rape*

34.      At the time of the alleged offences, s. 144 provided that a person convicted of rape could be liable to life imprisonment and to be whipped.  The offence of rape was abolished in 1983.  Conduct that was previously defined under the rape provision was captured by the offence of "sexual assault", enacted January 4, 1983.  This provision provided a maximum penalty for sexual assault of 10 years' imprisonment. The current sexual assault provision in section 271 of the *Criminal Code* provides a maximum punishment of 10 years, or a maximum of 14 years if the complainant is under the age of 16 years.  Whipping was removed as a possible punishment for rape with the enactment of the new sexual assault legislation in 1983.

35.      Section 11(i) of the *Canadian Charter of Rights and Freedoms* provides that any person charged with an offence has the right, if found guilty of an offence for which the punishment has been varied between the time of the commission of the offence and the time of sentencing, "to the benefit of the lesser punishment".  As a result of the application of s. 11(i) of the *Charter*, KOLLMAR can no longer be sentenced to life imprisonment or to be whipped.

*ii.*      ***Indecent Assault – s. 149***

36.      Between 1975 and 1979, indecent assault was an indictable offence prohibited by section

_____

[3] *R. v. Sansregret*, [1985] 1 S.C.R. 570: Although this case was decided in 1985 after the abolishment of the offence of rape, it considered an offence committed in 1982.  Thus, the rape provisions applied as they were still in force during 1982.
[4] *R. v. Sansregret*, [1985] 1 S.C.R. 570, at para. 15: Although this case was decided in 1985 after the abolishment of the offence of rape, it considered an offence committed in 1982.  Thus, the rape provisions applied as they were still in force during 1982.

8

149(1) of the *Criminal Code.* This provision was in force between 1970 and 1983.[5] An accused convicted of indecent assault under this section is liable to imprisonment for up to five years. As with section 143 above, although s. 149 specifies that a person convicted of indecent assault is liable to be whipped, an accused person convicted of this offence today would not be whipped.

37.  The offence and prescribed penalty were set out in the *Criminal Code* as follows:

> 149. (1) Every one who indecently assaults a female person is guilty of an indictable offence and is liable to imprisonment for five years and to be whipped.
>
> (2) An accused who is charged with an offence under subsection (1) may be convicted if the evidence establishes that the accused did anything to the female person with her consent that, but for her consent, would have been an indecent assault, if her consent was obtained by false and fraudulent representations as to the nature and quality of the act. 1953-54, c. 51, s. 141.

38.  Indecent assault is a species of assault, which requires the intentional application of force to another person without consent. To obtain a conviction for indecent assault, the prosecution must establish (1) touching; (2) the absence of consent; and (3) that the assault was "indecent".

### *"Indecent"*

39.  The *Criminal Code* provided no definition of "indecent". However, Canadian courts have interpreted "indecent assault" to be an assault committed in "circumstances of indecency". In *R. v. Swietlinski*, [1980] SCJ No 107, the Supreme Court of Canada stated:

> The law has been settled that an indecent assault is an assault that is committed in circumstances of indecency. What acts are indecent and what circumstances will have that character are questions of fact that will have to be decided in each case, but the determination of those questions will depend on an objective view of the facts and circumstances in relation to the actual assault, and not upon the mental state of the accused.

40.  An indecent assault can include an act that it is itself indecent, or an act that is indecent when the surrounding circumstances indicate that the intention was indecent. In *R. v. Golightly*, 2007 O.J. No. 2007 (S.C.J.), "indecent" was described as an assault "for a sexual purpose or with a sexual intent". In *R. v. MacIntosh*, 2011 NSSC 340, indecent assault was described as "a non-

---

[5] This provision was repealed by the *Act to amend the Criminal Code in relation to sexual offences and other offences against the person and to amend certain other Acts in relation thereto or in consequence thereof,* S.C. 1980-81-82-83, c. 125, which was proclaimed into force on January 4, 1983. After 1983, acts which previously constituted "indecent assault" would be captured under the general "sexual assault" provisions.

9

consensual touching that has an indecent element to it in this instance, sexual element to it".

### Lack of Consent

41.    Consent for the purpose of indecent assault is the same as for the offence of rape, as discussed above.   Factors relevant to whether consent was genuinely given can include the presence of threats or fear of bodily harm, and/or a relationship of authority between the perpetrator and the complainant.

### Mens rea

42.    Indecent assault requires proof of an intention to touch the complainant and proof of knowledge, recklessness, or wilful blindness as to lack of consent.

43.    There is no subjective mental element relating to the "indecent" nature of the assault. Whether an assault is "indecent" is determined based on an objective view of the facts and circumstances of the assault, not upon the mental state of the accused.

### Sentencing for Indecent Assault

44.    At the time of the alleged offences, s. 149 provided that a person convicted of indecent assault could be liable to imprisonment for 5 years and to be whipped.   The offence of indecent assault was repealed in 1983.   Conduct that was previously found under the indecent assault provision was captured by the offence of "sexual assault", enacted January 4, 1983. This provision provided a maximum penalty for sexual assault of 10 years' imprisonment. The current sexual assault provision in section 271 of the Criminal Code provides a maximum punishment of 10 years, or a maximum of 14 years if the complainant is under the age of 16 years.   Whipping was removed as a possible punishment for indecent assault with the enactment of the new sexual assault legislation in 1983.   Therefore, KOLLMAR will not be whipped should he be convicted of indecent assault.

45.    Section 11(i) of the Canadian Charter of Rights and Freedoms provides that any person charged with an offence has the right, if found guilty of an offence for which the punishment has been varied between the time of the commission of the offence and the time of sentencing, "to the benefit of the lesser punishment".   As the lower term of imprisonment between the "indecent assault" legislation and the current sexual assault legislation is the 5-year term in the "indecent

10

assault" legislation, 5 years is the maximum penalty that can be imposed on KOLLMAR for this offence.

### iii.    No Corroboration Required

46.    At the time of these alleged offences, the *Criminal Code* required the trial judge to instruct the jury that it would be dangerous to convict in the absence of evidence to corroborate the testimony of a complainant.  This is no longer a requirement today.  Although KOLLMAR must be charged under the offences in force at the time of the commission of the offences, a trial for these offences will be governed by the evidentiary and procedural rules in force at the time of the trial.  As a result, there is no requirement for corroboration. The presumption against the retrospective application of a statute does not apply to enactments which relate only to procedural or evidentiary matters.  An accused person has no right to have the charge against him proved by corroborated evidence, or to require corroboration as a precondition to conviction.  The right to be tried according to law is the right to be tried in accordance with the evidentiary rules and procedural requirements in effect *at the time of trial*.[6] Today, s. 274 of the *Criminal Code* expressly provides that "no corroboration is required" for a conviction on the enumerated sexual offences, including sexual interference, and sexual assault (which replaced the previous "rape" provision).  Therefore, the historical offences of rape and indecent assault no longer require evidence of corroboration.

### iv.    Doctrine of Recent Complaint Does Not Apply

47.    At the time of the alleged commission of these offences, a victim of sexual assault had to raise an immediate "hue and cry" following the assault.  This rule was abolished in 1985 by Parliament.  This rule has no application today to a prosecution for historical offences, and application of this principle is a reversible error.[7] Today, section 275 of the *Criminal Code* explicitly abrogates rules relating to recent complaint with respect to sexual offences, including the offences of sexual interference and sexual assault (which replaced the previous "rape" provisions).

---

[6] *R. v. Bickford*, [1989] O.J. No. 835, Ont. C.A.
[7] *R. v. W. (R.)*, [1992] 2 S.C.R. 122.

11

## D. **PROCEEDINGS NOT BARRED BY LIMITATION PERIOD**

48.     In Canada, there is a statutory 6-month limitation period in section 786(2) of the *Criminal Code* for summary conviction offences, but there is no statutory limitation period of general application in respect of indictable offences.  All three offences with which the offender is charged are indictable offences.  As such, prosecution on these offences is not barred by any limitation period.

## E. **OPINION**

49.     In Canada, in order to find an accused guilty of an offence contrary to the *Criminal Code*, the trier of fact must be satisfied that the guilt of the accused has been established beyond a reasonable doubt.

50.     I have carefully reviewed the charging document and the arrest warrant issued in relation to these charges.  I have also reviewed the Affidavit of DC Robert Speakman and all of the information that has been provided to me in connection with this request.  In my opinion, the evidence disclosed in the Affidavit of DC Speakman and the exhibits appended thereto establishes a *prima facie* case that KOLLMAR is guilty of indecent assault and rape.  That is to say, a reasonable jury, properly instructed in the law could, on that evidence, find beyond a reasonable doubt that KOLLMAR is guilty of these offences.

### i.     *Rape – s. 143-144*

51.     In this case, the evidence is expected to show that on the weekend of Mother's Day in 1977, KOLLMAR partially penetrated the complainant's vagina with his penis. This occurred when the complainant was 14-years-old.  Although penetration was only "partial", it was enough to cause the complainant "severe discomfort". Under the definition of sexual intercourse described above, the conduct the complainant describes satisfies the *actus reus* of the offence.

52.     In addition, the evidence is expected to establish that the complainant is a female person who was not KOLLMAR's wife.  Although KOLLMAR indicated to the complainant that he would marry her when she turned 16 years old, they were never in fact married and were unmarried when these incidents are alleged to have occurred.

12

53.     The evidence is also expected to show that the complainant did not provide genuine consent to sexual activity.  For historical offences, consent is determined subjectively, with reference to the state of mind of the complainant. It is clear from the victim's statement that she did not want to participate in any sexual activities.  She describes feeling "tormented by what [she] was feeling" when KOLLMAR was touching her, and that as a result she held herself "unbearably stiff".[8] She also described feeling "sickened, embarrassed and humiliated" when KOLLMAR masturbated her, and that enduring KOLLMAR's sexual abuse was "agonizing".[9]

54.     In addition, the surrounding circumstances of KOLLMAR's assaults make clear that any possible indication of consent was not freely given so as to constitute "genuine" consent. The complainant's statement establishes that she lived in constant fear of KOLLMAR, who exploited his position of authority over her as a "spiritual advisor" and teacher to control almost all aspects of her life and instill fear.  He also physically assaulted her on several occasions for minor violations of his "rules", and threatened to assault her on several more occasions.  The complainant lived in fear of triggering KOLLMAR's rage.

55.     The victim described that over a short period of time, KOLLMAR "became increasingly more volatile, oppressive, and abusive" towards her.  He controlled the clothes she was allowed to wear, when she was allowed to sleep, when she could use the bathroom, and whether she could shower or brush her teeth. On several occasions KOLLMAR physically assaulted the complainant for disobeying him.

56.     The evidence is also expected to show that KOLLMAR would insult and humiliate the complainant before each incident of sexual abuse.

57.     As discussed above, for historical offences consent is determined subjectively. It is clear from the victim's statement that she did not want to participate in any sexual activities.  Further, pursuant to the case law discussed above, the relationship of domination, the constant threat of assault for disobeying KOLLMAR's will, her fear of incurring KOLLMAR's rage, and the position of authority that existed between KOLLMAR and the complainant are all relevant in determining whether the complainant genuinely consented to any sexual activity.  In the context

---

[8] Complainant's Written Statement at p. 4.
[9] Complainant's Written Statement at p. 7.

13

of this abusive, dominating relationship, any possible indication of consent was not freely given as required to constitute genuine consent.

58.     In these circumstances, it is also reasonable to infer that KOLLMAR knew, or was reckless or wilfully blind as to whether the complainant consented to the sexual activity.

59.     In my opinion, there is sufficient evidence upon which a trier of fact could convict KOLLMAR for the offence of rape.

### ii.     *Indecent Assault – s. 149*

60.     In my opinion, the touching the complainant described to police constitutes "indecent assault". The complainant described that KOLLMAR would fondle her breasts and genitals. He inserted his fingers into her vagina, and masturbated her. This conduct is clearly sexual in nature, and as such falls within the category of "indecent" assault.

61.     As described above, in my opinion the evidence will establish that the complainant did not genuinely consent to such contact. The complainant lived in fear of KOLLMAR, who controlled every aspect of her life, physically assaulted her on several occasions, and threatened to assault her on other occasions. KOLLMAR was in a position of authority to the complainant, a vulnerable child. The complainant subjectively did not want the sexual touching to occur, and described feeling "tormented" when KOLLMAR touched her, and holding herself "unbearably stiff". In these circumstances the complainant did not provide genuine and free consent to sexual touching.

62.     In my opinion, there is sufficient evidence upon which a trier of fact could convict on the offence of indecent assault.

63.     In his affidavit, Detective Constable Speakman refers to an incident of sexual touching that occurred in Buffalo, New York. I note that KOLLMAR will not be prosecuted by our courts for any events reported by the complainant that occurred outside of Canada. This incident is described only as part of the narrative of their relationship.

### iii.     *Other Issues*

64.     I am also of the opinion that these offences are properly triable in the Province of Ontario,

14

and that the criminal courts of the Province of Ontario have jurisdiction to try KOLLMAR for these offences. In my opinion, there is sufficient evidence upon which a trier of fact could convict KOLLMAR of all charges.

65.    The offences with which KOLLMAR has been charged are not of a political character. I am also of the opinion that the charges have not been laid against KOLLMAR for the purpose of prosecuting him on account of his race, tribe, nationality, religion, sex or political opinion, and that, if he returned to Canada, he will not be prejudiced by reason of his race, tribe, nationality, religion, sex or political opinion.

66.    Extradition is sought and, if successful, the Crown will proceed with the prosecution of KOLLMAR for the aforementioned criminal offences.

67.    This Affidavit is made in good faith in support of a request by Canada for the extradition of KOLLMAR with respect to the alleged offences, and for no improper purpose.

**SWORN BEFORE ME** at the City          )
of Toronto in the Toronto Region          )
in the Province of Ontario, Canada,          )
this 20th day of June, 2019          )

_____          _____
Vallery Bayly                                  Erin Nicole Rivers
Barrister & Solicitor                         Crown Counsel
Commissioner of Oaths

15

EXT-KOLLMAR-00018

HER MAJESTY THE QUEEN

v.

DONALD KOLLMAR

IN THE MATTER of a request by Canada for the
extradition of DONALD KOLLMAR from the
United States of America with respect to offences
under the *Criminal Code* of Canada.

---

## AFFIDAVIT OF ERIN NICOLE RIVERS

---

**MINISTRY OF THE ATTORNEY GENERAL
FOR THE PROVINCE OF ONTARIO**
Crown Law Office – Criminal
720 Bay Street, 10th Floor
Toronto, Ontario
M7A 2S9

HER MAJESTY THE QUEEN

v.

DONALD KOLLMAR

IN THE MATTER of a request by Canada for the extradition of DONALD KOLLMAR from the United States of America with respect to offences under the *Criminal Code* of Canada.

---

**AFFIDAVIT OF ERIN NICOLE RIVERS**

---

**MINISTRY OF THE ATTORNEY GENERAL FOR THE PROVINCE OF ONTARIO**
Crown Law Office – Criminal
720 Bay Street, 10th Floor
Toronto, Ontario
M7A 2S9

HER MAJESTY THE QUEEN

v.

DONALD KOLLMAR

**IN THE MATTER** of a request by Canada for the extradition of DONALD KOLLMAR from the United States of America with respect to offences under the *Criminal Code* of Canada.

---

AFFIDAVIT OF ROBERT SPEAKMAN

---

**MINISTRY OF THE ATTORNEY GENERAL
FOR THE PROVINCE OF ONTARIO**
Crown Law Office – Criminal
720 Bay Street, 10th Floor
Toronto, Ontario
M7A 2S9

| CANADA | ) | HER MAJESTY THE QUEEN |
| | ) | |
| PROVINCE OF ONTARIO | ) | v. |
| | ) | |
| TORONTO REGION | ) | DONALD KOLLMAR |

**IN THE MATTER** of a request by Canada for the extradition of DONALD KOLLMAR from the United States of America with respect to offences under the *Criminal Code* of Canada.

---

## AFFIDAVIT OF ROBERT SPEAKMAN

---

I, **Robert Speakman,** of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY AS FOLLOWS:**

### A. INTRODUCTION

1.      I am a police officer with the Toronto Police Service ("TPS").  I hold the rank of Detective Constable.  I have been a police officer for 14 years, and I have been employed by TPS since August 23, 2004. I am currently assigned to the warrant office at 11 Division of TPS.

2.      I am the investigating officer in this matter.  As such, I have personal knowledge of the matters herein, except where I have indicated that my knowledge is based on information and belief, in which case I believe such information to be true.

### B. THE REQUEST FOR EXTRADITION

3.      Canada is seeking the extradition of Donald KOLLMAR ("KOLLMAR") so that he may be prosecuted on the following offences:

- Indecent assault, contrary to section 149 of the *Criminal Code* of Canada, R.S.C. 1970, c. C-34; and

- Rape, contrary to sections 143-144 of the *Criminal Code* of Canada, R.S.C. 1970, c. C-34.

## C. **SUMMARY OF ALLEGATIONS**

4.      On February 25, 1997, the complainant (date of birth October 13, 1962) provided a statement to the Metropolitan Toronto Police alleging that Donald KOLLMAR had sexually assaulted her on a number of occasions between the ages of twelve and sixteen, between 1974 and 1978.  The complainant provided an audio-video recorded statement on this date (February 25, 1997).  She also provided a written statement to police on February 25, 1997, which she had prepared in advance, outlining the allegations.  The information outlined below was provided either in the complainant's video-recorded statement or her written statement, unless otherwise noted.

### a.   *Students of Light*

5.      In 1974, when the complainant had just turned twelve, her family became involved in a group called "Students of Light", which studied Metaphysics.  The complainant described this group as a "new age California type movement".  It was through her involvement with this group that the complainant met Donald KOLLMAR.  KOLLMAR was a "spiritual advisor" and licensed minister.   KOLLMAR was the "right hand assistant" to the group's leader, John Hanas KOLLMAR's responsibility was lecturing about metaphysics, teaching meditation, and bringing people into this group.

### b.   *The Complainant's Relationship with Kollmar*

6.      The complainant first met KOLLMAR in Sudbury the winter of 1974, shortly after her twelfth birthday.  At the time, the complainant understood KOLLMAR to be in his mid-twenties.

7.      At this time, the complainant lived in Sudbury with her parents.  She advised that KOLLMAR was originally from the Buffalo area of New York, but that he spent much of his time in Toronto.

8.  .    KOLLMAR began to show a "strong interest" in the complainant at age twelve, telling her and her parents that she was an extremely special and sensitive child.  KOLLMAR made monthly trips to Sudbury to hold meetings and meditations.  During these visits to Sudbury, KOLLMAR initiated spending time alone with the complainant on several occasions.  The complainant

assumed this time would be spent in meditation or reflection, but instead KOLLMAR spent this time with her telling her how unique and important he was, and of the special and significant work he was committed and chosen to do on this earth. He told the complainant of his spiritual powers, psychic abilities, and direct relationship with God. He told the complainant that she was very special, and had unlimited potential. He told her that if she truly wanted to become a good and spiritual person, she could attain this only by letting him teach her.

9.     KOLLMAR told the complainant that he had a "very pure and unique love" for her, that he intended to wait until she was 16 years old before approaching her, but that he could not wait any longer. KOLLMAR emphasized to the complainant the importance of not telling anyone, because they "would not understand the spiritual depth and specialness of [their] connection and it would also make them jealous".

10.    The complainant stated the following:

> He told me I needed to unite with him emotionally, mentally and spiritually. I must turn my will totally and completely over to him so he could mold and shape me into a spiritual being that could best serve God and humanity. He said that I was chosen for him by God and that it was my inherent responsibility and honour to live the rest of my life with him, as his wife, as soon as I turned 16 years of age. He continuously reminded me that it was imperative not to discuss this with anyone, that this must only be between the two of us. I was always to maintain that we were merely close friends.

11.    KOLLMAR also criticized and condemned the complainant's parents and sisters, telling her that she must separate herself from them, and no longer feel part of their family unit. Most importantly, according to KOLLMAR, was that the complainant separate herself from her mother.

### c. *Controlling and Abusive Behaviour*

12.    The victim described that over time, KOLLMAR became "increasingly more volatile, oppressive, and abusive" towards her. He controlled every aspect of her life.

13.    She described that she was often only allowed to have one, two, or three hours of sleep a night. She described the following in her written statement:

> I was told what time I would awake and go to bed. Often I was only allowed one, two or three hours of sleep a night. There were several times while driving with Donald Kolmar [sic] that I could no longer bare [sic] how tired I was and began to fall asleep.

For this, I was slapped in my face and told not to be so lazy.

14.     In addition to controlling her sleep, the complainant was not allowed to go to the bathroom without KOLLMAR's permission, and she frequently had to wait to use the bathroom for several hours at a time.  He would also dictate when she was allowed to brush her teeth and shower.  She often went entire days without being allowed to brush her teeth, and was many times forced to go several days without bathing. She was only allowed to brush her hair once a day, was not allowed to wear her hair in a 'pony tail', and was only allowed to look in a mirror once a day.

15.     The complainant "felt paralyzed by fear in [KOLLMAR's] presence." Although KOLLMAR only physically slapped her on three occasions, he would, in the midst of all the verbal assaults, hold his hand up in a motion threatening to hit her.  She was told that she "angered him so much he could barely restrain himself from hitting [her] but would never do so because he would have to explain any marks to [her] parents."

16.     Several times, KOLLMAR painfully grabbed and twisted the complainant's wrist.  She described that one of the times he did this, it was because she won a card game in front of one of his group members.

17.     She described her fear of KOLLMAR as follows:

> Every second of my day with him was lived in severe anxiety and terror, never knowing what would trigger his rage.  To endure this man's volatile anger and sexual and verbal abuse was agonizing.  I abided by everything he did and said, always feeling like I was waking [sic] a tight rope, ensuring that I never gave him 'just cause' to be upset with me, which I believe angered him even more.

18.     The complainant was told that her will or desire "was not valid".  If she did not love KOLLMAR, or want to marry him, "it was the evil parts with in [her] going against God's plan and will".

19.     Even during the time that the complainant spent away from KOLLMAR, she describes that she was never "free" of the fear, intimidation and oppression:

> The effects of Donald Kolmar's constant punishment and humiliation of me infiltrated all aspects of my life.  Even though there were periods of time I spent away from this man, I never experienced a moment free from fear, intimidation and oppression.  He successfully had me believing he had many powers and could sense my every action and thought even when I was away from him.  So, if ever I did not abide by the rules

he had laid down for me to follow, I thought with no uncertainty, that he would know.

### d. *Sexual Abuse*

20.     The complainant described that KOLLMAR first touched her in a sexual manner when she was 13-years old, and the assaults continued until she was 16-years-old

### i.     The "Therapeutic Massage" in Buffalo

21.     The first time KOLLMAR touched the complainant in a sexual manner was when she was 13-years old.  The complainant's parents had allowed her to attend a weekend retreat with KOLLMAR in Buffalo, New York.  The complainant was to meet KOLLMAR in Toronto, and then they would fly to Buffalo together.  When the complainant arrived in Toronto, KOLLMAR was visibly frustrated and angry.  He eventually told the complainant that he was "incredibly disappointed and angry" with her because she had curled her hair, and her clothes were far "too pretty" and "attention seeking".

22.     The first evening that the complainant and KOLLMAR were in Buffalo, KOLLMAR told the complainant that he was going to give her a "massage".  He told her that this was a "therapeutic massage", something that he did regularly, and that there was no reason to feel self-conscious.  He instructed the complainant to remove her clothing and lay on a table.  KOLLMAR then massaged her entire body, front and back, for "at least two hours".  She described that KOLLMAR "spent a large portion of this time massaging [her] breasts".

23.     The complainant described that she tried to convince herself that KOLLMAR's intent was not sexual, but that she felt "sickened inside", and was "unbearably uncomfortable, embarrassed and confused".

24.     The same night, KOLLMAR told the complainant to put together a ballet routine for him, and to perform it for him.  When the complainant objected, indicating that she felt "too shy", KOLLMAR reacted angrily, telling the complainant that she was "selfish" and "ungrateful" for everything he was going for her.  Feeling "intimidated and embarrassed", the complainant danced for KOLLMAR.

### ii.     The Sudbury Incidents

25.     After their initial meeting, the complainant described that KOLLMAR made several trips to Sudbury, and he would make arrangements to spend time alone with the complainant, under the pretext of taking a drive or a walk. KOLLMAR travelled in a van that he had converted into a "mini home" with a bed, sink, toilet, propane heater and a hot plate. The victim described that in Sudbury, after their walk or meditation, KOLLMAR would tell her to lie down in the van. He would lie down beside her, place his arm around her, and then move his hand over her body and fondle her breasts over her clothes.

26.     KOLLMAR told the complainant that he would make arrangements for her to spend occasional weekends with him in Toronto. The Students of Light group owned a house on Keele Street in Toronto, which was used for group meditations, seminars, and social gatherings. It also provided out of town guests a place of room and board.

*iii.*     *The Toronto Incidents*

27.     When the complainant went to Toronto, she always arrived on a Friday night by Greyhound bus. Arrangements had been made for her to occupy a room in the Students of Light house. Once people had settled in for the evening, the complainant described that KOLLMAR would come to her room and bring her to his van, parked at the back of the house in the driveway. He would have her lay down beside him. KOLLMAR would put his arm around the complainant, and then eventually slip his hand up her night gown and fondle her breasts. He would pull her nightie off, and then lay on top of her. He would kiss her, fondle her breasts and genitals, and rub his groin up against her.

28.     The complainant described that when this occurred, she was "so tormented" by what she was feeling that she "always held [her]self unbearably stiff". This often angered KOLLMAR, who would demand that the complainant be more affectionate with him, and reminded her of the "honour" it was to be with him.

29.     On one of the complainant's visits to Toronto, KOLLMAR told her that he was angry that she never did anything for him, and called her selfish. He told her that to make up for it, he would teach her how to massage him. He told the complainant that the only way to do this was for both people to be completely nude. He would make her practice each technique over and over again.

He then lay on his back and instructed her to massage around his genitals. The complainant described that this was the first time she had seen a penis, and she felt "shocked and frightened". This was the first time that KOLLMAR had taken his clothes off while molesting her. She avoided touching his penis, which angered KOLLMAR, and he demanded that she do so. Using oil, KOLLMAR had the complainant "massage" his testicles and his penis. He then lay on top of her completely nude, fondling her breasts and genitals, and putting his fingers inside her vagina. KOLLMAR made the victim massage him regularly, for up to three or four hours at a time.

30.     Between approximately August 1975 and June 1978, the complainant made countless trips to Toronto, and approximately twenty trips throughout the U.S. with KOLLMAR. By the age of 14, she was coming to Toronto once or often twice a month.

*iv.     Mother's Day Weekend 1977 Incident*

31.     When the complainant was 14-years-old, KOLLMAR penetrated her vagina with his penis for the first time. This occurred on the weekend of Mother's Day in 1977, in KOLLMAR's van, in the same circumstances as the indecent assaults described above. The complainant described that KOLLMAR only partially penetrated her with his penis. He told her that the reason he did not penetrate deeper was because he wanted her to remain a virgin until he married her. She described that although KOLLMAR only partially penetrated her, it was enough to cause her "severe discomfort".

32.     She described that this occurred on four or five separate occasions, but she could not recall the specific dates or circumstances pertaining to the other occurrences, apart from the first incident on Mother's Day weekend.

33.     After this incident, KOLLMAR would masturbate the complainant. She described that it was important to KOLLMAR that she have an orgasm, and that it "enraged him" that she did not have an orgasm. KOLLMAR began forcing the complainant to masturbate herself in front of him. She described that she felt "sickened, embarrassed and humiliated" doing this. She never experienced an orgasm, which KOLLMAR saw as the complainant "willfully punishing and denying him pleasure". KOLLMAR also had the complainant masturbate him, and he ejaculated on several occasions.

v.      *Verbal Abuse Preceding the Sexual Abuse*

34.     The complainant described that "99%"of the time", KOLLMAR "preluded these sexual assaults by first verbally humiliating and demoralizing" her. She described that this seemed to be "an important ritual he always followed". Before molesting her, KOLLMAR would spend up to two hours standing over her and yelling at her. The content of his insults would include telling the complainant that she was "stupid", "incompetent", "a piece of shit", "worthless", "nothing", "fat and ugly", "cruel and uncaring toward him", "judgmental", "competitive with him", that she "embarrassed him", and was "a terrible person" who should be "ashamed" of herself, and that the "only reason [she] had any goodness or light in [her] was because of him", and that she "must submit [her] will to him".

e.      **_Explanation for Delay in Disclosing the Abuse_**

35.     In June of 1979, arrangements were underway for the complainant to marry KOLLMAR. Her parents were under the impression that it was something that she wanted, and the complainant believed she was doing what God wanted her to. In June 1979, the complainant lost consciousness in a school washroom. She described that she was "dizzy" and "overwhelmed" by her situation. She began to "long for death as a way out. It was because of these "intense thoughts and emotions" that she lost consciousness. She was taken to the hospital, suffering from severe pain in her stomach.

36.     While at the hospital, the complainant described that her mother "realized the tremendous oppression" placed upon the complainant. The complainant described that up until this point, she had said nothing to her parents about KOLLMAR's abuse, because he so often told her that she was "worthless" and he was a "King", so no one would believe her if she said anything negative. After her collapse, the complainant described that she was "finally able to say that [she] was fearful of, and did not want to be with [KOLLMAR]". As a result, in 1979, the complainant's relationship with KOLLMAR ended.

37.     The complainant described that KOLLMAR was "enraged" by her parents' interference in not allowing the complainant to travel with him or to marry him. Within 6 months, KOLLMAR became "volatile and hostile" to many people, and attempted to coerce people into following him

alone, foregoing a relationship with John Hanas.  When people chose not to follow KOLLMAR or abide by his demands, he returned to New York State.  The complainant had no further contact with KOLLMAR.

> The complainant described that it was not until she was in her early twenties that she shared with her family "just a portion" of KOLLMAR's abuse. Slowly, and over a period of "several years" she related the sexual abuse and the severity of the mental abuse she endured, to Hanas and several of his advisors. She described that her parents were "shocked and devastated", but that Hanas and others told her that the abuse was "[her] fault and that on 'inner levels', and in previous life times, [she] was his abuser."

38.    Both the complainant and her father described that a member of the cult group, Robert Pollock was assigned to seek legal advice on the complainant's behalf.  The complainant was not present to personally seek advice.  Instead, the complainant and her family were advised by Hanas and Pollock that it was a "weak case".

### f.  *The 1997 Warrant*

39.    After the complainant provided a statement to police in February 1997, a warrant was issued for KOLLMAR's arrest on November 17, 1997 ("the 1997 warrant").  At the time, the complainant did not know the proper spelling of KOLLMAR's last name, his date of birth, his address or his vehicle information.  As a result, this warrant was for "Donald KOLMAR 45 Years" because this was the spelling the complainant provided and no further information was available to identify the man who abused her.  The 1997 warrant is attached to this affidavit as **Exhibit "A"**.

40.    This warrant has been outstanding in Ontario since November 1997.  In July 2017, the 11 Division warrant office of TPS was conducting an audit on old arrest warrants when an internet search revealed a possible hit for the accused from the 1997 warrant, "Donald KOLMAR" on the website "http://www.csaprocess.com/don_bio.html".  This web page contained a photo of a man named "Don Kollmar", and the website had a similar spiritual aspect as the complainant's previous description of the "Students of Light" group. As a result, I contacted the complainant.  I was able to contact her, and she advised that she is willing to testify.  She had told the police that she saw KOLLMAR on the internet and on social media, but she did not expect the police to follow up, as it had been so long since the complaint.

41.     On November 28, 2018, I swore an information before Justice of the Peace A. Costa in Toronto, Ontario, charging KOLLMAR with indecent assault on a female, rape, and sexual intercourse with a female between 14 and 16 years old.  This information is attached to this affidavit as **Exhibit "B"**.

42.     Attached as **Exhibit "C"** to this affidavit is the Warrant for Arrest issued by the Honourable Justice of the Peace M.J. Callahan of the Ontario Court of Justice in Toronto, Ontario on December 24, 2018.  Another warrant was previously issued on November 28, 2018 at the same time the information was sworn.  However, the previous warrant incorrectly listed the suspect's address as Toronto.  The warrant dated December 24, 2018 replaced the previous warrant.

43.     Subsequent to the swearing of the information dated November 28, 2018, a decision was made to amend the wording of the charges, and to remove the charge of sexual intercourse with a female between 14 and 16 years old.  As a result, on June 5, 2019, Detective Paul Cargill swore an information against KOLLMAR before the Honourable Justice of the Peace P. Liu to replace the previous information dated November 28, 2018.  This information charges KOLLMAR with only indecent assault and rape.  The Crown is no longer pursuing a charge of sexual intercourse with a female between 14 and 16 years old.  This information is attached to this affidavit as **Exhibit "D"**.  On June 7, 2019, the Honourable Justice of the Peace B. Hudson issued a warrant for KOLLMAR's arrest on the updated charges of indecent assault and rape.   This warrant, which replaces the previous warrant dated December 24, 2018, is attached to this affidavit as **Exhibit "E"**.

### D.   IDENTIFICATION

44.     The accused/offender in these matters is Donald KOLLMAR.  His date of birth is July 29, 1951.  He is an American citizen.

45.     Attached as **Exhibit "F"** to this affidavit is a photograph of KOLLMAR.  This photograph is a New York Department of Motor Vehicles Driver's Licence Photo, issued in the name of KOLLMAR, Don, 1951/07/29, 62 Trails End, Grand Island New York, 14072.  This image was taken on September 19, 2011.

46.     Attached as **Exhibit "G"** to this affidavit is a photograph the complainant sent to me by

email on October 11, 2018, indicating with "100%" certainty that this photo was of the person who assaulted her. She advised that she had located this photo on his website. I have compared this photo to the photo displayed on the website "http://www.csaprocess.com/don_bio.html" discussed at paragraph 40 above, and I verily believe that they are the same photo.

47.     I have also compared the images in **Exhibits "F" and "G"** and I am satisfied that these images depict the same person.

48.     On May 3, 2019 I was advised that, on that day, the U.S. Marshals had arrested KOLLMAR pursuant to a provisional arrest warrant. He was released on bail on a later date at a location known to the U.S. authorities. CONCLUSION

49.     Based on the foregoing, I have reasonable and probable grounds to believe, and do believe, that KOLLMAR committed the offences of indecent assault and rape.

50.     I make this affidavit in support of Canada's request for the extradition of KOLLMAR from the United States of America to the City of Toronto, in the Province of Ontario, Canada, so that he may be tried for the offences with which he has been charged, and for no improper purpose or motive.

SWORN BEFORE ME at the          )
City of Toronto in the           )
Province of Ontario, on this     )
20ᵗʰ day of June, 2019           )
                                 )


_____          _____
A Commissioner of Oaths, etc.    D.C. Robert Speakman


CHRISTINA MEI LIEN CHAN,
a Commissioner, etc., City of Toronto,
for the Toronto Police Service.
Expires May 19, 2020.

# This is exhibit "A" to the affidavit of Robert Speakman, dated June 20, 2019.

_____

Date: 2019 · 06 · 20

Commissioner of Oaths

CHRISTINA MEI LIEN CHAN,
a Commissioner, etc., City of Toronto,
for Toronto Police Service.
Expires May 19, 2020.

(Address / Adresse) ................................ of the / de/du ................................ (Municipality / Municipalité)

........................ in the / dans le/la ................ (Region / Région) ................ of / de

hereinafter called, hereinafter, ci-après appelé le prévenu.

WHEREAS the accused has been charged that he/she, on or about the ........... day of ........... 19.... , at the
ATTENDU que le prévenu, a été inculpé d'avoir le ou vers le ........... jour de ........... dans le/la

Municipality ................................ of / de/du   Metropolitan Toronto   ................................ in the Toronto Region;
dans la région de Toronto;

Set out briefly the offence in respect of which the accused is charged / Indiquer brièvement l'infraction dont le prévenu est inculpé

1) Indecent Assault Female
2) Rape
3) Intercourse Female Under Sixteen

contrary to the Criminal Code. / contrairement au Code criminel.

ET ATTENDU:

☐ There are reasonable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of this accused (512(a)); 512(11);

☐ the accused failed to attend court in accordance with the summons issued upon (tender) (512(2));

☐ an appearance notice or promise to appear or a recognizance entered into before an officer in charge was confirmed and the accused failed to attend court in accordance therewith (512(2));

☐ a summons could not be served because the accused is evading service (512(2));

☐ the accused was ordered to be present at the hearing of an application for a review of an order made by a justice and did not attend the (hearing) (520(8); 521(8));

☐ there are reasonable grounds to believe that the accused has contravened or is about to contravene the (summons, appearance notice, promise to appear, undertaking or recognizance) upon which he was released (524(11); 525(5); 679(6));

☐ there are reasonable grounds to believe that the accused has since his release from custody on any summons, appearance notice, failed to appear at an undertaking or a recognizance) committed an indictable offence (524(1); 525(5); 679(6));

☐ the accused was required by an (appearance notice or promise to appear or a recognizance) entered into before an officer in charge to attend at a time and place stated therein for the purposes of the Identification of Criminals Act and did not appear at that time and place (502; 510);

☐ an indictment has been found against the accused and the accused has failed to appear or to remain in attendance before the court for his trial (597);

☐ the accused (set out allegations reproduced in the words of the particular section authorizing the warrant);

ET ATTENDU:

☐ qu'il y a des motifs raisonnables de croire qu'il est nécessaire dans l'intérêt public de décerner le présent mandat pour l'arrestation du prévenu (507(4); 512(11);

☐ que le prévenu a omis d'être présent au tribunal en conformité avec la sommation qui lui a été signifiée (512(2));

☐ qu'une citation à comparaître ou promesse de comparaître ou engagement contracté devant un fonctionnaire responsable a été confirmé(e) et que le prévenu a omis d'être présent au tribunal se conformer avec ledit document (512(2));

☐ qu'il parait qu'une sommation ne peut être signifiée du fait que le prévenu se soustrait à la signification (512(2));

☐ qu'il a été ordonné au prévenu d'être présent à l'audition d'une demande de révision d'une ordonnance rendue par un juge de paix et que le prévenu n'était pas présent à l'audition (520(8); 521(8));

☐ qu'il y a des motifs raisonnables de croire que le prévenu a violé ou est sur le point de violer (la sommation, la citation à comparaître, la promesse de comparaître ou la promesse ou l'engagement) en raison duquel/laquelle il a été mis en liberté (524(11); 525(5); 679(6));

☐ qu'il y a des motifs raisonnables et probables de croire que, depuis sa mise en liberté sur (toute sommation, citation à comparaître, promesse de comparaître ou promesse ou tout engagement), le prévenu a commis un acte criminel (524(1); 525(5); 679(6));

☐ qu'une citation à comparaître ou une promesse de comparaître ou un engagement contracté devant un fonctionnaire responsable ou une sommation, exigeait que le prévenu soit présent aux temps et lieu y indiqués aux fins de la Loi sur l'identification des criminels et que le prévenu n'a pas comparu aux temps et lieu indiqués (502; 510);

☐ qu'une mise en accusation a été prononcée contre le prévenu et que celui-ci n'a pas comparu ou n'est pas demeuré présent pour son procès (597);

☐ pour tout cas qui n'est pas visé par les attendus ci-dessus, insérer un attendu reproduisant les termes de la loi autorisant le mandat

THIS IS THEREFORE, to command you, in Her Majesty's name, forthwith to arrest the said accused and to bring him/her before the provincial judge of the Ontario Court (Provincial Division) of the Toronto Region, or before any justice in and for the said Region, to be dealt with according to law.

A CES CAUSES, les présentes ont pour objet de vous enjoindre, au nom de Sa Majesté, d'arrêter immédiatement ledit prévenu et le l'amener devant le juge provincial à la Cour de l'Ontario (division provinciale) de la région de Toronto, devant moi ou tout autre juge de paix dans et pour ladite région, afin que le prévenu réponde à cette accusation et qu'il soit traité selon la loi.

DATED at the Municipality of Metropolitan Toronto, in the Toronto Region, this ........... day of ..... November ..... 19 97
DONNÉ à la municipalité de la communauté urbaine de Toronto, dans la région de Toronto, le ........... jour de ...........

34

*déclare qu'il a des motifs raisonnables de croire que*

Donald KOLMAR sometime between and including the 1st day of January in the year 1974 and the 31st day of December in the year 1978 at the Municipality of Metropolitan Toronto, in the Toronto Region, did indecently assault Brenda Blais, a female person contrary to The Criminal Code

and further that Donald KOLMAR sometime between and including the 1st day of January in the year 1974 and the 31st day of December in the year 1978 at the Municipality of Metropolitan Toronto, in the Toronto Region, did have sexual intercourse with Brenda Blais, a female person who was not his wife with her consent which consent was obtained by false and fraudulent representations as to the nature and quality of the act contrary to The Criminal Code

and further that Donald KOLMAR sometime between and including the 1st day of January in the year 1974 and the 31st day of December in the year 1978 at the Municipality of Metropolitan Toronto, in the Toronto Region, being a male person, did have sexual intercourse with Brenda BLAIS a female person not his wife and of a previously chaste character who was under the age of sixteen years and over the age of fourteen years
contrary to the Criminal Code

OFFICE FOR DISABILITY ISSUES    OFFICE DES AFFAIRES DES PERSONNES HANDICAPÉES
INFORMATION, SERVICES FOR BARRIER-FREE COURTS    SERVICE D'INFORMATION SUR LES TRIBUNAUX À ACCÈS FACILE
1-800-387-4456    1-800-387-4456
TORONTO AREA 326-0111    RÉGION DE TORONTO 326-0111

35

| Date | Clerk | Reporter | For Crown |  |
| Date | Greffier | Sténographe | Iteur ou Couronne |  |

Accused /Accusé(e)

Notice Given Under H.1 A
Avis en vertu des Code de la route

36

# This is exhibit "B" to the affidavit of Robert Speakman, dated June 20, 2019.

Commissioner of Oaths

Date: 2019.06.20

CHRISTINA MEI LIEN CHAN,
a Commissioner, etc., City of Toronto,
for the Toronto Police Service.
Expires May 19, 2020.

TORONTO POLICE SERVICE
OCC#: 78-132546  Inv.Off.:1447

*Replaces*  *97-10068211-00*

Police Case ID#: 230634

☒ Replacement Information / *Dénonciation de remplacement*

☐ D/V    ☐ S

**18-15008964**
Information Number / *Nº de la dénonciation*

☐ Non-Disclosure Order Pursuant to S. 486.31
  *Ordonnance de non-divulgation, art 486 31*
☐ Non-communication s. 515(12) & 516(2)
  *Non-communication, par. 515(12) et 516(2)*

☐ Publication ban pursuant to
  *Interdiction de publication en vertu de* ........................
☐ Provisions of 530(3) Complied With
  *Dispositions du par 530 (3) observées* ........................

| | | |
|---|---|---|
| **Arrest Date:** *Date d'arrestation* | **15 month Flag:** *Alerte à 15 mois* | **18 month Flag:** *Alerte à 18 mois* |
| **Sworn Date:** NOVEMBER 2018 *Date d'assermentation* | **15 month Flag:** *Alerte à 15 mois* | **18 month Flag:** *Alerte à 18 mois* |

CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

Information of: *R. Speakman #90038*
*Dénonciation de*

**TORONTO**
(Region / *Région*)

of  **THE CITY OF TORONTO**
de

**PEACE OFFICER**
(occupation / *profession*)

The informant says that **he/she** believes on reasonable grounds that
*Le dénonciateur déclare qu'il a des motifs raisonnables de croire que*

(1) KOLLMAR, Don    DOB: 21 Jul. 1951
    62 TRAILS END, GRAND ISLAND, NY 14072

**COUNT 1**

**Don KOLLMAR**

between the 1st day of January in the year 1974 and the 31st day of December in the year 1978 at the City of Toronto in the Toronto Region did indecently assault Brenda Blais, a female person, contrary to Section 149 of the Criminal Code of Canada.

**COUNT 2 AND FURTHER THAT**

**Don KOLLMAR**

between the 1st day of January in the year 1974 and the 31st day of December in the year 1978 at the City of Toronto in the Toronto Region did have sexual intercourse with Brenda Blais, a female person who was not his wife, with her consent, which consent was obtained by false and fraudulent representations as to the nature and quality of the act, contrary to Section 143, clause (b), paragraph (iii) of the Criminal Code of Canada.

**Continued...**

Generated Date: November 28, 2018 08:53 AM

OCC 2-000-1-C (rev 06/16)

(Charges Continued / *Accusations, suite*)

**COUNT 3 AND FURTHER THAT**

**Don KOLLMAR**

between the 1st day of January in the year 1974 and the 31st day of December in the year 1978 at the City of Toronto in the Toronto Region being a male person, did have sexual intercourse with Brenda Blais, a female person who was not his wife, was of a previously chaste character, and who was fourteen years of age or more and under the age of sixteen years, contrary to Section 146, subsection (2) of the Criminal Code of Canada.

EXT-KOLLMAR-00039

Information Number / N°(s) de dénonciation    18-15008964

☐ To be completed where information is laid other than in person:    I, _____, state that
*À remplir lorsque la dénonciation est déposée autrement qu'en personne :   Je soussigné(e)*    (name of informant / nom du dénonciateur)    *déclare que*

all matters contained in this information are true to my knowledge and belief, pursuant to s. 508.1 (2) of the *Criminal Code*.
*tous les renseignements contenus dans la présente dénonciation sont, à ma connaissance, véridiques, en vertu de par 508.1 (2) du Code criminel*

☐ Deemed to be sworn / *Réputée être faite sous serment*

Sworn/affirmed before me at the   CITY
*Déclaré sous serment/affirmé solennellement devant moi à/au*

of / de   TORONTO                                                                    Informant / *Dénonciateur*

in the Province of Ontario / *dans la province de l'Ontario*

this    28    day of   NOVEMBER           , 20  18
*ce            jour de*                                                    Justice of the Peace / *Juge de paix*

| ☐ Appearance Notice *Citation à comparaître* | ☐ Promise to Appear *Promesse de comparaître* | ☐ Recognizance *Engagement* | for *pour le* ____ (day, month / jour, mois)    20 |

CHECK ONE OF THE FOLLOWING / *COCHEZ LA CASE QUI CONVIENT*

| ☐ Cancelled -- Police to notify defendant *Annulé(e) – La police informera la partie défenderesse* | ☐ Cancelled – Summons *Sommation* | ☐ Confirmed on *Confirmé(e) le* ____ (day, month / jour, mois)   20 |

☐ Cancelled - Warrant issued
*Annulé(e) – Mandat délivré*

_____                    _____
Justice of the Peace / *Juge de paix*

_____           , 20
Justice of the Peace / *Juge de paix*      (day, month / jour, mois)

| Date *Date* | Crown Elects to Proceed *La Couronne choisit de procéder par* | ☐ Summarily *Procédure sommaire* | ☐ By Indictment *Acte d'accusation* | ☐ Summary Conviction Offence(s) *Infraction(s) punissable(s) sur déclaration de culpabilité par procédure sommaire* | ☐ Indictable Offence(s) *Infraction(s) punissable(s) par mise en accusation* |

| Date *Date* | Accused *Accusé* | Elects Trial by *Choix d'un procès devant* | | | Preliminary Hearing Requested *Enquête préliminaire demandée* | | Justice Initials *Initiales du juge* | Abs Jurs Comp absolue | Pleads *Plaide* | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Superior Court *Cour supérieure* | | Ontario Court *Cour de l'Ontario* | Yes *Oui* | No *Non* | | | Guilty to Counts *Coupable aux chefs d'accusation* | Not Guilty to Counts *Non coupable aux chefs d'accusation* |
| | | Judge *Juge* | Judge & Jury *Juge et jury* | Judge On Counts *Juge pour les chefs d'accusation* | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| Date *Date* | Accused *Accusé* | Committed (or) Ord Std Trial "On Counts *Renvoyé à procès pour les chefs d'accusation* | Discharged on Counts *Libéré des chefs d'accusation* | Found / *Reconnu* | |
|---|---|---|---|---|---|
| | | | | Guilty on Counts *Coupable des chefs d'accusation* | Not Guilty on Counts *Non coupable des chefs d'accusation* |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* ☐ With consent of accused and prosecutor, without taking or recording
*Avec le consentement de l'accusé et du poursuivant, sans recueillir ou consigner*

☐ (a) any evidence  (or)  ☐ (b) further evidence
a) des preuves  (ou)  b) des preuves additionnelles

_____
Judge / *Juge*

CCO-2-000-1-C (rev 06/18)

Case 5:19-ny-01882-MAK   Document 59-1   Filed 07/12/19   Page 42 of 108

☐ **Information Number**
*Nº de la dénonciation*

☐ **Designation Filed**
*Désignation déposée*

☐ **Language Notification**
*Avis de langue*

☐ **Interpreter Required**
*Interprète requis*

| Date | Accused *Accusé* | Adjournment Date *Date d'ajournement* | Adjournment Details *Détails sur l'ajournement* | Designation *Désignation* | Counsel As Agent *Avocat mandataire* | Fails to Appear *Omet de comparaître* | Bench Warrant *Mandat d'arrêt* | Discretion *Discrétion* | Certificate of Default *Certificat de défaut* |
|------|------|------|------|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

| Date | Clerk *Greffier* | Crown *Couronne* | For the Accused *Pour l'accusé* | Justice's initials *Initiales du juge* |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**At Bail Review dated**
*À la révision de l'ordonnance de détention, datée du*

☐ **Original Order Confirmed**
*Ordonnance originale confirmée*

☐ **New Order Made**
*Nouvelle ordonnance rendue*

☐ **Gladue Report Ordered**
*Rapport Gladue commandé*

CCO-2-000-1-C (rev. 06/18)

Regina v / La Reine c _____     Information #(s) / Dénonciation(s) n°(s) _____

| Count / Chef | Sentence date / Date de détermination de la peine | | ☐ Withdrawn / Accusation retirée |
|---|---|---|---|

☐ Pre-sentence custody                  days/months        Time credited:              days/months       ☐ concurrent with
  *Détention sous garde avant prononcé de*       *jours/mois*        *Crédit octroyé*            *jours/mois*          *concurrente avec*

☐ Term that would have been imposed before credit granted:                    days/months/years
  *Période d'emprisonnement imposée avant l'octroi de tout crédit*                *jours/mois/ans*

☐ Absolute discharge          ☐ Conditional discharge            ☐ Suspended sentence
  *Absolution inconditionnelle*       *Absolution conditionnelle*            *Condamnation avec sursis*

☐ Imprisoned for            days/months/years       ☐ concurrent with        ☐ consecutive to
  *Emprisonnement pour*          *jours/mois/ans*          *concurrente avec*         *consécutif à*

☐ Intermittent sentence for      days               ☐ concurrent with        ☐ consecutive to
  *Peine discontinue*          *jours*               *concurrente avec*         *consécutif à*

☐ Conditional sentence for     days/months/years       ☐ concurrent with        ☐ consecutive to
  *Ordonnance de sursis*          *jours/mois/ans*          *concurrente avec*         *consécutif à*

☐ Probation              months/years        ☐ concurrent with        ☐ consecutive to
  *Période de probation*          *mois/ans*            *concurrente avec*         *consécutif à*

☐ Community service s 732 1(3)(f) / *Service communautaire, par 732 1(3)(f)*              hours / *heures*

☐ Fine of $              VS $           Time to pay                 Days in default
  *Amende de*            $ *sur  comp*       *Délai de paiement*               *Jours à défaut*

☐ Restitution        ☐ s. 738 / s. 739      Amount $                Time to pay
  *Dédommagement*       *art. 738 / art. 739*     *Montant*         $      *Délai de paiement*

☐ Victim surcharge $              Time to pay                    Days in default
  *Suramende compensatoire*        $    *Délai de paiement*               *Jours à défaut*

☐ Ordered to stand trial / *Renvoyé pour subir son procès*

| ☐ Dismissed | ☐ Driving prohibition | ☐ HTA cautioned | Months / Years | ☐ s 743.21(1) / par 743.21(1) |
|---|---|---|---|---|
| *Rejeté* | *Interdiction de conduite* | *Avertissement (Code de la route)* | *mois/années* | |
| ☐ Acquitted | ☐ Weapons prohibition | s. 109(2)    years | ☐ s. 109(3) (Life) | ☐ s. 110:    years   ☐ s. 110 (life) |
| *Acquitté* | *Interdiction d'armes* | *par. 109(2)    ans* | *par.109(3)(perpétuité)* | *art 110    ans  art 110 (perpétuité)* |
| ☐ Stayed | ☐ DNA. | 5.03 (Primary) | ☐ 5.04 (Secondary) | ☐ Denied (DND) |
| *Sursis* | *ADN* | *5.03 (primaire)* | *5.04 (secondaire)* | *Rejetée* |
| ☐ In Absentia | ☐ S.O.I.R.A. order | ☐ 10 years | ☐ 20 years | ☐ Life |
| *In absentia* | *Ordonnance LERDS* | *10 ans* | *20 ans* | *Perpétuité* |
| ☐ Other | ☐ s. 161 prohibition | months/years | s. 490 forfeiture order | ☐ Granted   ☐ Denied |
| *Autre* | *Interdiction, art. 161* | *mois/ans* | *Ordonnance de confiscation, art. 490* | *Accordée    Rejetée* |

---

| Count / Chef | Sentence date / Date de détermination de la peine | | ☐ Withdrawn / Accusation retirée |
|---|---|---|---|

☐ Pre-sentence custody                  days/months        Time credited:              days/months       ☐ concurrent with
  *Détention sous garde avant prononcé de*       *jours/mois*        *Crédit octroyé*            *jours/mois*          *concurrente avec*

☐ Term that would have been imposed before credit granted:                    days/months/years
  *Période d'emprisonnement imposée avant l'octroi de tout crédit*                *jours/mois/ans*

☐ Absolute discharge          ☐ Conditional discharge            ☐ Suspended sentence
  *Absolution inconditionnelle*       *Absolution conditionnelle*            *Condamnation avec sursis*

☐ Imprisoned for            days/months/years       ☐ concurrent with        ☐ consecutive to
  *Emprisonnement pour*          *jours/mois/ans*          *concurrente avec*         *consécutif à*

☐ Intermittent sentence for      days               ☐ concurrent with        ☐ consecutive to
  *Peine discontinue*          *jours*               *concurrente avec*         *consécutif à*

☐ Conditional sentence for     days/months/years       ☐ concurrent with        ☐ consecutive to
  *Ordonnance de sursis*          *jours/mois/ans*          *concurrente avec*         *consécutif à*

☐ Probation              months/years        ☐ concurrent with        ☐ consecutive to
  *Période de probation*          *mois/ans*            *concurrente avec*         *consécutif à*

☐ Community service s 732 1(3)(f) / *Service communautaire, par 732 1(3)(f)*              hours / *heures*

☐ Fine of $              VS $           Time to pay                 Days in default
  *Amende de*            $ *sur  comp*       *Délai de paiement*               *Jours à défaut*

☐ Restitution        ☐ s. 738 / s. 739      Amount $                Time to pay
  *Dédommagement*       *art. 738 / art. 739*     *Montant*         $      *Délai de paiement*

☐ Victim surcharge $              Time to pay:                   Days in default
  *Suramende compensatoire*        $    *Délai de paiement*               *Jours à défaut*

☐ Ordered to stand trial / *Renvoyé pour subir son procès*

| ☐ Dismissed | ☐ Driving prohibition | ☐ HTA cautioned | Months / Years | ☐ s 743.21(1) / par 743.21(1) |
|---|---|---|---|---|
| *Rejeté* | *Interdiction de conduite* | *Avertissement (Code de la route)* | *mois/années* | |
| ☐ Acquitted | ☐ Weapons prohibition | s. 109(2)    years | ☐ s. 109(3) (Life) | ☐ s. 110:    years   ☐ s. 110 (life) |
| *Acquitté* | *Interdiction d'armes* | *par. 109(2)    ans* | *par.109(3)(perpétuité)* | *art 110    ans  art 110 (perpétuité)* |
| ☐ Stayed | ☐ DNA. | 5.03 (Primary) | ☐ 5.04 (Secondary) | ☐ Denied (DND) |
| *Sursis* | *ADN* | *5.03 (primaire)* | *5.04 (secondaire)* | *Rejetée* |
| ☐ In Absentia | ☐ S.O.I.R.A. order | ☐ 10 years | ☐ 20 years | ☐ Life |
| *In absentia* | *Ordonnance LERDS* | *10 ans* | *20 ans* | *Perpétuité* |
| ☐ Other | ☐ s. 161 prohibition | months/years | s. 490 forfeiture order | ☐ Granted   ☐ Denied |
| *Autre* | *Interdiction, art. 161* | *mois/ans* | *Ordonnance de confiscation, art. 490* | *Accordée    Rejetée* |

Justice of the Peace / *Juge de paix* _____     Judge / *Juge* _____

| No. of Information / *Nº de la dénonciation* | No. of Information / *Nº de la dénonciation* | No. of Information / *Nº de la dénonciation* |
|---|---|---|
| 18-15008964 | | |
| Return Date / *Date à laquelle le document est rapporté* , 20 | Return Date / *Date à laquelle le document est rapporté* , 20 | Return Date / *Date à laquelle le document est rapporté* , 20 |

**INFORMATION Against / *DÉNONCIATION visant***
KOLLMAR,Don

Address / *Adresse*

62 TRAILS END
GRAND ISLAND, NY 14072

**CHARGE / *ACCUSATION***

INDECENT ASSAULT ON FEMALE
RAPE/CONSENT BY FALSE AND FRAUDULENT REP'S
SEXUAL INTERCOURSE/FEMALE BETWEEN 14 AND 16 YEARS

**INFORMATION Against / *DÉNONCIATION visant***

Address / *Adresse*

**CHARGE / *ACCUSATION***

**INFORMATION Against / *DÉNONCIATION visant***

Address / *Adresse*

**CHARGE / *ACCUSATION***

Refer to front page for further counts / *Reportez-vous à la première page pour plus de chefs*

---

### Panel 1

FOR ADMINISTRATIVE PURPOSES ONLY
*À DES FINS ADMINISTRATIVES SEULEMENT*

☐ Summons / *Sommation*   ☐ Show Cause *Audience de justification*   ☒ Warrant 1ˢᵗ *Mandat en 1ᵉʳ instance*   ☐ Re-laid Information *Dénonciation de remplacement*

☐ Reportable M.V. Offence (H.T.A.199) *Infraction V.M. à déclarer (Code de la route 199)*   C.V.O.R. No (Commercial Vehicles Only) *Numéro C.E.C.V.U. (véhicules utilitaires seulement)*

| Sex *Sexe* | Birth Date / *Date de naissance* | | | Was defendant owner? *La partie défenderesse était-elle propriétaire?* |
|---|---|---|---|---|
| | Day / *Jour* | Month / *Mois* | Year / *Année* | |
| M | 21 | 07 | 1951 | ☐ Yes / *Oui*  ☐ No / *Non* |

Driver's Licence Number / *Numéro du permis de conduire*

Plate No. / *Numéro de plaque*   ☐ Involves a Collision *Infraction liée à un accident*

Informant *Dénonciateur*

| Date Sworn *Date d'assermentation* NOV ,18 | Date of Arrest *Date de l'arrestation* |
|---|---|

| Officer / *Agent de police* CARGILL, PAUL | No. / *Nº* 1447 |
|---|---|

| Police Agency / *Service de police* TORONTO POLICE SERVIC | Div. / *Dist.* 11 DIVISION |
|---|---|

Occurrence Number / *Nº d'incident*
78-132546

Courtroom / *Salle d'audience*
101

At / *À(Au)* OLD CITY HALL COURTS - SC
60 QUEEN ST.W., TORONTO ON M5H 2M4

---

### Panel 2

FOR ADMINISTRATIVE PURPOSES ONLY
*À DES FINS ADMINISTRATIVES SEULEMENT*

☐ Summons / *Sommation*   ☐ Show Cause *Audience de justification*   ☐ Warrant 1ˢᵗ *Mandat en 1ᵉʳ instance*   ☐ Re-laid Information *Dénonciation de remplacement*

☐ Reportable M.V. Offence (H.T.A.199) *Infraction V.M. à déclarer (Code de la route 199)*   C.V.O.R. No (Commercial Vehicles Only) *Numéro C.E.C.V.U. (véhicules utilitaires seulement)*

| Sex *Sexe* | Birth Date / *Date de naissance* | | | Was defendant owner? *La partie défenderesse était-elle propriétaire?* |
|---|---|---|---|---|
| | Day / *Jour* | Month / *Mois* | Year / *Année* | |
| | | | | ☐ Yes / *Oui*  ☐ No / *Non* |

Driver's Licence Number / *Numéro du permis de conduire*

Plate No. / *Numéro de plaque*   ☐ Involves a Collision *Infraction liée à un accident*

Informant *Dénonciateur*

| Date Sworn *Date d'assermentation* | Date of Arrest *Date de l'arrestation* |
|---|---|

| Officer / *Agent de police* | No. / *Nº* |
|---|---|

| Police Agency / *Service de police* | Div. / *Dist.* |
|---|---|

Occurrence Number / *Nº d'incident*

Courtroom / *Salle d'audience*

At / *À(Au)*

---

### Panel 3

FOR ADMINISTRATIVE PURPOSES ONLY
*À DES FINS ADMINISTRATIVES SEULEMENT*

☐ Summons / *Sommation*   ☐ Show Cause *Audience de justification*   ☐ Warrant 1ˢᵗ *Mandat en 1ᵉʳ instance*   ☐ Re-laid Information *Dénonciation de remplacement*

☐ Reportable M.V. Offence (H.T.A.199) *Infraction V.M. à déclarer (Code de la route 199)*   C.V.O.R. No (Commercial Vehicles Only) *Numéro C.E.C.V.U. (véhicules utilitaires seulement)*

| Sex *Sexe* | Birth Date / *Date de naissance* | | | Was defendant owner? *La partie défenderesse était-elle propriétaire?* |
|---|---|---|---|---|
| | Day / *Jour* | Month / *Mois* | Year / *Année* | |
| | | | | ☐ Yes / *Oui*  ☐ No / *Non* |

Driver's Licence Number / *Numéro du permis de conduire*

Plate No. / *Numéro de plaque*   ☐ Involves a Collision *Infraction liée à un accident*

Informant *Dénonciateur*

| Date Sworn *Date d'assermentation* | Date of Arrest *Date de l'arrestation* |
|---|---|

| Officer / *Agent de police* | No. / *Nº* |
|---|---|

| Police Agency / *Service de police* | Div. / *Dist.* |
|---|---|

Occurrence Number / *Nº d'incident*

Courtroom / *Salle d'audience*

At / *À(Au)*

---

EXT-KOLLMAR-00043

# This is exhibit "C" to the affidavit of Robert Speakman, dated June 20, 2019.

_____

**Commissioner of Oaths**

Date: 2019 · 06 · 20

CHRISTINA MEI LIEN CHAN,
a Commissioner, etc., City of Toronto,
for the Toronto Police Service.
Expires May 19, 2020.

TORONTO POLICE SERVICE                  Police Case ID: 230634

## WARRANT FOR ARREST WITH OPTIONAL AUTHORIZATION TO ENTER A DWELLING-HOUSE
### *MANDAT D'ARRESTATION AVEC AUTORISATION FACULTATIVE D'ENTRER*
### *DANS UNE MAISON D'HABITATION*

OCC#: 78-132546

CANADA

PROVINCE OF ONTARIO

*PROVINCE DE L'ONTARIO*

Form / *Formule* 7

Sections / *Articles* 475, 493, 597, 800, and / *et* 803
of the *Criminal Code / du Code criminel*

TORONTO

(Region / *Région*)

To the peace officers in the said Region and in the Province of Ontario: 18-15008964

*Aux agents de la paix dans ladite région et dans la province de l'Ontario :*    Case/File No. / *N° du cas/dossier*

This warrant is issued for the arrest of   KOLLMAR, Don             21 Jul 1951

*Le présent mandat est décerné pour l'arrestation de*                          *(date of birth / date de naissance)*

UNKNOWN , of the      CITY   of      GRANDISLAND

(occupation / *profession*)    *du(de la)*                     *de*

in the    County    of        Erie              , hereinafter called the accused.

*dans le(la)*          *de*                       *ci-après appelé(e) le prévenu.*

**WHEREAS** the accused has been charged that he/she / *ATTENDU QUE le prévenu a été inculpé d'avoir,*

COUNT 1

between the 1st day of January in the year 1974 and the 31st day of December in the year 1978 at the City of Toronto in the Toronto Region did indecently assault Brenda Blais, a female person, contrary to Section 149 of the Criminal Code of Canada.

(see Appendix "A" attached)

**AND WHEREAS: ***
**ET ATTENDU QUE : ***

(a) there are reasonable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused (507(4), 512(1));
*il existe des motifs raisonnables de croire qu'il est nécessaire dans l'intérêt public de décerner ce mandat pour l'arrestation du prévenu (507(4); 512(1));*

(b) the accused failed to attend court in accordance with the summons served on him/her (512(2));
*le prévenu a omis d'être présent au tribunal en conformité avec la sommation qui lui a été signifiée (512(2));*

(c) (an appearance notice or a promise to appear or a recognizance entered into before an officer in charge) was confirmed and the accused failed to attend court in accordance therewith (512(2));
*(une citation à comparaître ou une promesse de comparaître ou un engagement contracté devant un fonctionnaire responsable) a été confirmé(e) et le prévenu a omis d'être présent au tribunal en conformité avec cette citation ou promesse ou cet engagement (512(2));*

(d) it appears that a summons cannot be served because the accused is evading service (512(2));
*il semble qu'une sommation ne peut être signifiée car le prévenu se soustrait à la signification (512(2));*

(e) the accused was ordered to be present at the hearing of an application for a review of an order made by a justice and did not attend the hearing (520(5), 521(5));
*il a été ordonné au prévenu de se présenter à l'audience d'une requête pour l'examen d'une ordonnance rendue par un juge et il ne s'y est pas présenté (520(5), 521(5));*

(f) there are reasonable grounds to believe that the accused has contravened or is about to contravene the (summons or appearance notice or promise to appear *or* undertaking *or* recognizance) on which he/she was released (524(1), 525(5), 679(6));
*il y a des motifs raisonnables de croire que le prévenu a violé ou est sur le point de violer (sommation ou citation à comparaître ou une promesse de comparaître ou une promesse ou un engagement) en raison duquel ou de laquelle il a été mis en liberté (524(1), 525(5), 679(6));*

(g) there are reasonable grounds to believe that the accused has since his/her release from custody on (any summons or appearance notice or promise to appear *or* an undertaking *or* a recognizance) committed an indictable offence (524(1), 525(5), 679(6));
*il y a des motifs raisonnables de croire que, depuis sa mise en liberté sur (toute sommation ou citation à comparaître ou promesse de comparaître ou une promesse ou un engagement), le prévenu a commis un acte criminel (524(1), 525(5), 679(6));*

\*   Initial applicable recital.
   *Parapher l'attendu qui s'applique.*

Generated Date: November 28, 2018 08:53 AM
CCO-7-475-1 (rev. 03/10) eJust-CMS 08/2015          EXT-KOLLMAR-00045

**WARRANT FOR ARREST WITH OPTIONAL AUTHORIZATION TO ENTER A DWELLING-HOUSE**
*MANDAT D'ARRESTATION AVEC AUTORISATION FACULTATIVE D'ENTRER DANS UNE MAISON D'HABITATION*

Form / *Formule* 7
Sections / *Articles* 475, 493, 597, 800, and / *et* 803
of the *Criminal Code* / *du Code criminel*

(h)   the accused was required by (an appearance notice *or* a promise to appear *or* a recognizance entered into before an officer in charge *or* a summons) to attend at a time and place stated therein for the purposes of the *Identification of Criminals Act* and did not appear at the time and place (502, 510);
*le prévenu devait en vertu (d'une citation à comparaître ou d'une promesse de comparaître ou d'un engagement contracté devant un fonctionnaire responsable ou une sommation) comparaître aux temps et lieu y indiqués aux fins de la Loi sur l'identification des criminels et a omis de comparaître aux temps et lieu ainsi indiqués (502, 510);*

(i)   an indictment has been found against the accused and the accused has not appeared or remained in attendance before the court for his/her trial (597);
*un acte d'accusation a été présenté contre le prévenu et celui-ci n'a pas comparu ou n'est pas demeuré présent pour son procès (597);*

(j)   **

**THIS IS THEREFORE,** to command you, in Her Majesty's name, forthwith to arrest the said accused and to bring him/her before the
*IL VOUS EST PAR LES PRÉSENTES enjoint, au nom de Sa Majesté, d'arrêter ledit prévenu et de l'amener devant le*
Justice/Judge of the Superior Court of Ontario/Ontario Court of Justice*** of the said Region or before me or any Justice in and for the said Region, to answer to the said charge.
*juge de paix ou juge présiden de la Cour supérieure de justice/Cour de justice de l'Ontario*** de ladite région ou devant moi ou tout juge de paix dans et pour ladite région, pour répondre à ladite inculpation.*

DATED this __24th__ day of __December / November__ , yr. __2018__
*FAIT ce         jour de                                  an*

at the        CITY
*à(au )*

of        TORONTO                        9:00 am
*de*

in the Province of Ontario / *dans la province de l'Ontario*

_____
Judge, or Justice of the Peace / *Juge ou juge de paix*
M.J. Callahan

**   For any case not covered by recitals (a) to (i), insert recital in the words of the statute authorizing the warrant.
*Pour tout cas qui n'est pas couvert par les attendus a) à i), insérez l'attendu en empruntant les termes de la loi autorisant le mandat.*

***   Choose applicable recital.
*Choisir l'attendu qui s'applique.*

Appendix "A"                                                                                    Page 1
(KOLLMAR, Don )

**COUNT 2 AND FURTHER THAT**
Between the 1st day of January in the year 1974 and the 31st day of December in the year 1978
at the City of Toronto in the Toronto Region did have sexual intercourse with Brenda Blais, a
female person who was not his wife, with her consent, which consent was obtained by false and
fraudulent representations as to the nature and quality of the act, contrary to Section 143,
clause (b), paragraph (iii) of the Criminal Code of Canada.

**COUNT 3 AND FURTHER THAT**
Between the 1st day of January in the year 1974 and the 31st day of December in the year 1978
at the City of Toronto in the Toronto Region being a male person, did have sexual intercourse
with Brenda Blais, a female person who was not his wife, was of a previously chaste
character, and who was fourteen years of age or more and under the age of sixteen years,
contrary to Section 146, subsection (2) of the Criminal Code of Canada.

**WARRANT FOR ARREST WITH OPTIONAL AUTHORIZATION TO ENTER A DWELLING-HOUSE**
*MANDAT D'ARRESTATION AVEC AUTORISATION FACULTATIVE D'ENTRER DANS UNE MAISON D'HABITATION*

Form / *Formule 7*
Sections / *Articles* 475, 493, 597, 800, and / *et* 803
of the *Criminal Code* / *du Code criminel*

# AUTHORIZATION TO ENTER A DWELLING-HOUSE
## *AUTORISATION POUR ENTRER DANS UNE MAISON D'HABITATION*

[And where applicable] Whereas there are reasonable grounds to believe that the accused is or will be present in
*[S'il y a lieu] Attendu qu'il y a des motifs raisonnables de croire que le prévenu se trouve ou se trouvera dans*
(here describe dwelling-house / *décrire ici la maison d'habitation*)

This warrant is also issued to authorize you to enter the dwelling-house for the purpose of arresting or apprehending the accused at any time
*Le présent mandat est également décerné pour vous autoriser à entrer dans la maison d'habitation en vue d'arrêter ou d'appréhender le*

between the hour of _____ , on the _____ day of _____ , yr. _____ .
*prévenu à tout moment entre*       h       *jour de*       *an*

and the hour of _____ , on the _____ day of _____ , yr. _____ .
*et*       h       *jour de*       *an*

subject to the condition that you may not enter the dwelling-house unless you have, immediately before entering the dwelling-house, reasonable grounds to believe that the person to be arrested or apprehended is present in the dwelling-house.
*Toutefois, vous n'avez pas le droit d'entrer dans la maison d'habitation à moins d'avoir, immédiatement avant d'y entrer, des motifs raisonnables de croire que la personne devant être arrêtée ou appréhendée se trouve dans la maison d'habitation.*

[And where applicable] Whereas there are reasonable grounds to believe that prior announcement of the entry would ***
*[S'il y a lieu] Attendu qu'il y a des motifs raisonnables de croire que le fait de prévenir de pénétrer dans la maison d'habitation :***

(a) expose the peace officer or any other person to imminent bodily harm or death;
*exposerait l'agent de la paix ou toute autre personne à des lésions corporelles imminentes ou à la mort;*

or / *ou*

(b) result in the imminent loss or imminent destruction of evidence relating to the commission of an indictable offence.
*entraînerait la perte ou la destruction imminente d'éléments de preuve relatifs à la perpétration d'un acte criminel.*

This warrant is also issued to authorize you to enter the dwelling-house without prior announcement, subject to the condition that you may not enter the dwelling-house without prior announcement unless you have, immediately before entering the dwelling-house, ***
*Le présent mandat est également décerné pour vous autoriser à entrer dans la maison d'habitation sans prévenir. Toutefois, vous n'avez pas le droit d'entrer dans la maison d'habitation sans prévenir à moins d'avoir, immédiatement avant d'y entrer, ***

(a) reasonable grounds to suspect that prior announcement of the entry would expose the peace officer or any other person to imminent bodily harm or death
*des motifs raisonnables de soupçonner que le fait de prévenir de l'entrée dans la maison d'habitation exposerait l'agent de la paix ou toute autre personne à des lésions corporelles imminentes ou à la mort;*

or / *ou*

(b) reasonable grounds to believe that prior announcement of the entry would result in the imminent loss or imminent destruction of evidence relating to the commission of an indictable offence.
*des motifs raisonnables de croire que le fait de prévenir avant de pénétrer dans la maison d'habitation entraînerait la perte ou la destruction imminente d'éléments de preuve relatifs à la perpétration d'un acte criminel.*

The authorization to enter the dwelling-house for the purpose of arresting or apprehending the accused shall be carried out in accordance with following terms and conditions:
*L'autorisation d'entrer dans la maison d'habitation dans le but d'arrêter ou d'appréhender le prévenu sera exécutée conformément aux conditions suivantes :*
(conditions to be specified / *conditions à préciser*)

DATED this _____ day of _____ , yr. _____ .
*FAIT ce*       *jour de*       *an*

at the _____
*à(au )*

of _____
*de*

in the Province of Ontario / *dans la province de l'Ontario*

_____
Judge, or Justice of the Peace / *Juge ou juge de paix*

***    Choose applicable recital.
     *Choisir l'attendu qui s'applique.*

Form / *Formule* 28
Sections / *Articles* 487 and / *et* 528
of the *Criminal Code* / *du* Code criminel

**ENDORSEMENT OF WARRANT**
*VISA DU MANDAT*
CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

_____
(Region / *Région*)

Pursuant to application this day made to me, I hereby authorize the arrest of the accused (or defendant)
*Conformément à la demande qui m'est faite aujourd'hui, j'autorise par les présentes l'arrestation du prévenu (ou du défendeur)*

within the _____
*dans*
(Region / *Région*)

Dated this _____ day of _____ , yr. ____
*Fait ce* *jour de* *an*

at the _____ of _____
*à(au)* *de*

in the Province of Ontario / *dans la province de l'Ontario*

_____
Judge, or Justice of the Peace / *Juge ou juge de paix*

Form / *Formule* 29
Section / *Article* 499 and / *et*
subsection / *paragraphe* 507(6)
of the *Criminal Code* / *du* Code criminel

**ENDORSEMENT OF WARRANT**
*VISA DU MANDAT*
CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

_____
(Region / *Région*)

Whereas this warrant is issued in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 thereof.
*Attendu que le présent mandat est décerné relativement à une infraction autre qu'une infraction mentionnée à l'article 522 du Code criminel, j'autorise par les présentes la mise en liberté du prévenu conformément à l'article 499 mentionné ci-dessus.*

Dated this _____ day of _____ , yr. ____
*Fait ce* *jour de* *an*

at the _____ of _____
*à(au)* *de*

in the Province of Ontario / *dans la province de l'Ontario*

_____
Judge, or Justice of the Peace / *Juge ou juge de paix*

EXT-KOLLMAR-00049

CCO-7-475-1 (rev. 03/10) eJust-CMS 08/2015

# This is exhibit "D" to the affidavit of Robert Speakman, dated June 20, 2019.

Date: 2019.06.20

Commissioner of Oaths

CHRISTINA MEI LIEN CHAN,
a Commissioner, etc., City of Toronto,
for the Toronto Police Service.
Expires May 19, 2020.

EXT-KOLLMAR-00050

TORONTO POLICE SERVICE          REPLACES INFO #19-15000734     Police Case ID#: 230634
OCC#: 78-132546 Inv.Off.:1447

## Information / *Dénonciation*

Form 2, sections 506, 508.1 and 788 / *Formule 2, articles 506, 508.1 et 788*

☐ DV  (Domestic Violence / *Violence conjugale*)

☐ S  (Impaired driving with substances / *Conduite avec capacités affaiblies par des substances*)

☐ V  (Vessel / *Bateau*)

**19-15003954**
Information Number / *N° de la dénonciation*

☐ Replacement Information / *Dénonciation de remplacement*

| | |
|---|---|
| ☐ Non-Disclosure Order Pursuant to s. 486.31 *Ordonnance de non-divulgation, art. 486.31* | ☐ Publication ban pursuant to *Interdiction de publication en vertu de* |
| ☐ Non-communication s. 515(12)/516(2) *Non-communication, par. 515 (12)/516 (2)* | ☐ Provisions of 530(3) complied with *Dispositions du par. 530 (3) observées* |

| Arrest Date: *Date d'arrestation* | 15 month Flag: *Alerte à 15 mois* | 18 month Flag: *Alerte à 18 mois* |
|---|---|---|
| Sworn/Affirmed Date / Deemed Sworn/Affirmed Date: **Jun   2019** *Déclarée sous serment/affirmée solennellement le / réputée être déclarée sous serment/affirmée solennellement le* | 15 month Flag: *Alerte à 15 mois* | 18 month Flag: *Alerte à 18 mois* |

CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

**TORONTO**
(Region / *Région*)

Information of: _____ Paul Cargill
*Dénonciation de :*

of  **THE CITY OF TORONTO**                          **PEACE OFFICER**
*de*                                                      (occupation / *profession*)

hereinafter called the informant. / *ci-après appelé(e) le dénonciateur.*

The informant says that **he/she** believes on reasonable grounds that
*Le dénonciateur déclare qu'il a des motifs raisonnables de croire que*

(1) **KOLLMAR, Don**     DOB: 29 Jul. 1951    DL:
    62 TRAILS END, GRAND ISLAND, NY 14072

**COUNT 1**

**Don KOLLMAR**

between the 1st day of January in the year 1975 and the 31st day of December in the year 1979 at the City of Toronto in the Toronto Region did indecently assault Brenda Blais, a female person, contrary to Section 149 of the Criminal Code of Canada.

**COUNT 2 AND FURTHER THAT**

**Don KOLLMAR**

between the 1st day of January in the year 1975 and the 31st day of December in the year 1979 at the City of Toronto in the Toronto Region did rape Brenda Blais, contrary to Section 144 of the Criminal Code of Canada.

Generated Date: June 05, 2019 01:39 PM

CCO-2-000-1-C (rev. 10/18)

(Charges Continued / *Accusations, suite*)

**19-15003954**

Information Number / *N° de la dénonciation*

☐ Accused notified court under s. 530(3)      ☐ Designation Filed      ☐ Interpreter Required
*Tribunal avisé par l'accusé en vertu du par. 530 (3)*      *Désignation déposée*      *Interprète requis*

| Date | Accused / *Accusé* | Adjournment Date / *Date d'ajournement* | Adjournment Details / *Détails sur l'ajournement* | Designation / *Désignation* | Counsel As Agent / *Avocat mandataire* | Fails to Appear / *Omet de comparaître* | Bench Warrant / *Mandat d'arrêt* | Discretion / *Discrétion* | Certificate of Default / *Certificat de défaut* |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Date / *Date* | Clerk / *Greffier* | Crown / *Couronne* | For the Accused / *Pour l'accusé* | Justice's initials / *Initiales du juge* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

At Bail Review dated _____      ☐ Original Order Confirmed      ☐ New Order Made      ☐ Gladue Report Requested
*À la révision de l'ordonnance*      *Ordonnance*      *Nouvelle*      *Rapport Gladue*
*de détention datée du*      *originale confirmée*      *ordonnance rendue*      *demandé*      (date / *date*)

CCO-2-000-1-C (rev. 10/18)

19-15003954
Information Number / Nº de la dénonciation

☐ Deemed to be sworn/affirmed – To be completed where information is laid other than in person:
    *Réputée être déclarée sous serment/affirmée solennellement – À remplir lorsque la dénonciation est déposée autrement qu'en personne :*

I, _____, state that all matters contained in this information are true to my knowledge and
*Je soussigné(e)         (name of informant / nom du dénonciateur)     déclare que tous les renseignements contenus dans la présente dénonciation*
belief, pursuant to s. 508.1(2) of the *Criminal Code*.
*sont, à ma connaissance, véridiques, en vertu du par. 508.1 (2) du Code criminel.*

Dated at _____ in the Province of Ontario, this _____ day of _____, 20 ____
*Fait à(au)                                                    dans la province de l'Ontario, ce                   jour de*

☒ To be completed where information is laid in person:
    *À remplir lorsque la dénonciation est déposée en personne :*

Sworn/affirmed before me at the    CITY
*Déclarée sous serment/affirmée solennellement devant moi à/au*

of / de    TORONTO                                                              Informant / Dénonciateur
in the Province of Ontario / *dans la province de l'Ontario*

this _____ day of    JUNE          , 20 19
*ce         jour de*                                          Justice of the Peace / *Juge de paix*

☐ Appearance Notice         ☐ Promise to Appear       ☐ Recognizance        for _____, 20 ___
  *Citation à comparaître*      *Promesse de comparaître*   *Engagement*          *pour le*    (day, month / jour, mois)

CHECK ONE OF THE FOLLOWING / *COCHEZ LA CASE QUI CONVIENT*

☐ Cancelled – Police to notify defendant        ☐ Cancelled – Summons        ☐ Confirmed on _____, 20 ___
  *Annulé(e) – La police informera la partie défenderesse*    *Annulé –Sommation*        *Confirmé(e) le*  (day, month / jour, mois)
☐ Cancelled – Warrant issued
  *Annulé(e) – Mandat délivré*

_____, 20 ___
    Justice of the Peace / *Juge de paix*          (day, month / jour, mois)         Justice of the Peace / *Juge de paix*

| Date *Date* | Crown Elects to Proceed *La Couronne choisit de procéder par* | ☐ Summarily *Procédure sommaire* | ☐ By Indictment *Acte d'accusation* | ☐ Summary Conviction Offence(s) *Infraction(s) punissable(s) sur déclaration de culpabilité par procédure sommaire* | | | ☐ Indictable Offence(s) *Acte(s) criminel(s)* |
|---|---|---|---|---|---|---|---|

| Date *Date* | Accused *Accusé* | Elects Trial by *Choix d'un procès devant* | | | Preliminary Hearing Requested *Enquête préliminaire demandée* | | Justice Initials *Initiales du juge* | Abs. Juris. Comp. absolue | Pleads *Plaide* | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Superior Court *Cour supérieure* | | Ontario Court *Cour de l'Ontario* | Yes *Oui* | No *Non* | | | Guilty to Counts *Coupable des chefs d'accusation* | Not Guilty to Counts *Non coupable des chefs d'accusation* |
| | | Judge *Juge* | Judge & Jury *Juge et jury* | Judge On Counts *Juge pour les chefs d'accusation* | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| Date *Date* | Accused *Accusé* | Committed (or) Ord. Std. Trial *On Counts *Renvoyé à procès *pour les chefs d'accusation* | Discharged on Counts *Libéré des chefs d'accusation* | Found / *Reconnu* | |
|---|---|---|---|---|---|
| | | | | Guilty on Counts *Coupable des chefs d'accusation* | Not Guilty on Counts *Non coupable des chefs d'accusation* |
| | | | | | |
| | | | | | |

* ☐ With consent of accused and prosecutor, without taking or recording    ☐ (a) any evidence  (or)  ☐ (b) further evidence
  *Avec le consentement de l'accusé et du poursuivant, sans recueillir ou consigner*    *a) des preuves*   *(ou)*   *b) des preuves additionnelles*

_____
            Judge / *Juge*

CCO-2-000-1-C (rev. 10/18)

EXT-KOLLMAR-00054

**19-15003954**

Regina v. / La Reine c. _____   Information No. / N° de la dénonciation

---

Count / Chef _____ Sentence date / Date de détermination de la peine _____   ☐ Withdrawn / Accusation retirée

☐ Pre-sentence custody _____ days/months   Time credited: _____ days/months   ☐ concurrent with
   Détention présentencielle        jours/mois         Crédit octroyé         jours/mois         concurrente avec
☐ Term that would have been imposed before credit granted: _____ days/months/years
   Période d'emprisonnement imposée avant l'octroi de tout crédit         jours/mois/ans
☐ Absolute discharge         ☐ Conditional discharge         ☐ Suspended sentence
   Absolution inconditionnelle      Absolution conditionnelle         Condamnation avec sursis
☐ Imprisoned for _____ days/months/years   ☐ concurrent with   ☐ consecutive to _____
   Emprisonnement pour      jours/mois/ans         concurrent avec      consécutive à
☐ Intermittent sentence for _____ days   ☐ concurrent with   ☐ consecutive to _____
   Peine discontinue         jours         concurrent avec      consécutive à
☐ Conditional sentence for _____ days/months/years   ☐ concurrent with   ☐ consecutive to _____
   Ordonnance de sursis      jours/mois/ans         concurrente avec      consécutive à
☐ Probation _____ months/years   ☐ concurrent with   ☐ consecutive to _____
   Période de probation      mois/ans         concurrente avec      consécutive à
☐ Community service s.732.1(3)(f) / Service communautaire, par.732.1 (3)f) _____ hours / heures
☐ Fine of $ _____ VS $ _____   Time to pay _____
   Amende de _____ $ sur. comp. _____ $   délai de paiement
☐ Restitution   ☐ s. 738 / s. 739   Amount: $ _____   Time to pay _____
   Dédommagement      art. 738 / art. 739   Montant _____ $   Délai de paiement
☐ Victim surcharge: $ _____   Time to pay: _____
   Suramende compensatoire _____ $   Délai de paiement

| | | | |
|---|---|---|---|
| ☐ Dismissed<br>Rejeté | ☐ HTA cautioned<br>Avertissement (Code de la route) | ☐ Driving prohibition:<br>Interdiction de conduite : | Months / Years _____<br>mois/années   ☐ s.743.21(1) / par. 743.21 (1) |
| ☐ Acquitted<br>Acquitté | Weapons prohibition:<br>Interdiction d'armes | ☐ s.109(2): _____ years<br>par. 109 (2)   ans | ☐ s. 109(3) (Life) _____   ☐ s. 110: _____ years   ☐ s. 110 (life)<br>par.109 (3)(perpétuité)   art. 110   ans   art.110 (perpétuité) |
| ☐ Stayed<br>Sursis | ☐ DNA:<br>ADN | ☐ 5.03 (Primary)<br>5.03 (primaire) | ☐ 5.04 (Secondary)   ☐ Denied (DND)<br>5.04 (secondaire)   Rejetée |
| ☐ In Absentia<br>In absentia | ☐ S.O.I.R.A. order:<br>Ordonnance LERDS | ☐ 10 years<br>10 ans | ☐ 20 years   ☐ Life<br>20 ans   Perpétuité |
| ☐ Other<br>Autre | ☐ s. 161 prohibition: _____ months/years<br>Interdiction, art. 161   mois/ans | ☐ s. 490 forfeiture order:<br>Ordonnance de confiscation, art. 490 | ☐ Granted   ☐ Denied<br>Accordée   Rejetée |

---

Count / Chef _____ Sentence date / Date de détermination de la peine _____   ☐ Withdrawn / Accusation retirée

☐ Pre-sentence _____ days/months   Time credited: _____ days/months   ☐ concurrent with
   Détention présentencielle        jours/mois         Crédit octroyé         jours/mois         concurrente avec
☐ Term that would have been imposed before credit granted: _____ days/months/years
   Période d'emprisonnement imposée avant l'octroi de tout crédit         jours/mois/ans
☐ Absolute discharge         ☐ Conditional discharge         ☐ Suspended sentence
   Absolution inconditionnelle      Absolution conditionnelle         Condamnation avec sursis
☐ Imprisoned for _____ days/months/years   ☐ concurrent with   ☐ consecutive to _____
   Emprisonnement pour      jours/mois/ans         concurrent avec      consécutive à
☐ Intermittent sentence for _____ days   ☐ concurrent with   ☐ consecutive to _____
   Peine discontinue         jours         concurrente avec      consécutive à
☐ Conditional sentence for _____ days/months/years   ☐ concurrent with   ☐ consecutive to _____
   Ordonnance de sursis      jours/mois/ans         concurrente avec      consécutive à
☐ Probation _____ months/years   ☐ concurrent with   ☐ consecutive to _____
   Période de probation      mois/ans         concurrente avec      consécutive à
☐ Community service s.732.1(3)(f) / Service communautaire, par.732.1(3)f) _____ hours / heures
☐ Fine of $ _____ VS $ _____   Time to pay _____
   Amende de _____ $ sur. comp. _____ $   Délai de paiement
☐ Restitution   ☐ s. 738 / s. 739   Amount: $ _____   Time to pay _____
   Dédommagement      art. 738 / art. 739   Montant _____ $   Délai de paiement
☐ Victim surcharge: $ _____   Time to pay: _____
   Suramende compensatoire _____ $   Délai de paiement

| | | | |
|---|---|---|---|
| ☐ Dismissed<br>Rejeté | ☐ HTA cautioned<br>Avertissement (Code de la route) | ☐ Driving prohibition:<br>Interdiction de conduite : | Months / Years _____<br>mois/années   ☐ s.743.21(1) / par. 743.21 (1) |
| ☐ Acquitted<br>Acquitté | Weapons prohibition:<br>Interdiction d'armes | ☐ s.109(2): _____ years<br>par. 109 (2)   ans | ☐ s. 109(3) (Life) _____   ☐ s. 110: _____ years   ☐ s. 110 (life)<br>par.109(3)(perpétuité)   art. 110   ans   art.110 (perpétuité) |
| ☐ Stayed<br>Sursis | ☐ DNA:<br>ADN | ☐ 5.03 (Primary)<br>5.03 (primaire) | ☐ 5.04 (Secondary)   ☐ Denied (DND)<br>5.04 (secondaire)   Rejetée |
| ☐ In Absentia<br>In absentia | ☐ S.O.I.R.A. order:<br>Ordonnance LERDS | ☐ 10 years<br>10 ans | ☐ 20 years   ☐ Life<br>20 ans   Perpétuité |
| ☐ Other<br>Autre | ☐ s. 161 prohibition: _____ months/years<br>Interdiction, art. 161   mois/ans | ☐ s. 490 forfeiture order:<br>Ordonnance de confiscation, art. 490 | ☐ Granted   ☐ Denied<br>Accordée   Rejetée |

---

_____   _____
Justice of the Peace / Juge de paix         Judge / Juge

CCO-2-000-1-C (rev. 10/18)

| Information No. / N° de la dénonciation | Information No. / N° de la dénonciation | Information No. / N° de la dénonciation |
|---|---|---|
| 19-15003954 | | |
| **Return Date / Date à laquelle le document est rapporté** | **Return Date / Date à laquelle le document est rapporté** | **Return Date / Date à laquelle le document est rapporté** |
| , 20 | , 20 | , 20 |

**INFORMATION Against / DÉNONCIATION visant**
KOLLMAR, Don

Address / Adresse
62 TRAILS END
GRAND ISLAND, NY 14072

**CHARGE / ACCUSATION**
INDECENT ASSAULT ON FEMALE
RAPE/CONSENT BY FALSE AND FRAUDULENT REP'S

Refer to front page for further counts. / Reportez-vous à la première page pour plus de chefs.

---

**INFORMATION Against / DÉNONCIATION visant**

Address / Adresse

**CHARGE / ACCUSATION**

Refer to front page for further counts. / Reportez-vous à la première page pour plus de chefs.

---

**INFORMATION Against / DÉNONCIATION visant**

Address / Adresse

**CHARGE / ACCUSATION**

Refer to front page for further counts. / Reportez-vous à la première page pour plus de chefs.

---

### FOR ADMINISTRATIVE PURPOSES ONLY / À DES FINS ADMINISTRATIVES SEULEMENT (Column 1)

☐ Summons / Sommation   ☐ Show Cause / Audience de justification   ☒ Warrant 1st / Mandat en 1re instance
☐ Replacement Information / Dénonciation de remplacement

☐ Reportable M.V. Offence (H.T.A. 199) / Infraction V.A. à déclarer (Code de la route 199)   C.V.O.R. No (Commercial Vehicles Only) / Numéro C.I.U.V.U. (véhicules utilitaires seulement)

| Sex / Sexe | Birth Date / Date de naissance | | | Was defendant owner? / La partie défenderesse était-elle propriétaire? |
| | Day / Jour | Month / Mois | Year / Année | ☐ Yes / Oui   ☐ No / Non |
| M | 29 | 07 | 1951 | |

Driver's Licence Number / Numéro du permis de conduire

Plate No. / Numéro de plaque   ☐ Involves a Collision / Infraction reliée à un accident

Informant / Dénonciateur

| Date Sworn/Affirmed / Déclarée sous serment/affirmée solennellement le   JUN , 19 | Date of Arrest / Date de l'arrestation |
|---|---|

☐ Deemed to be sworn/affirmed / Réputée être déclarée sous serment/affirmée solennellement le

Officer / Agent de police   No. / N°
CARGILL, PAUL   1447

Police Agency / Service de police   Div. / Dist.
TORONTO POLICE SERVIC   11 DIVISION

Occurrence Number / N° d'incident
78-132546

Courtroom / Salle d'audience
101

At / À (Au)   OLD CITY HALL COURTS - SC
60 QUEEN ST.W., TORONTO ON M5H 2M4

---

### FOR ADMINISTRATIVE PURPOSES ONLY / À DES FINS ADMINISTRATIVES SEULEMENT (Column 2)

☐ Summons / Sommation   ☐ Show Cause / Audience de justification   ☐ Warrant 1st / Mandat en 1re instance
☐ Replacement Information / Dénonciation de remplacement

☐ Reportable M.V. Offence (H.T.A. 199) / Infraction V.A. à déclarer (Code de la route 199)   C.V.O.R. No (Commercial Vehicles Only) / Numéro C.I.U.V.U. (véhicules utilitaires seulement)

| Sex / Sexe | Birth Date / Date de naissance | | | Was defendant owner? / La partie défenderesse était-elle propriétaire? |
| | Day / Jour | Month / Mois | Year / Année | ☐ Yes / Oui   ☐ No / Non |

Driver's Licence Number / Numéro du permis de conduire

Plate No. / Numéro de plaque   ☐ Involves a Collision / Infraction reliée à un accident

Informant / Dénonciateur

| Date Sworn/Affirmed / Déclarée sous serment/affirmée solennellement le | Date of Arrest / Date de l'arrestation |
|---|---|

☐ Deemed to be sworn/affirmed / Réputée être déclarée sous serment/affirmée solennellement le

Officer / Agent de police   No. / N°

Police Agency / Service de police   Div. / Dist.

Occurrence Number / N° d'incident

Courtroom / Salle d'audience

At / À (Au)

---

### FOR ADMINISTRATIVE PURPOSES ONLY / À DES FINS ADMINISTRATIVES SEULEMENT (Column 3)

☐ Summons / Sommation   ☐ Show Cause / Audience de justification   ☐ Warrant 1st / Mandat en 1re instance
☐ Replacement Information / Dénonciation de remplacement

☐ Reportable M.V. Offence (H.T.A. 199) / Infraction V.A. à déclarer (Code de la route 199)   C.V.O.R. No (Commercial Vehicles Only) / Numéro C.I.U.V.U. (véhicules utilitaires seulement)

| Sex / Sexe | Birth Date / Date de naissance | | | Was defendant owner? / La partie défenderesse était-elle propriétaire? |
| | Day / Jour | Month / Mois | Year / Année | ☐ Yes / Oui   ☐ No / Non |

Driver's Licence Number / Numéro du permis de conduire

Plate No. / Numéro de plaque   ☐ Involves a Collision / Infraction reliée à un accident

Informant / Dénonciateur

| Date Sworn/Affirmed / Déclarée sous serment/affirmée solennellement le | Date of Arrest / Date de l'arrestation |
|---|---|

☐ Deemed to be sworn/affirmed / Réputée être déclarée sous serment/affirmée solennellement le

Officer / Agent de police   No. / N°

Police Agency / Service de police   Div. / Dist.

Occurrence Number / N° d'incident

Courtroom / Salle d'audience

At / À (Au)

EXT-KOLLMAR-00056

# This is exhibit "E" to the affidavit of Robert Speakman, dated June 20, 2019.

Date: 2019.06.20

**Commissioner of Oaths**

CHRISTINA MEI LIEN CHAN,
a Commissioner, etc., City of Toronto,
for the Toronto Police Service.
Expires May 19, 2020.

**WARRANT FOR ARREST WITH OPTIONAL AUTHORIZATION TO ENTER A DWELLING-HOUSE**
*MANDAT D'ARRESTATION AVEC AUTORISATION FACULTATIVE D'ENTRER*
*DANS UNE MAISON D'HABITATION*

OCC#:78-132546

CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

Form / *Formule* 7

Sections / *Articles* 475, 493, 597, 800, and / *et* 803
of the *Criminal Code* / *du Code criminel*

| TORONTO | To the peace officers in the said Region and in the Province of Ontario: | 19-15003954 |
|---|---|---|
| (Region / *Région*) | *Aux agents de la paix dans ladite région et dans la province de l'Ontario :* | Case/File No. / *N° du cas/dossier* |

This warrant is issued for the arrest of **KOLLMAR, Don**          29 Jul 1951
*Le présent mandat est décerné pour l'arrestation de*          (date of birth / *date de naissance*)

| **UNKNOWN** | , of the | **CITY** | of | **GRANDISLAND** |
|---|---|---|---|---|
| (occupation / *profession*) | *du(de la)* | | *de* | |

in the     **REGION**     of          **NEW YORK**          , hereinafter called the accused.
*dans le(la)*     *de*                         *ci-après appelé(e) le prévenu.*

**WHEREAS** the accused has been charged that he/she / *ATTENDU QUE le prévenu a été inculpé d'avoir,*

COUNT 1
between the 1st day of January in the year 1975 and the 31st day of December in the year 1979
at the City of Toronto in the Toronto Region did indecently assault Brenda Blais, a female
person, contrary to Section 149 of the Criminal Code of Canada.

(see Appendix "A" attached)

**AND WHEREAS: ***
*ET ATTENDU QUE : ***

(a) there is reasonable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused (507(4), 512(1));
*il existe des motifs raisonnables de croire qu'il est nécessaire dans l'intérêt public de décerner ce mandat pour l'arrestation du prévenu (507(4); 512(1));*

(b) the accused failed to attend court in accordance with the summons served on him/her (512(2));
*le prévenu a omis d'être présent au tribunal en conformité avec la sommation qui lui a été signifiée (512(2));*

(c) (an appearance notice or a promise to appear or a recognizance entered into before an officer in charge) was confirmed and the accused failed to attend court in accordance therewith (512(2));
*(une citation à comparaître ou une promesse de comparaître ou un engagement contracté devant un fonctionnaire responsable) a été confirmé(e) et le prévenu a omis d'être présent au tribunal en conformité avec cette citation ou promesse ou cet engagement (512(2));*

(d) it appears that a summons cannot be served because the accused is evading service (512(2));
*il semble qu'une sommation ne peut être signifiée car le prévenu se soustrait à la signification (512(2));*

(e) the accused was ordered to be present at the hearing of an application for a review of an order made by a justice and did not attend the hearing (520(5), 521(5));
*il a été ordonné au prévenu de se présenter à l'audience d'une requête pour l'examen d'une ordonnance rendue par un juge et il ne s'y est pas présenté (520(5), 521(5));*

(f) there are reasonable grounds to believe that the accused has contravened or is about to contravene the (summons or appearance notice or promise to appear or undertaking or recognizance) on which he/she was released (524(1), 525(5), 679(6));
*il y a des motifs raisonnables de croire que le prévenu a violé ou est sur le point de violer (sommation ou citation à comparaître ou promesse de comparaître ou une promesse ou un engagement) en raison duquel ou de laquelle il a été mis en liberté (524(1), 525(5), 679(6));*

(g) there are reasonable grounds to believe that the accused has since his/her release from custody on (any summons or appearance notice or promise to appear or an undertaking or a recognizance) committed an indictable offence (524(1), 525(5), 679(6));
*il y a des motifs raisonnables de croire que, depuis sa mise en liberté sur (toute sommation ou citation à comparaître ou promesse de comparaître ou une promesse ou un engagement), le prévenu a commis un acte criminel (524(1), 525(5), 679(6));*

* Initial applicable recital.
*Parapher l'attendu qui s'applique.*

Generated Date: June 07, 2019 07:07 AM          EXT-KOLLMAR-00058
:CO-7-475-1 (rev. 03/10) eJust-CMS 08/2015

**WARRANT FOR ARREST WITH OPTIONAL AUTHORIZATION TO ENTER A DWELLING-HOUSE**
*MANDAT D'ARRESTATION AVEC AUTORISATION FACULTATIVE D'ENTRER DANS UNE MAISON D'HABITATION*

Form / *Formule* 7
Sections / *Articles* 475, 493, 597, 800, and / *et* 803
of the *Criminal Code* / *du Code criminel*

(h)   the accused was required by (an appearance notice *or* a promise to appear *or* a recognizance entered into before an officer in charge *or* a summons) to attend at a time and place stated therein for the purposes of the *Identification of Criminals Act* and did not appear at the time and place (502, 510);
*le prévenu devait en vertu (d'une citation à comparaître ou d'une promesse de comparaître ou d'un engagement contracté devant un fonctionnaire responsable ou une sommation) comparaître aux temps et lieu y indiqués aux fins de la Loi sur l'identification des criminels et a omis de comparaître aux temps et lieu ainsi indiqués (502, 510);*

(i)   an indictment has been found against the accused and the accused has not appeared or remained in attendance before the court for his/her trial (597);
*un acte d'accusation a été présenté contre le prévenu et celui-ci n'a pas comparu ou n'est pas demeuré présent pour son procès (597);*

(j)   **

**THIS IS THEREFORE**, to command you, in Her Majesty's name, forthwith to arrest the said accused and to bring him/her before the
***IL VOUS EST PAR LES PRÉSENTES*** *enjoint, au nom de Sa Majesté, d'arrêter ledit prévenu et de l'amener devant le*

Justice/Judge of the Superior Court of Ontario/Ontario Court of Justice*** of the said Region or before me or any Justice in and for the said Region, to answer to the said charge.
*juge de paix ou juge présiden de la Cour supérieure de justice/Cour de justice de l'Ontario*** de ladite région ou devant moi ou tout juge de paix dans et pour ladite région, pour répondre à ladite inculpation.*

DATED this   7ᵗʰ   day of   JUNE   , yr.   2019
*FAIT ce            jour de                    an*

at the       CITY
*à(au )*

of           TORONTO
*de*

in the Province of Ontario / *dans la province de l'Ontario*

_____
~~Judge,~~ or Justice of the Peace / *Juge ou juge de paix*

**       For any case not covered by recitals (a) to (i), insert recital in the words of the statute authorizing the warrant.
*Pour tout cas qui n'est pas couvert par les attendus a) à i), insérez l'attendu en empruntant les termes de la loi autorisant le mandat.*

***     Choose applicable recital.
*Choisir l'attendu qui s'applique.*

Case 5:20-cv-01888-LHK   Document 15-2   Filed 06/02/20   Page 84 of 131
Case 4:19-my-70677-MAG   Document 59-1   Filed 07/10/19   Page 61 of 108
Page 1

Appendix "A"
(KOLLMAR, Don )

**COUNT 2 AND FURTHER THAT**
Between the 1st day of January in the year 1975 and the 31st day of December in the year 1979
at the City of Toronto in the Toronto Region did rape Brenda Blais, contrary to Section 144
of the Criminal Code of Canada.

# This is exhibit "F" to the affidavit of Robert Speakman, dated June 20, 2019.

_____

**Commissioner of Oaths**

Date:   2019.06.20

CHRISTINA MEI LIEN CHAN,
Commissioner, etc., City of Toronto,
for the Toronto Police Service.
Expires May 19, 2020.

APPENDIX "A"



# This is exhibit "G" to the affidavit of Robert Speakman, dated June 20, 2019.

_____

Commissioner of Oaths

Date: 2019.06.20

CHRISTINA MEI LIEN CHAN,
Commissioner, etc., City of Toronto,
for Toronto Police Service.
Expires May 19, 2020.

# Appendix "B"



DISTRICT OF COLUMBIA, ss:

## DECLARATION OF KATHERINE C. FENNELL

I, Katherine C. Fennell, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser, Department of State, Washington, D.C. This office has responsibility for extradition requests within the Department of State, and I am charged with the extradition case of Donald Kollmar. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Canada are found in the Extradition Treaty between the United States of America and Canada of December 3, 1971, which entered into force on March 22, 1976 (the "1971 Treaty"), the Protocol Amending the Extradition Treaty with Canada of January 11, 1988, which entered into force on November 26, 1991 (the "1988 Protocol"), and the Second Protocol Amending the Extradition Treaty with Canada of January 12, 2001, which entered into force on April 30, 2003 (the "2001 Protocol"). Copies of the Treaty and the Protocols are attached to this declaration.

3. In accordance with the provisions of the extradition treaty in full force and effect between the United States and Canada, the Canadian Embassy has submitted Diplomatic Note No. 7383, dated June 24, 2019, formally requesting the extradition of Donald Kollmar. A copy of the Diplomatic Note is attached to this declaration.

4. In accordance with Article 17 of the 1971 Treaty, the Government of the United States provides legal representation in its courts for Canada in its extradition requests, and Canada provides legal representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are extraditable offenses pursuant to Article 2 of the 1971 Treaty, as replaced by Article I of the 1988 Protocol.

Case 4:19-my-06977-MAC   Document 59-1   Filed 07/10/19   Page 97 of 108

-2-

6.  Documents submitted by the Government of Canada in support of its extradition request were certified on June 24, 2019, by Kelly Craft, Ambassador of the United States of America in Ottawa, in accordance with Title 18, United States Code, Section 3190.  Ms. Craft, at the time of her certification, was the principal diplomatic officer of the United States in Canada.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July  3  , 2019.


_Katherine C Fennell_
KATHERINE C. FENNELL

Attachments:

1.  Copy of the Note
2.  Copies of Treaty and Protocols

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

ify That Katherine C. Fennell, whose name is subscribed to the document hereunto annexed,
time of subscribing the same Attorney Adviser, Office of the Legal Adviser for the
nt of State, Department of State, United States of America, and that full faith and credit are
acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, Michael R. Pompeo, Secretary of State ,
have hereunto caused the seal of the Department of State to be
affixed and my name subscribed by the Assistant Authentication
Officer, of the said Department, at the city of Washington, in the
District of Columbia, this fifth day of July, 2019.

*Issue          uant to CHXIV,       of*
*Sept.          789, 1 Stat. 68*
*USC            22USC 2651a;*
*301;           C 1733 et. seq.; &*
*1443           LE 44 Federal Ru*
*Civil          ure.*

_____ Secretary of State

By_____

Assistant Authentication Officer,
Department of State



Embassy of Canada     Ambassade du Canada

<u>Note No. 7383</u>

The Embassy of Canada presents its compliments to the Department of State and has the honour to request the extradition of Donald Kollmar, an American citizen, born on July 29, 1951.

Photographs of the person sought are appended to the documents submitted in support of the extradition request.

Canada is seeking the extradition of Donald Kollmar to stand trial in relation to:

One count of indecent assault, contrary to section 149 of the *Criminal Code*; and

One count of rape, contrary to sections 143 and 144 of the *Criminal Code*.

Information 19-15003954 was sworn on June 5, 2019 by Detective Paul Cargill, Toronto Police Service, in the city of Barrie, Ontario before Justice of the Peace P. Liu.

Warrant for arrest was issued on June 7, 2019 by Justice of the Peace B. Hudson, in the city of Toronto, of the Province of Ontario.

There is no statute of limitations in respect of the offences for which the person sought stands charged.

The indictable offences are punishable by more than one-year imprisonment.

...../2



EXT-KOLLMAR-00068

-2-

Donald Kollmar was provisionally arrested on May 3, 2019. The present location of the accused is in California. The Prosecuting Attorney is Erin Nicole Rivers, Counsel, Ministry of the Attorney General of Ontario, telephone 416 212-0916.

The Police contact is Detective Constable Robert Speakman, Toronto Police Service.

The Embassy of Canada avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

WASHINGTON, D.C.

June 24, 2019



| 107TH CONGRESS *2d Session* | SENATE | TREATY DOC. 107–11 |
| --- | --- | --- |

# SECOND PROTOCOL AMENDING EXTRADITION TREATY WITH CANADA

————

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA, SIGNED AT OTTAWA ON JANUARY 12, 2001



JULY 11, 2002.—The Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

————

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 2002

99–118

EXT-KOLLMAR-00070

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *July 11, 2002.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Second Protocol Amending the Treaty on Extradition Between the Government of the United States of America and the Government of Canada, as amended, signed at Ottawa on January 12, 2001. In addition, I transmit, for the information of the Senate, the report of the Department of State with respect to the Second Protocol. As the report explains, the Second Protocol will not require implementing legislation.

The Second Protocol amends the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988.

The Second Protocol, upon entry into force, will enhance cooperation between the law enforcement communities of both nations. The Second Protocol incorporates into the U.S.-Canada Extradition Treaty a provision on temporary surrender of persons that is a standard provision in more recent U.S. bilateral extradition treaties. It also provides for new authentication requirements of documentary evidence, which should streamline the processing of extradition requests.

I recommend that the Senate give early and favorable consideration to the Second Protocol and give its advice and consent to ratification.

GEORGE W. BUSH.

(III)

# LETTER OF SUBMITTAL

---

DEPARTMENT OF STATE,
*Washington, May 31, 2002.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Second Protocol Amending the Treaty on Extradition Between the Government of the United states of America and the Government of Canada, signed at Ottawa on January 12, 2001 ("Second Protocol"). I recommend that the Second Protocol be transmitted to the Senate for its advice and consent to ratification.

The Second Protocol will strengthen the U.S.-Canada extradition relationship by incorporating a temporary surrender mechanism into the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988 ("Extradition Treaty"). The Second Protocol will also streamline the extradition process by modifying the Extradition Treaty's authentication requirements relating to the admissibility of documentary evidence.

A temporary surrender mechanism has become a standard provision in more recent U.S. bilateral extradition treaties. It allows person who have been found extraditable to be temporarily surrendered to one State to stand trial while they are still serving sentences in the other State. Temporary surrender can be an important tool for use in cases where serious crimes have been committed in one country which might go unpunished if trial in that country were to be delayed for a long period while a sentence was being served for crimes committed in the other country. It enables sequential trials of individuals who have committed extraditable offenses in both countries at a time when witnesses and evidence to both crimes are more readily available.

Article 1 of the Second Protocol amends the Extradition Treaty to provide for a new Article 7bis, which will follow Article 7's existing provisions authorizing the State in receipt of an extradition request ("requested State") to delay surrender until after proceedings against a person in that State have been completed or the person's sentence in that State has been served.

New article 7bis(1) provides that if the requested State has granted an extradition request in accordance with the Treaty with respect to a person who already has been convicted and sentenced in the requested State, it may temporarily surrender the person to the requesting State for prosecution. It further provides that the courts of the requested State must not be divested by virtue of the temporary surrender of jurisdiction over any appeal or habeas cor-

(V)

VI

pus application relating to the conviction or sentence in the requested State.

Article 7bis(2) provides that the person surrendered pursuant to paragraph (1) must be kept in custody in the requesting State. It also provides that the person must be returned to the requested State within forty-five days after the conclusion of the proceedings for which the person's presence was required or at another time as specified by the requested State, in accordance with conditions determined by the Parties. This provision anticipates that authorities in the United States and Canada, which in some cases will include state-level authorities, will consult to determine appropriate conditions for the temporary surrender of an individual, including arrangements for the transfer and return of the prisoner, as well as any extraordinary matters that may be relevant, such as medical care requirements. Consistent with our normal extradition practice, any case-specific agreements or assurances relating to the temporary surrender would be concluded by the federal authorities on behalf of state authorities. Similar to the language in paragraph (1), Article 7bis(2) also provides that the transfer of the person back to the requested State will not divest the courts of the requesting State of jurisdiction over any appeal or habeas corpus application relating to the matter for which the prisoner was temporarily surrendered.

Article 7bis(3) provides that the time spent in custody in the requesting State may be credited to the sentence in the requested State. In the case of the United States, credit for time served by a person surrendered to Canadian authorities may differ among U.S. state and federal authorities.

Article 7bis(4) provides that the requested State can waive the return of the surrendered person in the event the person's sentence in the requested State expires during the temporary surrender period. Article 7bis(4) provides that in such cases the person's surrender shall be considered a "final surrender" under the Extradition Treaty.

Because temporary surrender is contingent on a grant of extradition, Article 7bis(5) provides that the requesting State does not have to make a further request for the extradition of a person who has been returned to the requested State after having been convicted and sentenced in the requesting State for the offense for which temporary surrender was granted.

Article 7bis(6) provides that a person who has been returned to the requested State, after having been convicted and sentenced during a temporary surrender, must be finally surrendered once the custodial portion of the person's sentence in the requested State has been completed or, if the requested State so specifies, at an earlier time. This provision contemplates that the requested State will finally surrender a person who has been released on parole or under other conditions. It also envisions that the requested State may choose to surrender the person at an earlier time.

Article 7bis(7) recognizes that there may be reasons not to proceed with final surrender even though the person was convicted and sentenced during a temporary surrender. Article 7bis(7) (a) provides that final surrender will not take place when the requesting State advises that it is no longer required because the sentence

EXT-KOLLMAR-00073

imposed in the requesting State has expired or for other reasons. Similarly, Article 7bis(7) (b) provides that the person will not be surrendered to the requesting State in the event the competent authority of the requested State revokes its original grant of extradition.

Article 2 of the Second Protocol will establish a new framework for the admissibility of documentary evidence in support of a request for extradition by replacing existing Article 10(2) of the Extradition Treaty.

Consistent with U.S. extradition law on the admissibility of documentation, new Article 10(2)(a) reiterates the existing requirement that, in the case of a request from Canada, documents be authenticated by an officer of the Department of Justice of Canada and certified by the principal diplomatic or consular office of the United States in Canada. Article 10(2)(b), however, changes existing requirements with respect to requests emanating from the United States, so as to take advantage of changes in Canadian law regarding the admissibility of extradition documents in Canadian courts. Specifically, Article 10(2)(b) eliminates the requirement that the United States have its documentary evidence in support of extradition requests to Canada authenticated by an officer of the U.S. Department of State and certified by the principal diplomatic or consular officer of Canada in the United States. Instead, Article 10(2) (b) streamlines the authentication process by allowing documents to be certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. When the person whose extradition is sought has already been convicted, documents supporting the U.S. request are to be certified by a judicial, prosecuting or correctional authority who can attest to the fact that the documents are accurate. These changes should simplify and thereby reduce the administrative burden of processing extradition requests by the United States.

New Article 10(2) (c) provides an alternative to subparagraphs (a) and (b), by providing that documents may also be certified or authenticated in any other manner accepted by the law of the requested State. This addition will enable both countries to take advantage of any changes to their applicable laws.

Article 3 of the Second Protocol addresses the relationship between the Second Protocol and the Extradition Treaty. Paragraph (1) provides that the Second Protocol will form an integral part of the Extradition Treaty. Paragraph (2) provides for retroactivity, noting that, notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, the Second Protocol will apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date. Finally, paragraph (3) provides that the Second Protocol is subject to ratification, and enters into force upon the exchange of instruments of ratification. The Second Protocol would terminate upon termination of the Extradition Treaty.

The Second Protocol does not require implementing legislation. A Technical Analysis explaining in detail the provisions of the Second Protocol is being prepared by the United States negotiating delegation, consisting of the Departments of State and Justice, and will

VIII

be submitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Second Protocol by the Senate at an early date.

Respectfully submitted,

COLIN L. POWELL.

EXT-KOLLMAR-00075

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNEMENT OF CANADA

Signed at Washington on December 3, 1971,
as amended by an Exchange of Notes at Washington on June 28 and July 9, 1974,
and by a Protocol signed at Ottawa on January 11, 1988

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA (hereinafter "the Parties");

RECOGNIZING the close bilateral relationship which exists between them, reflected in numerous instruments and mechanisms of legal cooperation;

COMMITTED to strengthening legal cooperation in the fight against crime; and

DESIRING to make more effective the Extradition Treaty between the Parties, signed at Washington on December 3, 1971 (hereinafter "the Extradition Treaty"), as amended by an exchange of notes of June 28 and July 9, 1974, and the Protocol to the Extradition Treaty between the Parties, signed at Ottawa on January 11, 1988 (hereinafter "the Protocol");

HAVE AGREED as follows:

ARTICLE 1

The Extradition Treaty is amended by adding the following after Article 7:

"Article 7 bis

1.    The requested State, after granting an extradition request made in accordance with the Extradition Treaty, may temporarily surrender a person who has been convicted and sentenced in the requested State, in order that the person sought may be prosecuted in the requesting State. The temporary surrender of the person shall not divest the Courts in the requested State of jurisdiction over any appeal or habeas corpus application relating to the conviction or sentence that otherwise may be available under the laws of the requested State.

(1)

EXT-KOLLMAR-00076

2.      A person temporarily surrendered pursuant to paragraph 1 shall be kept in custody in the requesting State. The person shall be returned to the requested State within forty-five (45) days after the conclusion of the proceedings for which the person's presence was required in the requesting State or at another time as specified by the requested State, in accordance with conditions to be determined by the Parties for that purpose.   The return of the person to the requested State shall not divest the Courts in the requesting State of jurisdiction over any appeal or habeas corpus application that otherwise may be available under the laws of that State, in relation to the matter for which the person was temporarily surrendered.

3.      The period of time spent in custody in the requesting State may be credited to the sentence in the requested State.

4.      When the sentence that the person was serving in the requested State expires during the temporary surrender, the requested State may waive the return of the person and the surrender will be considered to be a final surrender.  A "final surrender" is a surrender of a person pursuant to this Treaty other than as provided for by this Article.

5.      Subject to paragraph 7, if a person temporarily surrendered and returned to the requested State has been sentenced to imprisonment in the requesting State for the offence for which the person was temporarily surrendered, the person shall be finally surrendered to the requesting State, in accordance with paragraph 6, without a further request for extradition.

6.      Final surrender shall take place when the person has finished serving the custodial portion of the sentence in the requested State, or at an earlier time specified by the requested State.

7.      Final surrender shall not take place when:

(a)      the requesting State advises that final surrender is no longer required due to the expiration of the sentence imposed or for other reasons; or

(b)      after the temporary surrender, the warrant or order for the final surrender of a person sought is revoked by the competent authority of the requested State."

## ARTICLE 2

Article 10(2) of the Extradition Treaty is deleted and replaced by the following text:

"(2)   The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when:

(a)      in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada;

3

(b)  in the case of a request emanating from the United States for a person who is sought for prosecution, they are certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. In the case of a request emanating from the United States for a person who is sought in connection with a conviction, the documents must be certified by a judicial, prosecuting or correctional authority who attests to the fact that the documents are accurate; or

(c)  they are certified or authenticated in any other manner accepted by the law of the requested State."

## ARTICLE 3

1.     This Second Protocol shall form an integral part of the Extradition Treaty.

2.     Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Second Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

3.     This Second Protocol shall be subject to ratification, and shall enter into force upon the exchange of instruments of ratification. It shall terminate upon termination of the Extradition Treaty.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Second Protocol.

DONE in duplicate at *Ottawa* this *Twelfth* day of *January* 2001 in the English and French languages, the two texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF
AMERICA

FOR THE GOVERNMENT
OF CANADA

EXT-KOLLMAR-00078

| 101st Congress 2d Session | SENATE | Treaty Doc. 101–17 |
|---|---|---|

# PROTOCOL AMENDING THE EXTRADITION TREATY WITH CANADA

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE PROTOCOL SIGNED AT OTTAWA ON JANUARY 11, 1988, AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA, SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974



April 24, 1990.—Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1990

39–118

# LETTER OF TRANSMITTAL

THE WHITE HOUSE, *April 24, 1990.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol signed at Ottawa on January 11, 1988, amending the Treaty on Extradition Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. I transmit also, for the information of the Senate, the report of the Department of State with respect to the protocol.

The protocol amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. It represents an important step in improving law enforcement cooperation and combatting terrorism by excluding from the scope of the political offense exception serious offenses typically committed by terrorists; e.g., murder, manslaughter, kidnapping, use of an explosive device capable of endangering life or causing grievous bodily harm, and attempt or conspiracy to commit the foregoing offenses.

The protocol also will help to improve implementation of the current extradition treaty in several other respects. Most significant, the protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, *inter alia,* parental child abduction and certain additional narcotics offenses will be covered by the new treaty.

I recommend that the Senate give early and favorable consideration to the protocol and give its advice and consent to ratification.

GEORGE BUSH.

(III)

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, April 10, 1990.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Protocol amending the 1971 Extradition Treaty Between the United States of America and Canada signed at Ottawa January 11, 1988. I recommend that the Protocol be transmitted to the Senate for advice and consent to ratification.

The Protocol supplements and amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974 (27 U.S.T. 983; TIAS 8237). The Protocol would exclude specified crimes of violence, typically committed by terrorists, from the scope of the political offense exception to extradition. It therefore represents an important step toward improving law enforcement cooperation and countering the threat of international terrorism and other crimes of violence. In addition, the Protocol will help improve the implementation of the current Treaty in several other respects. Most significantly, the Protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, inter alia, parental child abduction and certain additional narcotics offenses will be covered.

Article 2 of the 1971 Extradition Treaty, as amended, which incorporates a Schedule of extraditable offenses, has been replaced in its entirety. Pursuant to the current Extradition Treaty, only crimes that are listed in the Schedule are considered extraditable offenses. As amended by Article I of the Protocol, Article 2 of the 1971 Treaty, as amended, adopts a dual criminality approach, which emphasizes extradition based on underlying criminal conduct rather than for a particular offense. A dual criminality clause permits extradition for any crime that is punishable in both countries by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause, therefore, obviates the need to renegotiate or supplement the Treaty as offenses, such as computer-related crimes or money laundering, become punishable under the laws of both states.

Article I of the Protocol replaces Article 2 of the 1971 Treaty and provides that an offense is extraditable notwithstanding that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States. This provision will allow the United States to request extradition for offenses including interstate and foreign travel or transportation in aid of racketeering enterprises

(1)

2

even though the Canadian laws do not include analogous jurisdictional elements for similar underlying criminal behavior. The new provision also stipulates that offenses that relate to taxation or revenue or that are of a "purely fiscal character" will be extraditable offenses.

Article II of the Protocol is a technical amendment, deleting the Schedule of extraditable offenses annexed to the 1971 Treaty, as amended, and incorporated by reference in Article 2.

Article III of the Protocol deletes Article 3 of the 1971 Treaty, in which a particularized definition of "territory," which was necessary at that time to cover certain types of hijacking offenses, is no longer necessary, as both the United States and Canada are parties to the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague December 16, 1970, and entered into force October 14, 1971, (Hijacking Convention) (22 U.S.T. 1641; TIAS 7192) and the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal September 23, 1971, and entered into force January 26, 1973, (Sabotage Convention) (24 U.S.T. 564; TIAS 7570).

Article 3(3) of the 1971 Treaty is amended to give the Executive or other appropriate Authority the discretion to extradite fugitives when the requesting state has jurisdiction over an offense in a situation where the laws of the requested state would not provide for jurisdiction in similar circumstances.

Article IV of the Protocol replaces Article 4 of the 1971 Treaty, and effectively limits the scope of the political offense exception. It specifies certain crimes which shall not be regarded as political offenses, including murder, manslaughter, malicious assault, kidnapping, specified explosives offenses, and conspiracy or attempt to commit any of the foregoing offenses.

In addition, Article IV of the Protocol includes a provision that excludes from the reach of the political offense exception any offense for which both the United States and Canada have an international treaty obligation to extradite the person or submit his case for prosecution; e.g., aircraft hijacking pursuant to the Hijacking Convention; aircraft sabotage pursuant to the Sabotage Convention; crimes against internationally protected persons, including diplomats, under the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, done at New York December 14, 1973 (28 U.S.T. 1975; TIAS 8532); and hostage taking pursuant to the International Convention against the Taking of Hostages, done at New York on December 17, 1979. This exception will also extend to crimes similarly defined in future multilateral treaties.

Article V of the Protocol replaces Article 7 of the 1971 Extradition Treaty, which allows the Requested State to defer surrender of a fugitive being proceeded against or serving a sentence in its territory until the conclusion of the proceedings and the full execution of any punishment. Under the Protocol, the Requested State has the discretion to choose to extradite to the Requesting State a fugitive who is serving a prison sentence in the Requested State before the expiration of his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

3

Article VI of the Protocol replaces Article 11(3) of the current Treaty to extend the period of provisional arrest in the Requested State from forty-five days to sixty days, which is the time period most commonly provided under U.S. extradition treaties. The extension will allow prosecutors greater latitude in assembling extradition packages and in making necessary adjustments or additions to the documents.

Article VII of the Protocol amends the 1971 Treaty by adding a provision that establishes that, in cases where both states have jurisdiction to prosecute for an offense, the Executive Authority of the Requested State will consult with the Executive Authority of the Requesting State and make a decision whether to extradite the fugitive, or whether to submit the case to its competent authorities for the purpose of prosecution, after considering all relevant factors.

Article VIII of the Protocol provides that its provisions shall apply to any offense committed, any request made or any person found extraditable before or after the entry into force of the Protocol, but shall not apply to an offense committed before the Protocol enters into force if the offense in question was not an offense under the laws of both Contracting Parties at the time of its commission.

Article IX of the Protocol sets forth the procedures for ratification and entry into force.

I enclose, for the information of the Senate, an exchange of letters, dated January 11, 1988, which restates that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters," is an extraditable offense under the 1971 Extradition Treaty.

The Department of Justice joins the Department of State in favoring transmission of this Protocol to the Senate at the earliest possible date.

Respectfully submitted,

JAMES W. BAKER III.

Enclosure: As stated.

THE SECRETARY OF STATE,
*Washington, January 11, 1988.*

Hon. JOE CLARK, P.C., M.P.,
*Secretary of State for External Affairs of Canada, Ottawa.*

DEAR MR. MINISTER: I refer to the Protocol Amending the Treaty on Extradition between the United States and Canada we signed today and have the honor to address to you the following.

The United States and Canada recognize that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters", is an extraditable offense under the United States-Canada Extradition Treaty.

Where a person has been charged with or convicted of such an offense in Canada and is found within the jurisdiction of the United States, the United States agrees, upon request, to commence extradition proceedings against such a person pursuant to the Treaty in order that the person may be returned to Canada.

4

The United States will use its best efforts to honor Canadian requests for testimony, information, or other assistance pertaining to such abductions.

Canada and the United States agree to cooperate to deter such transborder abductions. To assist in achieving that purpose, the United States will continue to exert its best efforts to inform those engaged in business as bail bondsmen or bounty hunters and other interested parties of the positions set forth in this exchange of letters.

Canada and the United States agree to consult promptly concerning any case of transborder abduction involving bounty hunters which might arise in the future. The purpose of such consultations shall be to address matters relating to any such case, including any request by the Government of Canada for the return of the person so abducted. In the event of return, the Governments agree to cooperate to have the abducted person escorted to Canada and taken into custody at the border, pursuant to a request for provisional arrest, pending the outcome of extradition proceedings. For the purpose of these consultations, the principal law enforcement contact for the United States will be the Director of the Office of International Affairs of the Criminal Division of the Department of Justice.

I have the honor to propose that this letter and your reply constitute an understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Sincerely yours,

GEORGE P. SHULTZ.

OTTAWA, *January 11, 1988.*

JLA-0026.
Hon. GEORGE P. SHULTZ,
*Secretary of State of the United States of America.*

DEAR MR. SECRETARY: I have the honour to acknowledge receipt of your letter of today's date concerning transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters". I accept your proposal that your letter and this reply constitute an Understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Yours sincerely,

JOE CLARK.

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

The Government of the United States of America and the Government of Canada;

Desiring to make more effective the Extradition Treaty between the Contracting Parties, signed at Washington on December 3, 1971, as amended by the agreement effected by an Exchange of Notes on June 28 and July 9, 1974 (hereinafter referred to as "the Extradition Treaty");

Have agreed as follows:

### ARTICLE I

Article 2 of the Extradition Treaty is deleted and replaced by the following:

#### "ARTICLE 2

"(1) Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

"(2) An offense is extraditable notwithstanding

"(i) that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States, or

"(ii) that it relates to taxation or revenue or is one of a purely fiscal character."

### ARTICLE II

The SCHEDULE to the Extradition Treaty, as amended, is deleted.

### ARTICLE III

Paragraph (2) of Article 3 of the Extradition Treaty is deleted. Paragraph (3) of Article 3 of the Extradition Treaty is amended to read as follows:

"(2) When the offense for which extradition is requested was committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall grant extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances. If the laws in the requested State do not so provide, the executive

(5)

EXT-KOLLMAR-00085

6

authority in the requested State may, in its discretion, grant extradition."

## ARTICLE IV

Paragraph (2) of Article 4 of the Extradition Treaty, as amended, is deleted and replaced by the following:

"(2) For the purpose of this Treaty, the following offenses shall be deemed not to be offenses within subparagraph (iii) of paragraph 1 of this Article:

"(i) An offense for which each Contracting Party has the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to its competent authorities for the purpose of prosecution;

"(ii) Murder, manslaughter or other culpable homicide, malicious wounding or inflicting grievous bodily harm;

"(iii) An offense involving kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

"(iv) An offense involving the placing or use of explosives, incendiaries or destructive devices or substances capable of endangering life or of causing grievous bodily harm or substantial property damage; and

"(v) An attempt or conspiracy to commit, or counselling the commission of, any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses."

## ARTICLE V

Article 7 of the Extradition Treaty is deleted and replaced by the following:

### "ARTICLE 7

"When the person sought is being proceeded against or is serving a sentence in the requested State for an offense other than that for which extradition is requested, the requested State may surrender the person sought or postpone surrender until the conclusion of the proceedings or the service of the whole or any part of the sentence imposed."

## ARTICLE VI

Paragraph (3) of Article 11 of the Extradition Treaty is deleted and replaced by the following:

"(3) A person arrested shall be set at liberty upon the expiration of sixty days from the date of arrest pursuant to such application if a request for extradition and the documents specified in Article 9 have not been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request and documents are subsequently received."

## ARTICLE VII

The Extradition Treaty is amended by adding the following after Article 17:

7

"ARTICLE 17 BIS

"If both contracting Parties have jurisdiction to prosecute the person for the offense for which extradition is sought, the executive authority of the requested State, after consulting with the executive authority of the requesting State, shall decide whether to extradite the person or to submit the case to its competent authorities for the purpose of prosecution. In making its decision, the requested State shall consider all relevant factors, including but not limited to:

"(i) the place where the act was committed or intended to be committed or the injury occurred or was intended to occur;

"(ii) the respective interests of the Contracting Parties;

"(iii) the nationality of the victim or the intended victim; and

"(iv) the availability and location of the evidence."

ARTICLE VIII

Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date.

ARTICLE IX

(1) This Protocol shall be subject to ratification in accordance with the applicable procedures of the Government of the United States and the Government of Canada and instruments of ratification shall be exchanged as soon as possible.

(2) The Protocol shall enter into force upon the exchange of instruments of ratification.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Ottawa, this 11th day of January 1988, in the English and French languages, the two texts being equally authentic.

For the Government of the United States of America.

GEORGE P. SHULTZ.

For the Government of Canada.

JOE CLARK.

O

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 8237

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and CANADA

Signed at Washington December 3, 1971

*and*

Agreement Amending the Treaty
Effected by Exchange of Notes
Signed at Washington June 28 and July 9, 1974



# CANADA

## Extradition

*Treaty signed at Washington December 3, 1971;*
*And agreement amending the treaty*
*Effected by exchange of notes*
*Signed at Washington June 28 and July 9, 1974;*
*Ratification of the treaty, as amended, advised by the Senate of*
*the United States of America December 1, 1975;*
*Ratified by the President of the United States of America De-*
*cember 12, 1975;*
*Ratified by Canada February 2, 1976;*
*Ratifications exchanged at Ottawa March 22, 1976;*
*Proclaimed by the President of the United States of America*
*May 6, 1976;*
*Entered into force March 22, 1976.*

---

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Canada was signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada;

The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended,

(1)                                          TIAS 8237

2

to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six [SEAL] and of the Independence of the United States of America the two hundredth.

GERALD R. FORD

By the President:
JOSEPH JOHN SISCO
*Acting Secretary of State*

TIAS 8237

EXT-KOLLMAR-00090

3

TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND CANADA

The United States of America and Canada, desiring to make
more effective the cooperation of the two countries in the
repression of crime by making provision for the reciprocal
extradition of offenders, agree as follows:

TIAS 8237

EXT-KOLLMAR-00091

4

## ARTICLE 1

Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty committed within the territory of the other, or outside thereof under the conditions specified in Article 3(3) of this Treaty.

## ARTICLE 2

(1)  Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

(2)  Extradition shall also be granted for attempts to commit, or conspiracy to commit or being a party to any of the offenses listed in the annexed Schedule.

(3)  Extradition shall also be granted for any offense against a federal law of the United States in which one of the offenses listed in the annexed Schedule, or made extraditable by paragraph (2) of this Article, is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

## ARTICLE 3

(1)  For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including air space

TIAS 8237

5

and territorial waters and vessels and aircraft registered in that Contracting Party or aircraft leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in, that Contracting Party if any such aircraft is in flight, or if any such vessel is on the high seas when the offense is committed. For the purposes of this Treaty an aircraft shall be considered in flight from the moment when power is applied for the purpose of the take-off until the moment when the landing run ends.

(2)  In a case when offense 23 of the annexed Schedule is committed on board an aircraft at any time from the moment when all its external doors are closed following embarkation until the moment when any such door is opened for disembarkation, such offense and any other offense covered by Article 2 committed against passengers or crew of that aircraft in connection with such offense shall be considered to have been committed within the territory of a Contracting Party if the aircraft was registered in that Contracting Party, if the aircraft landed in the territory of that Contracting Party with the alleged offender still on board, or if the aircraft was leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in that Contracting Party.

(3)  When the offense for which extradition has been requested has been committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

TIAS 8237

6

ARTICLE 4

(1)  Extradition shall not be granted in any of the
following circumstances:

(i)  When the person whose surrender is sought is being
proceeded against, or has been tried and discharged or punished
in the territory of the requested State for the offense for which
his extradition is requested.

(ii) When the prosecution for the offense has become barred
by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is
requested is of a political character, or the person whose
extradition is requested proves that the extradition request
has been made for the purpose of trying or punishing him for an
offense of the above-mentioned character.  If any question arises
as to whether a case comes within the provisions of this
subparagraph, the authorities of the Government on which the
requisition is made shall decide.

(2)  The provisions of subparagraph (iii) of paragraph (1)
of this Article shall not be applicable to the following:

(i)  A kidnapping, murder or other assault against the life
or physical integrity of a person to whom a Contracting Party has
the duty according to international law to give special protection,
or any attempt to commit such an offense with respect to any such
person.

(ii) When offense 23 of the annexed Schedule, or an attempt
to commit, or a conspiracy to commit, or being a party to the
commission of that offense, has been committed  on board an aircraft
engaged in commercial services carrying passengers.

TIAS 8237

7

## ARTICLE 5

If a request for extradition is made under this Treaty for a person who at the time of such request, or at the time of the commission of the offense for which extradition is sought, is under the age of eighteen years and is considered by the requested State to be one of its residents, the requested State, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting State that the request for extradition be withdrawn, specifying the reasons therefor.

## ARTICLE 6

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

## ARTICLE 7

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

TIAS 8237

EXT-KOLLMAR-00095

8

### ARTICLE 8

The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

### ARTICLE 9

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3) When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4) When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting State, by a statement showing how much of the sentence has not been served, and by evidence proving that the person requested is the person to whom the sentence refers.

TIAS 8237

9

## ARTICLE 10

(1)  Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

(2)  The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada, or when, in the case of a request emanating from the United States, they are authenticated by an officer of the Department of State of the United States and are certified by the principal diplomatic or consular officer of Canada in the United States.

## ARTICLE 11

(1)  In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.

TIAS 8237

10

(2)  On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3)  A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received.  This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

ARTICLE 12

(1)  A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i)  He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii) He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii) The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his extradition to a third State, provided such other offense is covered by Article 2.

(2)  The foregoing shall not apply to offenses committed after the extradition.

TIAS 8237

Case 4:19-my-70677-MAG  Document 55-2  Filed 07/12/19  Page 100 of 108

11

ARTICLE 13

(1)  A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought.

(2)  Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

ARTICLE 14

(1)  The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)  If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

ARTICLE 15

(1)  To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered to the requesting State if extradition is granted.

**TIAS 8237**

12

(2)  Subject to the qualifications of paragraph (l) of this Article, the above-mentioned articles shall be returned to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

ARTICLE 16

(l)  The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

(2)  The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE 17

(l)  Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State.  The appropriate legal officers of the State in which the extradition proceedings take place shall, by all legal means within their power, assist the requesting State before the respective judges and magistrates.

TIAS 8237

13

(2)  No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

ARTICLE 18

(1)  This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2)  This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3)  This Treaty shall enter into force upon the exchange of ratifications.[1] It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

---

[1] Mar. 22, 1976.

TIAS 8237

14

IN WITNESS WHEREOF the undersigned, being duly authorized
thereto by their respective Governments, have signed this
Treaty.

DONE in duplicate, in the English and French languages,
each language version being equally authentic, at Washington
this third day of December, one thousand nine hundred seventy
one.

FOR THE UNITED STATES OF AMERICA:

*[signature]* [1]

FOR CANADA:

*[signature]* [2]

---

[1] William P. Rogers
[2] Mitchell Sharp

TIAS 8237

15

SCHEDULE

1.  Murder; assault with intent to commit murder.

2.  Manslaughter.

3.  Wounding; maiming; or assault occasioning bodily harm.

4.  Unlawful throwing or application of any corrosive substances at or upon the person of another.

5.  Rape; indecent assault.

6.  Unlawful sexual acts with or upon children under the age specified by the laws of both the requesting and requested States.

7.  Willful nonsupport or willful abandonment of a minor when such minor is or is likely to be injured or his life is or is likely to be endangered.

8.  Kidnapping; child stealing; abduction; false imprisonment.

9.  Robbery; assault with intent to steal.

10. Burglary; housebreaking.

11. Larceny, theft or embezzlement.

12. Obtaining property, money or valuable securities by false pretenses or by threat of force or by defrauding the public or any person by deceit or falsehood or other fraudulent means, whether such deceit or falsehood or any fraudulent means would or would not amount to a false pretense.

13. Bribery, including soliciting, offering and accepting.

14. Extortion.

TIAS 8237

73-798 O—76

EXT-KOLLMAR-00103

16

15. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.

16. Fraud by a banker, agent, or by a director or officer of any company.

17. Offenses against the laws relating to counterfeiting or forgery.

18. Perjury in any proceeding whatsoever.

19. Making a false affidavit or statutory declaration for any extrajudicial purpose.

20. Arson.

21. Any act done with intent to endanger the safety of any person travelling upon a railway, or in any aircraft or vessel or other means of transportation.

22. Piracy, by statute or by law of nations; mutiny or revolt on board a vessel against the authority of the captain or commander of such vessel.

23. Any unlawful seizure or exercise of control of an aircraft, by force or violence or threat of force or violence, or by any other form of intimidation, on board such aircraft.

24. Willful injury to property.

25. Offenses against the bankruptcy laws.

26. Offenses against the laws relating to the traffic in, production, manufacture, or importation of narcotic drugs, Cannabis sativa L., hallucinogenic drugs, amphetamines, barbiturates, cocaine and its derivatives.

TIAS 8237

EXT-KOLLMAR-00104

17

27. Use of the mails or other means of communication in connection with schemes devised or intended to deceive or defraud the public or for the purpose of obtaining money or property by false pretenses.

28. Offenses against federal laws relating to the sale or purchase of securities.

29. Making or having in possession any explosive substance with intent to endanger life, or to cause severe damage to property.

30. Obstructing the course of justice in a judicial proceeding, existing or proposed, by:

    a)   dissuading or attempting to dissuade a person by threats, bribes, or other corrupt means from giving evidence;

    b)   influencing or attempting to influence by threat, bribes, or other corrupt means a person in his conduct as a juror; or

    c)   accepting a bribe or other corrupt consideration to abstain from giving evidence or to do or to refrain from doing anything as a juror.

TIAS 8237

EXT-KOLLMAR-00105

35

[AMENDING AGREEMENT]

*The Canadian Ambassador to the Secretary of State*



Canadian Embassy

Ambassade du Canada

Washington, D.C.

June 28, 1974

No. 126

Excellency,

I have the honour to refer to the Treaty on Extra-
dition between the Government of Canada and the Government
of the United States signed at Washington on December 3,
1971 and to subsequent discussions between representatives
of our two governments concerning the amendment of the said
Treaty.

Further to those discussions I now have the honour
to propose that the said Treaty be amended as follows:

    (1) That Article 4(2)(i) of the Treaty shall
        be amended to read:  "A kidnapping, murder,
        or other assault against the life or physical
        integrity of a person to whom a Contracting
        Party has the duty according to international
        law to give special protection, or any attempt
        or conspiracy to commit, or being a party to

The Honourable
  Henry A. Kissinger,
    Secretary of State,
      Washington, D.C.
        20520

TIAS 8237

EXT-KOLLMAR-00106

36

the commission of, such an offence with
respect to any such person."

(2) That clause 26 of the Schedule annexed to
the Treaty shall be amended to read:
"Offences against the laws relating to
the traffic in, production, manufacture or
importation of drugs listed in Schedule I
to the Single Convention on Narcotic Drugs
of March 30, 1961 and of drugs listed in [1]
Schedules I, II and III to the Convention
on Psychotropic Substances of February 21,
1971."

If this proposal meets with the approval of your
government, I have the further honour to propose that
this Note, which is authentic in English and in French,
and your reply shall constitute an amendment to the Treaty
on Extradition between Canada and the United States referred
to above, which shall come into force on the date of the
entry into force of the said Treaty and which shall be con-
sidered an integral part of the said Treaty.

Accept, Excellency, the assurances of my highest
consideration.

M. Cadieux,
Ambassador.

---

[1] TIAS 6298; 18 UST 1559.

TIAS 8237