# EXHIBIT D

COLEMAN & BALOGH LLP
ETHAN A. BALOGH, No. 172224
235 Montgomery Street, Suite 1070
San Francisco, CA 94104
Telephone: 415.391.0440
Facsimile: 415.373.3901
eab@colemanbalogh.com

Attorneys for the Accused
DONALD KOLLMAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF DON KOLLMAR | Case No. 4:19-70677 MAG<br><br>NOTICE OF CORRECTED OPPOSITION BRIEF |

Donald Kollmar, by and through his counsel, respectfully files the Corrected Brief in Opposition Certification of Extradition, attached hereto.  The attached brief corrects several typographical errors.

Respectfully submitted,

DATED: December 12, 2019                COLEMAN & BALOGH LLP

*/s/ E A Balogh*
ETHAN A. BALOGH
235 Montgomery Street, Suite 1070
San Francisco, CA 94104

Attorneys for Arrestee
DONALD KOLLMAR

1

COLEMAN & BALOGH LLP
ETHAN A. BALOGH, No. 172224
235 Montgomery Street, Suite 1070
San Francisco, CA 94104
Telephone: 415.391.0440
Facsimile: 415.373.3901
eab@colemanbalogh.com

Attorneys for the Accused
DONALD KOLLMAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF DON KOLLMAR | Case No. 4:19-70677 MAG<br><br>DONALD KOLLMAR'S CORRECTED BRIEF IN OPPOSITION TO CERTIFICATION OF EXTRADITION<br><br>Date:   January 16, 2020<br>Time:  1:30 p.m.<br><br>Before the Honorable Kandis A. Westmore<br>United States Magistrate Judge |

Case 4:19-mj-70677-MAG    Document 56-1    Filed 05/22/20    Page 5 of 49

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

OVERVIEW ...................................................................................................... 1

STATEMENT OF THE CASE............................................................................. 6

A.  The Government arrested the accused on allegations of consensual sex obtained by false
    pretense. ..................................................................................................... 6

B.  The parties litigated bail, and Kollmar identified deficiencies in the Canadian
    Information and federal Complaint.......................................................... 9

C.  The July 2019 extradition request, while relying on the same materials used to prepare
    the December 2018 Information, substantially changed the allegations to allege non-
    consensual rape as opposed to rape by false pretenses. ...................... 10

APPLICABLE STANDARDS .......................................................................... 11

STATEMENT OF FACTS .............................................................................. 13

A.  The complainant relied on a script when presenting her account. ..................... 13

B.  The complainant's account and the evidence that explains, negates and obliterates it. .. 14

    1.  Buffalo 1975 ................................................................................. 14

    2.  The Students of Light home on Keele Street and Kollmar's van ...................... 17

    3.  Mother's Day 1976 ....................................................................... 19

    4.  The United States travel............................................................... 20

    5.  The report to John Hanas ............................................................ 22

    6.  The complainant's family calls off the wedding............................ 23

    7.  The relevant scientific literature supports the conclusion that the complainant has
        presented an account based on false memories at the direction of and to please
        her parents and/or John Hanas. ................................................ 25

ARGUMENT.................................................................................................. 27

A.  The Government has failed to establish dual criminality under the Treaty; at most, the
    Court should address the forcible rape charge as a basis for extradition......................... 27

I

B.    The evidence in this matter demonstrates insufficient cause to conclude that Donald Kolmar forcibly raped Baker. ........................................................................................ 31

C.    The Government may not extradite Kollmar based on the extreme passage of time and the prejudice he has suffered as a result. ........................................................................ 36

CONCLUSION ........................................................................................................................ 39

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Argento v. Jacobs*, 176 F. Supp. 877 (N.D. Ohio 1959) ................................................ 12

4

*Austin v. Healy*, 5 F.3d 598 (2d Cir. 1993) .................................................................. 12

5

*Beck v. Ohio*, 379 U.S. 89 (1964) ....................................................................... 11, 31

6

*Brady v.* Maryland, 373 U.S. 83 (1963) .................................................................... 15

7

*Commonwealth v. Bethlehem*, 391 Pa. Super 162 (1989) ............................................ 38

8

*Cucuzzella v. Keliikoa*, 638 F.2d 105 (9th Cir. 1981) .............................................. 28, 29

9

*Foster v. California*, 394 U.S. 440 (1969) ................................................................... 8

10

*Freedman v. United States*, 437 F. Supp. 1252 (N.D. Ga. 1977) ................................. 12

11

*Gill v. Imundi*, 747 F. Supp. 1028 (S.D.N.Y. 1990) .................................................... 12

12

*Henry v. United States*, 361 U.S. 98 (1959) .............................................................. 12

13

*In re Lane*, 135 U.S. 443 (1890) ............................................................................... 8

14

*In re Sindona*, 450 F. Supp. 672 (S.D.N.Y. 1978) ..................................................... 12

15

*In the Matter of the Extradition of Sylvester*, 2006 WL 6323514 (M.D. PA Feb. 14, 2006) 37, 38

16

*Manson v. Brathwaite*, 432 U.S. 98 (1977) ................................................................ 8

17

*McKenzie v. Lamb*, 738 F.2d 1005 (9th Cir.1984) ..................................................... 12

18

*Mooney v. Holohan*, 294 U.S. 103 (1935) ................................................................ 15

19

*People v. Crosby*, 58 Cal.2d 713 (1962) .................................................................. 37

20

*People v. Lopez*, 52 Cal.App.4th 233 (1997) ............................................................ 37

21

*People v. McGee*, 1 Cal.2d 611 (1934) ................................................................... 37

22

*People v. Osband,* 13 Cal. 4th 622 (1996) .................................................................. 8

23

*Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986) ..................................................... 12

24

*R. v. MAURANTONIO*, [1968] 2 C.C.C.115, 2 C.R.N.S.375 (Ont.C.A.) ...................................9

25

*Republic of France v. Moghadam*, 617 F. Supp. 777 (N.D. Cal. 1985) ........................ 13

26

27

28

III

*Shapiro v. Ferrandina*, 355 F. Supp. 563 (S.D.N.Y. 1973)........................5, 12, 13, 15

*Simmons v. United States*, 390 U.S. 377 (1968) ...........................................8

*Theron v. United States*, 832 F.2d 492 (9th Cir. 1987)...........................27, 28

*United States v. Cooper*, 2014 WL 3784344 (N.D. Cal. 2014) ......................8

*United States v. Fowler*, 439 F.2d 133 (9th Cir. 1971) ................................9

*United States v. Givens*, 767 F.2d 574 (9th Cir. 1985) .................................9

*United States v. Gomez-Mendez*, 486 F.3d 599 (9th Cir. 2007) ......................8

*United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007)......................11, 12, 31

*United States v. Moss*, 2014 WL 1349494 (N.D. Cal. 2014)..........................8

*United States v. Rodriguez-Gomez*, 506 F.3d 738 (9th Cir. 2007) .................8

*United States v. Smith*, 790 F.2d 789 (9th Cir.1986) ..................................12

*United States v. Wathne*, 2008 WL 4344112 (N.D. Cal. Sept. 22, 2008)...................29

*United States v. Wells*, 519 U.S. 482 (1997)..............................................27

**Statutes**

18 U.S.C. § 2244 .......................................................................28, 29

18 U.S.C. § 3184 ................................................................................1

18 U.S.C. § 2243 ..................................................................28, 29, 30

Cal. Penal Code § 261.5 ..............................................................28, 30

Cal. Penal Code § 288 ................................................................28, 30

Cal. Penal Code § 261 ...........................................................28, 30, 37

Crim. Code Canada § 143 ..................................................................7

Crim. Code Canada § 146 ............................................................7, 9, 30

Crim. Code Canada § 149 ...................................................................7

*Tackling Violent Crime Act*, S.C. 2008.............................................2, 30

IV

**Other Authorities**

1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 368, p. 421 ..........................................37

CALJIC 10.00 ...........................................................................................................................30

Canadian Charter of Rights and Freedoms .............................................................................36

Clancy, S. (2005). *Abducted: How People Come to Believe They Were Abducted by Aliens.* Harvard University Press ..............................................................25

Crombag, H. F. M., Wagenaar, W. A. , Van Koppen, P. J. (1996), *Crashing Memories and the Problem of Source Monitoring*, Applied Cognitive Psychology ....................................25

Davis, D. & Loftus, E.F. (2007), *Internal and External Sources of Misinformation in Adult Witness Memory* ......................................................................................26

Extradition Treaty, Canada-U.S., Mar. 22, 1976 ......................................28, 36, 37, 38

Gudjonsson, G. H.; Sigurdsson, J. F.; Sigurdardottir, A. S.; Steinthorsson, H.; Sigurdardottir, V. M. (2014), *The Role of Memory Distrust in Cases of Internalized False Confession,* Applied Cognitive Psychology .........................................................25

Henkel, L. A.; Coffman, K. J. (2004), *Memory Distortions in Coerced False Confessions: A Source Monitoring Framework Analysis,* Applied Cognitive Psychology...................25

Jelicic, M., Smeets, T., Peters, M. J. V., Candel, I., Horselenberg, R., & Merckelbach, H. (2006), *Assassination of a Controversial Politician: Remembering Details from Another Non-Existent Film*, Applied Cognitive Psychology........................................25

Kassin, S. M. (2007), *Internalized False Confessions* ..............................................................25

Laney, C., & Takarangi, M. K. T. (2013), *False Memories for Aggressive Acts*, Acta Psychologica .........................................................................................26

Leding, J. K. (2012), *False Memories and Persuasion Strategies*, Review of General Psychology..................................................................................26

Loftus, E. F. & Davis, D. (2006), *Recovered Memories*, Annual Review of Clinical Psychology ..........................................................................................................26

Loftus, E. F., & Ketcham, K. (1994), *The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse*, St. Martin's Griffin.........................................25

Loftus, E. F., & Ketcham, K. (1994), *The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse.* St. Martin's Griffin.........................................25

v

Loftus, E. F.; Cahill, L. (2007), *Memory Distortion: From Misinformation to Rich False Memory* ............................................................................................26

M.P. Toglia, J.D. Read, D.F. Ross, & R.C.L. Lindsay (Eds), *Handbook of Eyewitness Psychology (Vol l), Memory for Events*, Mahwah, NJ: Erlbaum......................................26

Nairne, J. S. (Ed), *The Foundations of Remembering: Essays in Honor of Henry L. Roediger,* III New York, NY, US: Psychology Press..........................................................26

Nash, R. A., Wheeler, R. L., & Hope, L. (2014), *On the Persuadability of Memory: Is Changing People's Memories No More Than Changing Their Minds?* British Journal of Psychology ..............................................................................................26

Ofshe, R. (1994), *Making Monsters*, Scribner ......................................................25

Ost, J., Vrij, A., Costall, A., & Bull, R. (2002), *Crashing Memories and Reality Monitoring: Distinguishing Between Perceptions, Imaginations and 'False Memories'*, Applied Cognitive Psychology ....................................................................................25

Patihis, L., Frenda, S. J., LePort, A. K. R., Petersen, N., *et al* (2010), *False Memories in Highly Superior Autobiographical Memory Individuals,* Proceedings of the National Academy of Sciences ......................................................................................26

Shaw, J. & Porter, S. (2015), *Constructing Rich False Memories of Committing Crime,* Psychological Science....................................................................................25

Toglia, M. P., Read, J. D., Ross, D. F., Lindsay, R. C. L. (Eds), *The Handbook of Eyewitness Psychology, Vol I: Memory for Events*, Mahwah, NJ, US: Lawrence Erlbaum Associates Publishers...............................................................................................25

**Rules**

Fed. R. Evid. 801 ..........................................................................................15

VI

**PRELIMINARY STATEMENT**

Donald Kollmar, by and through his counsel, respectfully opposes the Government's request for extradition. *See* ECF 1 & 39. Based on the applicable treaties between the United States and Canada, the United States Constitution, 18 U.S.C. § 3184, and the authorities, evidence, and argument presented herein and herewith, including the Declarations of Ethan A. Balogh, Brian Greenspan, Thomas Klatt, Marie Louise Kollmar-Stienen, Helen Harrington, Stanford Harrington, Lynn Nelson, Richard Kollmar, Allan Ajaya, Donna Barnett, Marilyn Clements, Charles Crook, Deborah Dutton, Kathleen Faith, Ellen Fietz-Hall, Helen Gabel, Mary Beth Gwynn, Carl Hall, Bonnie Johnson, Paul Karasik, Jeffrey Masters, Linda Mayo Willis, Roberto Moreno, Philip Notermann, M'Lisse Ramsey, Peter Reynolds, James Rudd, Lane Schulz, Vittoria Segalla, Nancy Solomon, Donna Sternberg, Thomas Tryforos, Maxine Weiner, and Rhonda Whetstine, the Court should deny the Government's application for the extradition of Donald Kollmar.

**OVERVIEW**

This extradition case involves serious allegations of sexual assault upon B.B. ("Bonnie Baker")[1] purportedly committed by Donald Kollmar more than 40 years ago. In cases with inflammatory allegations, it is often difficult to avoid an emotional view of the case. But it is precisely in those types of cases where the Court's focused and dispassionate attention are needed most.

As originally presented, *see* ECF 1, this case offered allegations worthy of skepticism based on their vintage, and the lack of a clear and sensible explanation for the delay in reporting. The Canadians' account was likewise suspect for repeating allegations, as the Government explained, from a complainant who had claimed to have been brainwashed for years by a cult that (1) Kollmar had left in June 1979 and (2) her parents then joined in 1980 when they moved to Toronto. It was during those later years that the complainant "related the sexual abuse and the severity of the mental abuse she endured to [John] Hanas and several of

---

[1] Consistent with the Court's Order forbidding the accused from naming his accuser in his filings, ECF 57, we apply the pseudonym "Bonnie Baker" to the complainant.

his advisors." ECF 22 at 4:12-13.[2]  Even then, without genuine explanation, the complainant

delayed reporting for six years *after* she left that organization, even though she claimed she

feared at all times for the children left under the cult's powers, as well as those subject to

Kollmar's alleged (non-existent) compound in the Catskill Mountains of New York.  *See* ECF

55 at 70-74.  Yet, despite this grave fear for the children, Baker did nothing for years on end.

Canada's presentation has only degraded since then.  At this stage, the allegations have

changed considerably: while Canada relied on Baker's 1997 accounts to set forth sexual assault

allegations arising from *consensual* sex, Canada has since reversed ground and now asserts that

those same 1997 accounts now establish *nonconsensual* sex.  The need for considered scrutiny

under these circumstances is thus even plainer.[3]  When a reasoned view of the facts and law is

undertaken, it becomes clear that the Court should reject the Government's request for

extradition on the merits of the Canadians' revised allegations.

---

[2] The quoted language raises questions about the veracity Government's representations
in this case.  In July, *see* ECF 40, the Government represented that it did not possess the
complainant's direct accounts and that it didn't "even know if the Canadians would release
those statements to us."  Audio Record at 29:35.  But in May, the Government paraphrased and
quoted the complainant's witness statement: Baker claimed that "over a period of several years,
I related to John Hanas and several of his right-hand advisors, the sexual abuse" alleged.  ECF
55 at 156; *compare* ECF 22 at 4:12-13 ("The victim advised that slowly, over a period of
'several years,' she related the sexual abuse and the severity of the mental abuse she endured to
Hanas and several of his advisors").  How could the Government quote from Baker's statement
in May when it denied possessing it in July?  This record suggests strongly that the Government
was not truthful with the Court and the accused.

[3] Until 2008, the age of consent in Canada was 14 years old.  *See* the *Tackling Violent
Crime Act*, S.C. 2008, c. 6, s. 13.  As a result, consensual sexual activities between the accused
and the complainant after October 13, 1976 were lawful under Canadian law.  In any case, the
Canadians have abandoned the allegations of statutory rape, as the Government has expressly
conceded.  ECF 39 at 2 & n.4;  *see also* ECF 39-1 at 6, 31.  And as the Canadian's expert
witness has explained, its allegations address sexual assault obtained by force and threats, and
without consent, and that its allegations do *not* turn on lack of consent due to incapacity, *viz.*,
based on the complainant's age.  ECF 39-1 at 8-15.  (We cite to the numbers on the bottom of
the Government's memorandum of law with respect to ECF 39, and we cite to the ECF-
generated page numbers with respect to ECF 39-1 and ECF 55.)  As a result, the complainant's
age is not germane to the Court's analysis of the Canadian's allegations.

In brief, the complainant said that in or around 1985, the leader of the Students of Light—John Hanas—told her parents that Donald Kollmar was in Toronto, and that Kollmar presented a threat to Hanas and his group, including the Baker family. *See* ECF 55 at 156.[4] To protect them all, Hanas pressed the Bakers to have the complainant raise allegations of sexual abuse against Kollmar. *See* ECF 55 at 64-70 & 156. Hanas further urged the Bakers to threaten Kollmar with prosecution unless Kollmar stayed away from Hanas and his followers. *See* ECF 55 at 64-70 & 156.

Up until this moment, the complainant had *never* claimed to any person, including her parents and her sisters, that she had been sexually abused by Donald Kollmar. It was only in response to this call for help from the cult leader that the complainant raised allegations of sexual abuse. *See* ECF 55 at 64-70 & 156. As will be shown, the vast scientific literature demonstrates that this circumstance falls squarely within the type of suggestibility that leads to false reports of sexual abuse and assault: an authority figure providing an account, of extreme importance, for the witness to adopt.

The complainant and her family complied with Hanas's request for help. Baker reported that her father did as Hanas directed: he called Kollmar, accused Kollmar of sexual abuse, and threatened prosecution *if* Kollmar troubled Hanas or the group. ECF 55 at 68-69. The complainant further explained that the threat worked, and they "never heard from Donald Kollmar again, so I, until now, never [had to] come forward with this." ECF 55 at 69. In other words, although being told that his daughter endured years of sexual assault by the accused, he was only interested in threatening Kollmar to stay away from the cult and its members, and her father did not take any action to alert the authorities. *See id*.

The complainant then explained that for the next six years, until 1991, she and her family remained in the group under John Hanas's tutelage. *See id*. During those six years, the complainant discussed with Hanas and his advisors the long abuse she claimed Kollmar

---

[4] Kollmar had left the group six years earlier, and had not been in contact with the complainant or her family thereafter; in contrast, *after* Kollmar left the group in 1979, Baker and her family moved to Toronto and joined the group in 1980. *See* ECF 55 at 62-78.

committed.  *See id.*; *see also* ECF 22 at 4:12-13.  At this time, the complainant understood that Hanas considered Kollmar his enemy, and that Hanas, as cult leader, was a great and powerful man.  (Robert Mason Pollock, in his book about the Students of Light, confirms that Hanas learned through a shaman that he (Hanas) was, in fact, Jesus Christ himself, returned to earth. *See* Balogh Decl. Ex. A at 100; *see also id.*, at 107-08, 144.)

But even after freeing herself of Hanas and his group, the complainant neither went to the authorities nor sought counseling or professional treatment for what occurred.  Instead, beginning in February 1996, she prepared a 12-page single-spaced typed account of her "years" with Don Kollmar.  While Baker claims she wrote this account herself, the verbiage and details of the written account do not mesh with the verbal account she provided in February 1997, and suggests strongly that her claim of writing it herself is false.  Tellingly, when the investigating detectives asked Baker directly if she prepared the written statement by herself, she replied "This – no, this ..." before being cut off.  ECF 55 at 136.  In any case, Baker then used that written account as a script to finally raise serious, conflicted, and suspicious allegations against Don Kollmar.

As shall be detailed below, her account is improbable, often vague, and explained away, negated, and obliterated by a wealth of unimpeachable evidence.  In those claims, Baker alleged marathon molestation sessions, including while she drove a van, at age 14 (without any apparent training or driving experience), across the highways of the United States, and she also alleged marathon masturbation sessions, lasting several hours.  *See e.g.*, *id.*, at 37, 66.  Baker also claims that the accused accomplished this perfidy under the noses of a house full of people, while providing a simultaneous contrary account that the adults in that home berated her for taking up so much of Kollmar's time and attention.  *See* ECF 55 at 149.  Her extraordinary account included the scene of her barefoot, running away from a rest stop that contained no other people and no telephones, and wasn't even on a highway, and during her eight-hour journey on a South Carolina highway, she could not find any people, any cars or any phones.

4

*See id.*, at 58-61 & 154.[5] And her rape allegations likewise appear confabulated: they didn't really have sex, rather, she alleged (literally) it was "just the tip" so as to ensure her continued virginity.

Indeed, this case conjures eerily the wildly inaccurate and unfortunate *McMartin* scandal, that arose from a panicked fear of sexual cults that arose in the 1980s, just as Baker's memory was being refreshed by Hanas. *See* ECF 55 at 65-70 & 155-56; *see also* ECF 55 at 157 (describing concerns about Hanas's cult and the danger it presented to children).[6] It is for good reason that the complainant recognized, and repeatedly so, that her account is "insane" and presents utter "insanity." *See e.g.*, ECF 55 at 26, 26, 38, 69, 75, 130.

These characteristics of Baker's account—vagueness and improbability—themselves support negation of the Government's attempted probable cause showing. *See Shapiro v. Ferrandina*, 355 F. Supp. 563, 572 (S.D.N.Y. 1973), *modified on other grounds*, 478 F.2d 894 (2d Cir.), *cert. dism'd*, 414 U.S. 884 (1973) (in extradition case, "improbability or vagueness of the testimony may destroy the probability of guilt").[7]

And when the complainant made clear allegations, the available evidence explains, negates, and obliterates her claims. For example, Baker first hinged her account on a critical trip to the accused's parents' home in Buffalo in March 1975, where she claimed the abuse began. *See* ECF 55 at 28-29. But the available evidence, including the accused's passport, proves that Kollmar took no such trip in March 1975 or March 1976, and that his parents didn't even purchase and move into that home until the summer of 1976.

---

[5] Common knowledge establishes that rest stops are on the main highways (that's why they're rest stops) and South Carolina rest stops are equipped with public telephones. *See* http://southcarolinarestareas.com. ("There are 53 rest areas at 35 sites along South Carolina's interstate highways which are generally located about 45 minutes traveling time apart. South Carolina rest areas provide restrooms, picnic areas (in most locations), pet walk areas, telephones and vending machines").

[6] *See* https://en.wikipedia.org/wiki/McMartin_preschool_trial

[7] The Government agrees that this Court should follow *Shapiro* as persuasive authority. ECF 39 at 5:19-22.

5

Likewise, Baker then claims that she and the accused engaged in a host of sexual activity at the SOL Keele Street property in 1975 and 1976. *See* ECF 55 at 148-51. But the SOL did not acquire the Keele Street home until 1977. Klatt Decl. ¶ 10 & Ex. A. Similarly, the complainant contended that she travelled consistently and repeatedly with the accused from 1976 through 1979. ECF 55 at 149-50. But the people that saw Kollmar regularly and continuously during his travels during those years—Henry Hall, Stanley North, Robin Harman, and Gary Stuber—have stated that the complainant was *not* with Kollmar at all during those periods. Klatt Decl. ¶¶ 4-7. And there's much more. *See infra.*

Once the totality of the evidence is considered, it will become clear that the Canadians have provided insufficient evidence to support their and the Government's burden in this case.

Finally, Kollmar will demonstrate that under the applicable Treaty, the lengthy delay in reporting and the lengthy delay on commencing these proceedings disqualify him from being extradited on these allegations. *See* Greenspan Decl. The Government's request for extradition now, 40 years later, after critical witnesses have died or lost their memory, and critical exonerating evidence has been lost, is fundamentally unfair and would violate the accused's rights under the Treaty and under the United States Constitution. Indeed, as shall be shown, California law and Article 10(1) proscribe extradition under these circumstances. These independent showings provide further bases for denying extradition.

At bottom, United States citizen Don Kollmar is innocent of these charges. Careful review of the complainant's account reflects an improbable and fantastical tale, explained and negated on all key claims, that is not worthy of belief and is insufficient to sustain the Government's burden. The Court should deny the Government's request for extradition.

## STATEMENT OF THE CASE

**A.    The Government arrested the accused on allegations of consensual sex obtained by false pretense.**

The Government arrested Kollmar on May 3, 2019, pursuant to a criminal complaint, sworn on May 1, 2019, seeking his provisional arrest pending a formal request for extradition by the Canadian Government. ECF 1 at 2 (¶ 3), ECF 6. The Complaint identified three alleged

crimes as established by the Criminal Code of Canada ("CCC"): "one count of Indecent Assault on a Female, in violation of CCC § 149 ('Count 1'); one count of Rape, in violation of CCC § 143(b)(iii) ('Count 2'); and one count of Rape of A Female, in violation of CCC § 146(2) ('Count 3')."  ECF 1 ¶ 6.

In sum, the Complaint asserted that 44 years ago, in 1975, the accused touched complainant's genitals, then aged 12 or 13, and digitally penetrated her.  *Id*. ¶ 7(c).  The Complaint also alleged that 42 years ago, on Mother's Day weekend 1977, the accused "placed part of his penis inside [Baker]'s vagina" when she was aged 14.  *Id*. ¶ 7(d).

The Complaint did *not* allege that this conduct was accomplished by force or violence, or by the threat of force of violence.  ECF 1.  In fact, the Complaint did not allege any violence; it instead grounded its charges on allegations of consensual activities secured by false pretenses.[8]  Specifically, the Complaint recited that during this time period, Baker and her family belonged to a religious group named "Students of Light" and that Baker "felt that she was 'chosen by God to be with [the accused].'"  *Id.* §§ 7(a) & 7(e).  The Complaint additionally asserted that Kollmar had told Baker "that he intended to marry her when she turned (16)[,]" and as a result, "[she] felt that it was her 'responsibility' and 'honour to be with him, and married to him.'"  *Id.*  The Complaint was expressly grounded on consensual sex and touching

////

////

---

[8] The pre-2019 Canadian Informations were expressly grounded on allegations of rape with consent "obtained by false and fraudulent representations as to the nature and quality of the act" as opposed to non-consensual sex obtained by threats of force or violence.  *See* ECF 1 ¶ 6 (citing CCC § 143(b)(iii)).  The Government's early filings have confirmed this fact.  ECF 11 at 3:2-3 (arguing that Kollmar pursued a "sex, under the clock of God, to deceive the victim into believing this was valid"); *see also id.* at 3-4 (arguing that the Complaint established that the accused "used false and fraudulent pretenses to obtain sex from [Baker] as required in Counts One and Two" of the December 2018 Information) (we cite to the page numbers from the MPA (not the ECF-generated page numbers) for ECF 9 & 11.)  These concessions make sense: plain as day, the 1997 warrant that alleged as the violation "sexual intercourse . . . [upon] consent [that] was obtained by false and fraudulent representations as to the nature and quality of the act[.]"  ECF 22 Attachment A; *see also* ECF 39-1 at 38-40 & 45-48 (warrants alleging identical charges on November 28, 2018, and December 24, 2018).

7

obtained by false pretenses (Counts One and Two), and statutory rape (Count Three), as opposed to common law rape, *viz.* forcible rape.[9]

According to the Complaint, Kollmar didn't marry Baker, and "[w]hen she was sixteen (16) years old, [*viz.*, in 1979, *see* ECF 1 ¶ 7(a),] [she] reported Kollmar's behavior to her parents." *Id.* ¶ 7(f). The Complaint then alleged that after consulting an attorney, she and her parents decided not to lodge a formal complaint. *Id.* The Complaint further alleged that in 1997, 20 years after those alleged events, Baker made a "statement to Canadian authorities[,]" and that statement resulted in an initial arrest warrant. *Id.* ¶ 7(e).[10] Twenty years after that, in July 2017, the Complaint alleged that Canadian law enforcement "observed a photograph of a man named Don Kollmar" on the internet, and Baker "identified the individual in the photograph as that of the man who had sexually assaulted her as a child." *Id.* ¶ 7(f)*.[11]

---

[9] The crime of "rape" refers to the common law crime of engaging in sexual activity with another by violence and against the will of the other party. *See In re Lane*, 135 U.S. 443, 448 (1890). The Complaint did not make out such a claim of rape. *See* ECF 1. Rather, Count Three attempted to make out a claim of statutory rape. *See United States v. Rodriguez-Gomez*, 506 F.3d 738, 741 (9th Cir. 2007) ("'Statutory rape' is commonly understood to be the offense of unlawful sexual intercourse with a minor." (quoting *People v. Osband,* 13 Cal.4th 622, 55 Cal.Rptr.2d 26, 919 P.2d 640, 712 (1996)); *United States v. Gomez-Mendez*, 486 F.3d 599, 603 (9th Cir. 2007) ("The term 'statutory rape' is ordinarily, contemporarily, and commonly understood to mean the unlawful sexual intercourse with a minor under the age of consent specified by state statute.")

[10] It appears that the Complaint intended to label this subparagraph as 7(g), because following subparagraphs 7(e) and 7(f), the Complaint then labels the next two subparagraphs 7(e) and 7(f) for the second time. Going forward, we will mark the second iterations of subparagraphs 7(e) and 7(f) with an asterisk (*) to identify them as the second of the two identically-labeled subparagraphs.

[11] The use of a single photograph to obtain an identification is unduly suggestive and improper. *See United States v. Cooper*, 2014 WL 3784344, *6 (N.D. Cal. 2014); *United States v. Moss*, 2014 WL 1349494, *2 (N.D. Cal. 2014) (Hamilton, J.) ("Defendant has demonstrated that the single photo show-up, rather than an array of other various people, was both suggestive and unnecessary."). Indeed, the Supreme Court has long held that "identifications arising from single-photograph displays may be viewed in general with suspicion," *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977), and that "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Foster v. California*, 394 U.S. 440, 443 (1969) (quotation marks and brackets omitted). *See also Simmons v. United States*, 390 U.S. 377, 383 (1968) (holding that the danger of

8

Finally, Count Three charged that on some unknown date between 1974 and 1977, Kollmar allegedly committed statutory rape, in violation of CCC § 146(2).  ECF 1 ¶ 6.[12] .

**B.  The parties litigated bail, and Kollmar identified deficiencies in the Canadian Information and federal Complaint.**

Following his arrest, the parties litigated Kollmar's application for bail.  *See* ECF 4, 9, 11, 13-14, 22-24, & 27-30.  During that litigation, Kollmar identified multiple deficiencies in the Government's pursuit of a provisional warrant based on the December 2018 Canadian Information, including:

- The Information's and the Complaint's failure to plead sufficiently "false and fraudulent representations as to the nature and quality of the act" to support rape by false pretenses because a promise to marry did not suffice.  *See* ECF 9 at 5 (citing *R. v. Maurantonio,* [1968] 2 C.C.C.115, 2 C.R.N.S.375 (Ont.C.A.)) (holding that in determining the question of obtaining consent by false and fraudulent representations the phrase 'nature and quality of the act' should be interpreted to encompass the surrounding circumstances which give meaning to the particular physical activity in question; and accordingly where the complainants consented to a medical examination by the accused who had falsely held himself out to be a doctor, they were subjected to something entirely different from that to which they had consented).  ECF 9 at 5:9-20;

- Canada's inability to establish dual criminality for the alleged crime of rape by false pretenses.  *See* ECF 9 at 6:1-3; 9:21-11:7 & n.7.[13]

---

misidentification is "increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw".  The Ninth Circuit is in accord. *See United States v. Givens*, 767 F.2d 574, 581 (9th Cir. 1985) ("Showing a witness a single photograph which potentially suggests an identification desired by law enforcement officials is *improper conduct* which we do not condone.") (emphases added); *United States v. Fowler*, 439 F.2d 133, 134 (9th Cir. 1971) ("[W]e are convinced that the use of a single photograph under these circumstances was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.") (quotation marks omitted).

[12] As the Government concedes, ECF 39 at 2 & n.4, the Canadians have since abandoned the statutory rape allegation, and no such allegation remains in this case.

[13] Notably, Kollmar also challenged that the Government could not establish dual criminality for the statutory rape allegation either, *see* ECF 9 at 11:8-17.  Although the

9

Thereafter, following Kollmar's admission to bail, the Canadian authorities—while relying on the identical source material from 1997—amended the allegations substantially.

**C.     The July 2019 extradition request, while relying on the same materials used to prepare the December 2018 Information, substantially changed the allegations to allege non-consensual rape as opposed to rape by false pretenses.**

Faced with dispositive challenges to Counts One and Two, the prosecution changed course.  On July 10, the Government filed its Canada's request for extradition in which presented wholly new allegations, and jettisoned one (the statutory rape charge).  ECF 39.

The new June 2019 allegations are as follows:

> **COUNT 1**
>
> Don Kollmar, between the 1st day of January in the year 1975 and the 31st day of December in the year 1979 at the City of Toronto in the Toronto Region did indecently assault [B.B.], a female person, contrary to Section 149 of the Criminal Code of Canada.
>
> **COUNT 2**
>
> AND FURTHER THAT Don Kollmar, between the 1st day of January in the year 1975 and the 31st day of December in the year 1979 at the City of Toronto in the Toronto Region did rape [B.B.], contrary to section 144 of the Criminal Code of Canada.

ECF 39-1 at 52.

The factual content of the new allegations is set forth in the Affidavit of Detective Constable Robert Speakman.  ECF 39-1 at 23-65.  Therein, Speakman declared that Baker, on February 25, 1997, provided a statement to the Canadian authorities and that statement was preserved by audio-video recording.  ECF 39-1 at 24 ¶ 4.  Speakman also revealed that in February 1997, Baker also provided a written account she had prepared in advance of her interview.  *Id.*  Speakman has admitted that he then crafted a narrative from selected portions of those statements.  *Id.*  Also by his own admission, Speakman's narrative does not further

---

Government disputed that argument, *see* ECF 11 at 5:12-20, it neither disputed the lack of dual criminality for the crime of rape by false pretenses nor identified any analog offense (federal or state).  In sum, the Government essentially conceded the issue.

10

identify the specific source of the statements included within the narrative, and does not establish his narrative is complete. *Id.*; *see also* ECF 39-1 at 23-65. In addition, the Canadians possess a March 1997 written account from Baker's father, but they have not produced it. *See* ECF 48.

As explained by the Canadian prosecutor, the new 2019 Information charges the accused in Count Two with rape, under three theories: (1) sexual intercourse with rape obtained with consent because the accused's "abusive and controlling behaviour and his position of authority over the complainant" vitiated consent, ECF 39-1 at 9, and (2) sexual intercourse where consent was either "(i) extorted by threats or fear of bodily harm[,] or . . . (iii) obtained by false and fraudulent representations as to the nature and quality of the act." ECF 39-1 at 9-10.

In addition, the Canadian prosecutor explains that Count One, indecent sexual assault, is essentially the same: rather than proscribe intercourse in these circumstances, the statute reaches indecent touching obtained without consent, and applying the same definition of consent. ECF 39-1 at 12-14 ("Consent for the purpose of indecent assault is the same as for the offence of rape, as discussed above.").

Thereafter, the Court ordered discovery, *see* ECF 48, and the Government produced Baker's written and video-recorded accounts. ECF 55, 56 & 62.[14]

## APPLICABLE STANDARDS

The Government first bears the burden of proving that the evidence presented by the Canadian authorities establishes probable cause under American standards. While a probable cause finding is not the highest burden of proof, it nonetheless requires this Court to exercise "reasonable caution" when evaluating the complainant's account. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007), *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Under this prism of "reasonable caution," the Court must determine if "the totality of circumstances" demonstrate to "a prudent person" that there exists "a fair probability that [the defendant] . . . committed [the

---

[14] The transcript provided at ECF 55 is mostly correct, but with one glaring error: when the complainant refers to "aura balancing" the Government mis-transcribed it as "oral balancing."

11

alleged] crime." *United States v. Smith,* 790 F.2d 789, 792 (9th Cir.1986). "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.'" *Lopez*, 482 F.3d at 1072 (quoting *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.1984) (citing *Henry v. United States,* 361 U.S. 98, 101, (1959))) (parallel citation omitted).

In contrast, the Government incorrectly suggests that the probable cause analysis amounts to little more than blind acceptance of the complainant's account. *See* ECF 39 at 15-16. But the law of this Circuit is clear: this Court is entrusted with evaluating carefully the credibility of the complainant's account to determine, in light of all of the evidence, whether the Government has established probable cause. *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986), *cert. denied*, 479 U.S. 882 (1986) ("The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate."). This standard also applies in the Second Circuit. *See Austin v. Healy,* 5 F.3d 598, 605 (2d Cir. 1993) (finding probable cause in extradition case because "there's a level of consistency among those affidavits that comes from several different quarters that the Court believes renders that information reliable"), *cert. denied*, 510 U.S. 1165 (1994); *Shapiro*, 355 F. Supp. at 572 (in an extradition case, "improbability or vagueness of the testimony may destroy the probability of guilt"); *Gill v. Imundi*, 747 F. Supp. 1028, 1041 (S.D.N.Y. 1990) (extradition magistrate has latitude in assessing credibility and is not strictly bound by face of government's affidavits); *see also Argento v. Jacobs*, 176 F. Supp. 877, 883 (N.D. Ohio 1959) ("the Court must scrutinize the evidence carefully" in an extradition case); *Freedman v. United States*, 437 F. Supp. 1252, 1265 (N.D. Ga. 1977) (extradition magistrate "should involve himself in a determination as to the reliability of the affidavits presented and not merely blindly believe such statements").

In addition, the accused is entitled to explain the Government's evidence, and to produce evidence to explain, negate and/or obliterate the attempted probable cause showing. *See e.g.*, *In re Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) ("In admitting 'explanatory evidence,' the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of

probable cause."); *Shapiro*, 355 F. Supp. at 572; *Republic of France v. Moghadam*, 617 F. Supp. 777, 782-84 (N.D. Cal. 1985) (finding that the defendant's evidence "negate[d] the only evidence of probable cause").

## STATEMENT OF FACTS

### A.   The complainant relied on a script when presenting her account.

Before presenting the complainant's allegations, it's important to note that she came to her February 25, 1997 interview armed with a 12-page, single-spaced typed account dated one year earlier, February 20, 1996.  ECF 55 at 8 ¶ 6 & 146-157.  She claims that this written account was lifted from "her own personal records, similar to a diary," *id.*, at 8 ¶ 6, but she never produced any such alleged corroboration, nor did the interviewing detectives follow up. And when asked if this written account was prepared solely by her, she essentially denied it when she started to say, "this, no" but was then cut off.  ECF 55 at 136.

In any case, as reflected in her 1997 recorded statement, Baker couldn't remember clearly, and couldn't conjure clearly those events in her mind's eyes, and instead relied on and referred repeatedly to her script during her interview.  *See e.g.*, ECF 55 at 20, 27, 48, 62.  This is so because they're not based on true memories, but arise from the events John Hanas provided to her so that she could falsely accuse Don Kollmar.  The need for a script itself raises genuine doubt on the *bona fides* of a person's claims.  Indeed, even after Detective Speakman's "follow up" in September 2019, the Canadians and the Americans still have never explained even the one-year gap between Baker's preparation of her script and her subsequent report to the authorities, which should only give the Court additional, substantial pause, when assessing Baker's statements.

Last on this point, despite the great care and attention obviously given to crafting complainant's 12-page, single-spaced, typed account, it is replete with obvious errors that raise additional grave questions about its accuracy.  For example, she hinges the first allegations of abuse on a trip that allegedly occurred "in March 1975, at age 13."  ECF 55 at 147.  But Baker was 12 years old in March 1975, *see* ECF 39 at 2:16, and this is not the type of mistake any person would make when reciting their age on a particular date.  The written account makes the

13

identical error when reciting another critical part of the account: the date of the first alleged rape. According to complainant's script, it occurred "at age 14, in 1976, [during] the weekend of Mother's Day." ECF 55 at 152. But Baker was only 13 years old in May 1976. She makes the same error again when she claims she was 16 "in June of 1978," *i.e.*, when she reported that she collapsed and her parents thereafter canceled the wedding, *id.*, at 155. But Baker didn't turn 16 until that October.

These are no small errors, as they undermine significantly Baker's claim that she wrote this account herself based on her "diary-like" "personal records." And while Baker ultimately "corrected" those dates by claiming she is sure of how old she was at any given time, she provided no evidence why or how that was so, *viz.*, by linking her age to an event or experience clear in time, *e.g.*, I had just seen the new Star Wars, or offering any other concrete explanation of how she linked her memories to determine when her "memories" occurred. In sum, there are many reasons to question the *bona fides* of the written account, and Baker's subsequent reliance on it as a script.

**B.    The complainant's account and the evidence that explains, negates and obliterates it.**

As for the substance of the complainant's account, it is vague and improbable on many key points, and explained, negated, and obliterated by other unimpeachable evidence.

### 1.    Buffalo 1975

The complainant hinged her account of abuse to the triggering event she claimed occurred "in March 1975" in Buffalo, NY. ECF 55 at 147. According to Baker, a few months after she and her parents met Kollmar in Canada, she flew with him from Toronto to Buffalo, "to attend a weekend retreat . . . at his parent's home in Buffalo." *Id.*; *see also id.*, at 28. In her written account, which she repeated in her recorded interview, she recollected these critical events because while at the Toronto Airport, Kollmar berated her in a fit of anger about her clothing and curled hair. *Id.* at 147; *see also* ECF 55 at 28-29. Baker then claimed that during this weekend, the accused gave her a therapeutic massage in the home's "front living room" (as opposed to its back living room) that included massaging her breasts for hours, required the

14

performance of a ballet routine after she changed by going upstairs, after which he berated her again, and spent the majority of his time extolling his extraordinary powers and other grandiose notions of self. ECF 55 at 83 & 147-48; *see also id.,* at 28-32. Baker claims she prepared the dance routine because Kollmar had yelled at her at the airport, and because she was shy. ECF 55 at 30.

But those critical allegations are refuted and obliterated by unimpeachable evidence. First, Kollmar's passport does not reflect any trip from Toronto to Buffalo in March 1975 or otherwise, proving her account inaccurate out of the gate. *See* Balogh Decl. ¶ 3 & Ex. B. Second, all evidence available to the accused reflects that no commercial flights flew that extraordinarily short route in 1975. Klatt Decl. ¶ 3.

Even further on these first two points, the Government most likely (if not assuredly) has records showing person's entries into the United States by international flight in 1975, and should thus confirm there exists no evidence that Kollmar and Baker entered the United States together (or otherwise) in March 1975 pursuant to its due process obligations, as recognized by cases starting with *Mooney v. Holohan*, 294 U.S. 103 (1935), and continuing through *Brady v. Maryland*, 373 U.S. 83 (1963), and their progeny. *See also* Fed. R. Evid. 801 (absence of records does not constitute hearsay). Likewise, the Government should be able to confirm the lack of regional commercial flights from Toronto to Buffalo in 1975, further refuting Baker's account.

Next on this point, the notion that, in the 1970s, spiritual hippies who lived in and traveled by van also traveled by airplane for trips covering less than 100 miles itself strains credulity. *See also Shapiro*, 355 F. Supp. at 572 (S.D.N.Y. 1973) (improbability of account may obliterate attempted probable cause showing). Indeed, the complainant later established this very fact: she told the investigating detectives that "he [Kollmar] *never* flew anywhere, it was, we always drove in the van." ECF 55 at 40.

In addition, Kollmar's father died in 1972, and his mother remarried in November 1975. Kollmar referred to his mother and step-father as his "parents" thereafter. Importantly, Kollmar's parents did not acquire and move into the home the complainant described until June

15

1976, more than a year later.  Rather, the home they owned in 1975 had one living room and all

the bedrooms were on the first floor; in contrast, the home they purchased and then moved into

in the summer of 1976—more than one year later—had two living rooms, with the family's

bedrooms being upstairs.  And while the Harringtons confirm a trip Baker took to that home in

Buffalo with the accused, that trip did not take place until March 1978.  As the Harringtons

establish, Kollmar used their home once during their absence, and it was in March 1978.  *See* H.

Harrington Decl.; S Harrington Decl.; R. Kollmar Decl.; and Nelson Decl.

 As we will see, this three-year gap in time will be critical to assessing other aspects of

Baker's allegations.  In brief, the complainant explains away several important points, like her

decision not to tell her parents or sisters or anyone about the trauma while it was ongoing

because the "years of abuse" had affected her so greatly during those years.  But in fact, she

knew and interacted with Kollmar for far less time, and the allegations that abuse began on the

Buffalo trip (which occurred in March 1978 and did not, in fact, include abuse) and ended in

June 1979 (her corrected date for when she called off the wedding that had been planned)—15

months—refutes itself her claims regarding "years of abuse" and the effects arising from years

of abuse.

 For example, Baker claimed that she did not disclose the sexual assault in Buffalo to her

family upon her return to Sudbury, because "this was a man that [she] had for now a year [seen]

people place on a pedestal ah, abiding by what he said."  ECF 55 at 33.  But she had just stated

the opposite: that she and her family had only just met Kollmar in the winter of 1974, a couple

of months after her 12th birthday in October 1974, *i.e.* December 1974.  ECF 55 at 146; *see also*

ECF 55 at 26 (same), ECF 55 at 36 (complainant "started making regular trips" to see the group

in Toronto in the months after, not before, the Buffalo events).  Indeed, Detective Speakman

confirms that during this period, Baker said at the time she met Kollmar, he was then making

"monthly trips to Sudbury," ECF 39-at 24 ¶ 8, and thus Baker (at most) met him in December,

January and February before this alleged trip.

 As a result, the complainant's basis for not reporting is false by her own account, and

undermined her account out of the gate.

16

So too, witnesses Henry Hall, Stanley North, and Robin Harman knew the accused during this time, and all agree that Kollmar never claimed to have special powers or otherwise was placed on a pedestal.  *See* Klatt Decl. ¶¶ 4-6.

In sum, the real estate records, passport records, the complainant's contradictory statements, and additional witness accounts undermine completely the complainant's account of this critical trip and cannot be accurate.  Most simply, this evidence explains, negates, and obliterates complainant's account of this purported critical event.

**2.      The Students of Light home on Keele Street and Kollmar's van**

Following the alleged (and refuted) March 1975 Buffalo trip, the complainant then claimed that beginning in the late spring of 1975, she would spend time with Kollmar at the house owned by the Students of Light at 301 Keele Street in Toronto.  *See* ECF 55 at 148-49; *see also* ECF 55 at 36.  Baker claimed she started visiting the Keele Street home regularly in the Spring of 1975, and by the autumn of 1975, she was going once or twice a month.  ECF 55 at 36-37.

The complainant claimed that when she was 13 (from October 1975 through 1976), the accused molested her and instructed her to masturbate him while they stayed at the Keele Street property.  *See* ECF 55 at 149; *see also* ECF 55 at 37-39.  Baker claimed that all of the sexual acts took place "always in [his] van," ECF 55 at 119-121,[15] and the accused would either sneak her out to his van and back into the house together (while the house was full of people) or that "he would go out and then I would go out, or [that] he would tell me just at a particular time to come to the van and meet him."  *Id.* at 155.  Despite the many people at the Keele Street property, no person saw or knew anything about the abuse, that their meeting entailed "hours" of verbal abuse detailing Baker's flaws as a human being followed by "several hours" of fondling her breasts and/or "three and four hours" of directed masturbation.  ECF 55 at 37-39.  "From 1975 to '78," Baker claimed she spent all of her school breaks and summer

---

[15] She then amended that allegation to claim on one occasion the sexual activities took place on a blanket in the snow.  *Id.*, at 122.

17

holidays doing "that sort of thing." ECF 55 at 39.  Baker concluded that the accused believed that she "had this special love for him as well." ECF 55 at 37.

The complainant also described ritual and regular humiliations, including in front of a large group of people, by the accused.  ECF 55 at 44.  She explained that her powerlessness stemmed from her dedicated belief that the accused had special powers, and she believed this because the accused repeatedly reminded her of his vast powers in grandiose, narcissistic monologues by which he exalted his extraordinary abilities.  *See e.g.*, ECF 55 at 44-45.  She even claimed he twisted her wrist before a group of people because she won a card game.  ECF 55 at 45.

With respect to the van that was the scene of these events, *see e.g.*, ECF 55 at 34, the complainant described this van as a "mini home" that contained a bed, sink, propane heater, and toilet.  *Id.*; *see also id.*, at 84-86.  The van also had a stained glass window, and only had front passenger doors and back doors, with no door on the side.  *See id.*

But again, significant evidence explains, negates, and obliterates the complainant's account.  To begin, the Students of Light purchased the Keele Street property in February 1977, *viz.*, two years *after* complainant claimed she was first subjected to abuse on that property.  *See* Klatt Decl. ¶ 10 & Ex. A.  Next, Kollmar's van was not outfitted like she claimed.  *See* Klatt Decl. ¶¶ 4-5.  Rather, Henry Hall and Stanley North knew the accused during this time and recollected the white van Kollmar drove in the 1970s: both remembered that the white did have a sliding door at the side, and both recalled that it was not outfitted with a toilet, kitchen, and heater like a mini home.  *Id.*  Kollmar's mother (Helen Harrington), step-father (Stanford Harrington), sister (Lynn Nelson), and brother (former FBI Deputy Assistant Director Richard Kollmar) likewise attest that Baker mis-described the accused's van.  *See* H. Harrington Decl. ¶ 4; S. Harrington Decl. ¶ 4; Nelson Decl. ¶ 4 & R. Kollmar Decl. ¶ 4.  Rather, it appears that the complainant described the red truck that the accused outfitted like a camper later on.  *See* H. Harrington Decl. ¶ 4; S. Harrington Decl. ¶ 4; Nelson Decl. ¶ 4 & R. Kollmar Decl. ¶ 4

////

18

### 3.    Mother's Day 1976

The other "triggering" event on which Baker stakes her claim occurred on Mother's Day weekend in 1976: this is the time she claimed the accused and her first had sexual intercourse, which she claimed occurred in his van.  Importantly, the complainant's alleged "clear memory" alleges that this "first time" occurred in 1976 *and* 1977, with the 1976 date arising from her personal, never produced or examined, "records" and the 1977 date arising from a "correction" with the investigating officers.  *See* ECF 55 at 152; *see also id.* at 47.  In her typewritten account prepared from her "personal records," she alleged that the couple had sexual congress in March 1976, *viz.*, Baker claimed that on Mother's Day weekend in 1976, that the accused "partially penetrated [her] with his penis for the first time" while they were in his van at an undisclosed location.  ECF 55 at 152.  She also claimed this same conduct occurred "four to five separate times[,]" *id.*, again without identifying where those events purportedly occurred.  Baker explained that this "partial entry" permitted her "to remain a virgin" until the two would be married in 1979.  *Id.*  In contrast, following those events, the complainant alleged that the accused would then simply masturbate her instead, and would have her masturbate him, while they were "in Toronto, Sudbury, and throughout the [United] States." *Id.*

Baker also raises allegations of mental abuse, sleep deprivation, violent outbursts of anger, and imposed fasting at the hands of the accused.  ECF 55 at 150-51.  According to the complainant, the accused was able to commit all of these acts secretly, in a home filled with other people, with no one catching on.  *See id.*  But, as demonstrated by the many declarations presented herewith, the complainant's imaginings do not in any manner reflect Donald Kollmar: a soft-spoken, kind, warm person who is not grandiose, narcissistic, controlling, angry, or focused on fasting.  *See* Declarations of Marie Louise Kollmar-Steinen, Helen Harrington, Stanford Harrington, Lynn Nelson,  Richard Kollmar, Allan Ajaya, Donna Barnett, Marilyn Clements, Charles Crook, Deborah Dutton, Kathleen Faith, Ellen Fietz-Hall, Helen Gabel, Mary Beth Gwynn, Carl Hall, Bonnie Johnson, Paul Karasik, Jeffrey Masters, Linda Mayo Willis, Roberto Moreno, Philip Notermann, M'Lisse Ramsey, Peter Reynolds, James

19

Rudd, Lane Schulz, Vittoria Segalla, Nancy Solomon, Donna Sternberg, Thomas Tryforos, Maxine Weiner, and Rhonda Whetstine.

The complainant also claimed that she was unable to tell her parents about the accused's alleged conduct, but instead confided in real-time with Hanas to have him intervene and rescue her. *Id.*, at 153. In her written statement, she explained that her mother expressed to her serious concerns about the accused, and questioned the complainant directly on her desire and comfort with respect to spending time and traveling with him. *Id.* The complainant doesn't set forth what she told her mother in response; instead, Baker claimed she then "would have done anything to have the abuse stop," but that does not appear to have included answering direct questions from her caring mother.

As for her recollections about Hanas, the complainant claimed that her focus then was to stop the accused's "anger and verbal attacks" on her, but curiously, not the alleged sexual abuse. *Id.* But rather than help her, Baker explained that Hanas simply confirmed that any anger from the accused arose from Baker's failure of love, understanding, and loyalty. *Id.* She then claimed that Hanas turned the tables, and pursued a sexual relationship with her. *Id.*; *see also id.*, at 156 (Hanas maintained it was "imperative for [complainant] to lose [her] virginity to" Hanas upon her 16th birthday, *viz.*, October 1978).

### 4.     The United States travel

The complainant further alleged that she traveled regularly throughout the United States with Kollmar, and engaged in lectures and aura balancing sessions with the large groups of people he visited. ECF 55 at 39. The complainant describes being controlled in every aspect of her life during these trips, which she alleges included the same abuse that she alleged occurred in Toronto. ECF 55 at 39-40. Her account itself betrays her desire to blame Kollmar for things that just don't make sense. For example, at the time she met the accused, she had already been a practicing vegetarian because her parents had led her to make that change. ECF 55 at 42. Nonetheless, Baker claimed that while she was already been a vegetarian before she met Kollmar, "great pressure . . . to become vegetarian" somehow came from Kollmar, even though he met her after she had adopted that practice. *Id.* So too, Baker alleged that the

accused required her to fast for four or five days at a time because that was "a big practice" of his.  ECF 55 at 42.

The complainant also described an alleged trip to South Carolina during "the summer of 1977, [when she was] age 15." ECF 55 at 154; *see also id.*, at 58.  According to Baker, she left a rest stop that lacked any telephone booths—a dubious and incredible allegation for anyone who traveled the United States in the 1970s—and ran away in a "thin, short nightie and barefoot[.]"  *Id*. at 154; *see also id.* at 59 (following script and describing running away in "just a little shorts and nightie [while] barefoot)".  She ran this way from the rest stop to "the main roadway[,]" but could not locate any cars or telephone booths or any person to help.  *Id*. at 154; *see also id.*, at 59-61.  After an hour and a half of running, and following the completely empty highway, she collapsed, recovered, and "remained on the road side crying."  *Id*., at 154.  Even though she had bloodied herself on her hands and knees from her extraordinary collapse, and "[s]everal hours had passed, and the sun was beginning to rise"[16] she then walked back to the van, where the accused remained asleep, apparently in an empty rest stop.  *Id.*

Much evidence likewise explains, negates, and obliterates Baker's accounts.  First, there are the first-hand witnesses.  Henry Hall met regularly with Donald Kollmar from 1975 to 1977 when he hosted "aura balancing" sessions in North Carolina.  Klatt Decl. ¶ 4.  Hall also travelled to Canada with Mr. Kollmar in May and June 1977, and spent time with him in Sudbury, Canada.  *Id.*  Hall stated that B.B. was not with Kollmar on any of these occasions, and that Hall never saw nor met B.B.  *Id.*  Stanley North met regularly with Kollmar from 1973 to 1976 when he hosted aura balancing sessions in Massachusetts, and North also spent time with Mr. Kollmar in Belmont, New York during the summers of 1977 to 1979.  Klatt Decl. ¶ 5. North declares that B.B. was not present on any of these occasions, and that like Hall, he never saw nor met B.B.  *Id.*  Robin Harman met Kollmar in 1976 at aura balancing sessions held in North Carolina.  Klatt Decl. ¶ 6.  From 1977 to 1978, Kollmar stayed as a guest in her

---

[16] Shortly after 6:00 a.m.  *See* https://www.google.com/search?client=firefox-b-1-d&q=what+time+does+the+sun+rise+in+south+carolina+in+July

21

residence during his visits.  *Id.*  Harman reported that she never saw Kollmar in the company of any young female.  *Id.*  And Gary Stuber met Donald Kollmar in 1976, and that from then until the end of 1979, Kollmar visited him in Massachusetts to lead aura balancing sessions approximately every four months.  Klatt Decl. ¶ 7.  Stuber reported that Kollmar typically traveled alone on these occasions, and that he never saw Kollmar in the company of any female companions.  *Id.*

At bottom, Baker's account of the South Carolina events presents the definition of "improbable" for the reasons set forth in the text.

### 5.     The report to John Hanas

Although Baker claims that despite the closeness to her parents and sisters, she told none of these events to any person except for John Hanas, on a purported trip to Boston when she was aged 15.  ECF 55 at 48-50.  But although "it took a tremendous amount of courage" to address these events with Hanas, and she then had that "courage," the complainant nonetheless did not allege sexual abuse, and instead asked Hanas to intervene with respect to Kollmar's verbal abuse.  ECF 55 at 49-51.  Hanas told her she deserved the abuse, and that she should sleep with him instead, because Kollmar was nobody and that Hanas was the true leader connected to God, the true "burning sun."  *See* ECF 55 at 50-54; *see also* ECF 55 at 66-67 (renewing claims about Hanas's bid to take Baker's virginity upon her 16th birthday).

With respect to her family, she claimed that at this same time, her mother had "concerns" about Kollmar's conduct and had noticed complainant's physical and mental deterioration.  ECF 55 at 51-52.  When Baker was 15, she claimed her mother asked the complainant if she wanted to stop traveling with the accused, but the complainant "didn't know how to" answer because she believed she had to marry Kollmar even though her mother's inquiries established that she did not.  ECF 55 at 52.  Complainant thus contradicts herself.  So too, although she claimed her mother witnessed all these horrific changes and effects, her mother still didn't pry and she simply allowed the complainant to ignore the questions.

////

////

**6.  The complainant's family calls off the wedding.**

Finally, the complainant describes that in June of 1979, she broke off her engagement to the accused, even though wedding arrangements had been made.  ECF 55 at 155; *see also* ECF 55 at 62, 108.  Baker describes a physical collapse so strong, it required hospitalization, and served as the catalyst to cancel the wedding.  *Id*.  Despite the complainant's odd description and verbiage—"it brought attention to the emotional and mental state I was in.  My mother realized the tremendous oppression being placed upon me"—Baker claimed in her written account that she then told her mother, who had herself "come to experience, first hand, Donald's Kollmar's volatile behavior" about the accused's alleged conduct.  *See id.*, at 155.[17] In her video-recorded account, the parents just canceled the wedding despite the fact that the complainant did not say anything about the alleged abuse, did not link her collapse to the alleged abuse, and "believed that [the complainant] wanted marry Donald Kollmar."  *See id.*, at 62.

Perhaps unsurprisingly, the complainant contradicted that explanation in other statements.  On one of the isolated accounts when the Canadian investigators pressed the complainant about her account—they noted the inconsistency with her claim that no one could resist Hanas's directives with her parents' cancelation of the wedding to Kollmar—the complainant responded that there were many phone calls which resulted in Hanas stating that Kollmar could marry her.  ECF 55 at 78-80.  She then turned that around and said the opposite: that Hanas blessed the cancellation.  *Id.*  This occurred, according to Baker, because her mother had packed her backs and threatened to leave.  *See* ECF 55 at 81.  But these alleged events occurred in Sudbury, where Baker's mother then lived, and her parents had not yet moved to

---

[17] The complainant then describes the accused's alleged explosion over this issue, which led Kollmar to rebel against John Hanas, including a failed attempt to coerce others to follow him (ostensibly in a new cult).  *See id.*  Thereafter, Baker explained that Kollmar abandoned the group, while she and her family moved to Toronto in 1980 to submit completely to it.  *Id.*; *see also id.*, at 64, 111.

join the group in Toronto.  Thus, there were no bags to pack and no supporting reason for her

mother's alleged "threat" to the all-powerful Hanas.

   The complainant also somewhat contradicted that account in her written statement, and

later statements in her video-recorded account.  *See* ECF 55 at 156.  Baker then claimed that

when she was in her early 20s (approximately 1983-1985), Hanas told her parents that Kollmar

was in Toronto and presented a threat to Hanas, his group, and the Baker family.  *See id*.; *see*

*also* ECF 55 at 65.  To protect them all, Hanas pressed the Bakers to have the complainant

raise allegations of sexual abuse against Kollmar.  *See id*, at 156.  At a minimum, Hanas urged

the Bakers to threaten Kollmar with prosecution unless Kollmar stayed away from Hanas and

his followers.  *See id*.

   In response, she and her parents addressed her account with attorney "Jim Slyth," but

he opined that there was no case to be raised.  *See id.*; *see also* ECF 55 at 67 (same allegations

regarding attorney Jim Smyth).

   Also at this point, while the complainant and her family blamed Hanas for helping hide

the alleged abuse complainant had reported to him (allegedly) years earlier, she nonetheless

then began a years-long relationship with Hanas and his "right-hand advisors" to discuss that

alleged abuse.  *See* ECF 55 at 156.  She then claimed that she and her family escaped Hanas's

reach in 1991, but never explained why it took six more years before she raised any claim to

the authorities.  *See* ECF 55 at 157.  So too, while Baker explains her grave concern for

children's safety from Hanas in the 1980s, she never explains why she didn't come forward for

more than 15 years after the accused had left and those children remained in danger of Hanas.

*See id*. at 157.  And while she claimed her father did as Hanas directed—he called Kollmar and

threatened him with prosecution for sexual abuse *if* Kollmar returned to Toronto—otherwise,

her father would not (and did not) make any claim to the police.  ECF 55 at 68-69.

   Six years later, in approximately 1991, Baker and her family left the Students of Light.

ECF 55 at 70.

////

24

Case 4:19-cv-01388-LHK   Document 15-1   Filed 05/12/20   Page 32 of 46

7.    **The relevant scientific literature supports the conclusion that the complainant has presented an account based on false memories at the direction of and to please her parents and/or John Hanas.**

The relevant scientific literature shows that false autobiographical memories can develop for events ranging from the relatively mundane (*e.g.*, school performance) to the seemingly impossible (*e.g.*, having been abducted by aliens, having sex with the devil).  Real life examples of extreme false memories have been documented in the scientific literature: witnessing murder[18], alien abduction[19], sexual abuse (including satanic ritual abuse)[20], witnessing dramatic fatal accidents[21], and committing a crime that one did not actually commit.[22]

---

[18] Loftus, E. F., & Ketcham, K. (1994), *The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse.* St. Martin's Griffin; Jelicic, M., Smeets, T., Peters, M. J. V., Candel, I., Horselenberg, R., & Merckelbach, H. (2006), *Assassination of a Controversial Politician: Remembering Details from Another Non-Existent Film*, Applied Cognitive Psychology, 20, 591–596.

[19] Clancy, S. (2005), *Abducted: How People Come to Believe They Were Abducted by Aliens.* Harvard University Press.

[20] Loftus, E. F., & Ketcham, K. (1994), *The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse*, St. Martin's Griffin; Ofshe, R. (1994), *Making Monsters*, Scribner.

[21] Crombag, H. F. M., Wagenaar, W. A. , Van Koppen, P. J. (1996), *Crashing Memories and the Problem of Source Monitoring*, Applied Cognitive Psychology, 10, 95-104; Ost, J., Vrij, A., Costall, A., & Bull, R. (2002), *Crashing Memories and Reality Monitoring: Distinguishing Between Perceptions, Imaginations and 'False Memories'*, Applied Cognitive Psychology, 16, 125–134.

[22] Gudjonsson, G. H.; Sigurdsson, J. F.; Sigurdardottir, A. S.; Steinthorsson, H.; Sigurdardottir, V. M. (2014), *The Role of Memory Distrust in Cases of Internalized False Confession,* Applied Cognitive Psychology, 28(3), 336-348; Henkel, L. A.; Coffman, K. J. (2004), *Memory Distortions in Coerced False Confessions: A Source Monitoring Framework Analysis,* Applied Cognitive Psychology, 18(5),567-588; Kassin, S. M. (2007), *Internalized False Confessions,* In: Toglia, M. P., Read, J. D., Ross, D. F., Lindsay, R. C. L. (Eds), *The Handbook of Eyewitness Psychology, Vol I: Memory for Events*, Mahwah, NJ, US: Lawrence Erlbaum Associates Publishers, pp.175-192; Shaw, J. & Porter, S. (2015), *Constructing Rich False Memories of Committing Crime,* Psychological Science.

In addition, laboratory studies have demonstrated that false memories for autobiographical events can be planted.  Specific procedures have been developed and/or tested that have been shown to lead to the development of rich (realistic sensory detail) false autobiographical memories in a subset of study participants.  Studies have planted false memories for more dramatic real life events: such as being lost in a mall or on a mountainside, being bitten by a vicious animal, riding in hot air balloons, meeting fictional characters at Disneyland, witnessing demon possession, being painfully injured, and many others.[23]  False memories have been planted for personally committing specific aggressive acts.[24]  Even people with purportedly near perfect autobiographical memory have been led to develop false memories.[25]  And many false memories develop through persuasion that the event in question happened, or happened in a particular way.[26]

The facts surrounding the complainant's accounts support the conclusion that she is reporting false memories.  In sum, Baker never raised any allegation of sexual abuse until around 1985, in *response* to a telephone call from John Hanas.  Hanas, the cult leader, told her

---

[23] Loftus, E. F. & Davis, D. (2006), *Recovered Memories*, Annual Review of Clinical Psychology, 2, 469-98; Loftus, E. F.; Cahill, L. (2007), *Memory Distortion: From Misinformation to Rich False Memory*, In:  Nairne, J. S. (Ed), *The Foundations of Remembering: Essays in Honor of Henry L. Roediger,* III New York, NY, US: Psychology Press, 413-25, 451; Davis, D. & Loftus, E.F. (2007), *Internal and External Sources of Misinformation in Adult Witness Memory,* In: M.P. Toglia, J.D. Read, D.F. Ross, & R.C.L. Lindsay (Eds), *Handbook of Eyewitness Psychology (Vol l), Memory for Events*, Mahwah, NJ: Erlbaum, 195-237.

[24] Laney, C., & Takarangi, M. K. T. (2013), *False Memories for Aggressive Acts*, Acta Psychologica, 143, 227-234.

[25] Patihis, L., Frenda, S. J., LePort, A. K. R., Petersen, N., *et al* (2010), *False Memories in Highly Superior Autobiographical Memory Individuals,*  Proceedings of the National Academy of Sciences, 110 (52), 20947-20952.

[26] Leding, J. K. (2012), *False Memories and Persuasion Strategies*, Review of General Psychology, 16(3), 256-268; Nash, R. A., Wheeler, R.  L., & Hope, L. (2014), *On the Persuadability of Memory: Is Changing People's Memories No More Than Changing Their Minds?* British Journal of Psychology.

parents that Kollmar sexually abused her, and that he needed their help to protect Hanas, their family, and all of the cult members from Kollmar. Then, and only then, did Baker make any allegations against Kollmar. And even then, the Bakers didn't go to the police: they simply used Hanas's information as he directed: to threaten Kollmar to make sure he stayed away, and that is exactly what the Bakers did. So too, the complainant relates that she spent the next several years discussing her "memories" with Hanas and other leaders of his organization. And the entire structure of those conversations was heightened by the animus Baker *knew* that Hanas held against Kollmar.

When one considers these facts, along with the vague, improbable, and fantastical nature of Baker's account, the complainant's errors on issues she should know, her reliance on a script, and the unimpeachable evidence that negates critical portions of her account, a reasonably cautious person will conclude that Baker's account does not represent true memory of historic fact, but instead is a invented memory developed by John Hanas.

## ARGUMENT

**A. The Government has failed to establish dual criminality under the Treaty; at most, the Court should address the forcible rape charge as a basis for extradition.**

"[U]nder the principle of dual criminality, no offense is extraditable unless it is a crime in both the requesting country and the country from which extradition is requested." *Theron v. United States*, 832 F.2d 492, 495-496 (9th Cir. 1987), *cert. denied*, 486 U.S. 1059 (1988), *abrogated on other grounds*, *United States v. Wells*, 519 U.S. 482, 486 n.3 (1997).

Here, the Canadian sexual assault statutes proscribe conduct that is not prohibited in the United States. Specifically, Canadian law proscribes the crime of sex by false pretenses and (according the current prosecutor) sexual assault obtained based on the complainant's lack of self-confidence. But neither the United States nor California criminal codes then or now proscribe such conduct. Accordingly, the principle of dual criminality prohibits extradition for these charges. As for the forcible rape and sexual assault charges, the evidence does not establish either.

////

27

When Canada and the United States first entered their extradition treaty, Article 2 directed that persons subject to extradition were those who had committed "any of the offenses listed in the Schedule annexed to this Treaty," and that Schedule included rape and indecent assault. *See* Ex. A, Art. 2 & Schedule.[27]  Thus, at that time, the Government may have argued a broader interpretation for extraditable offenses.[28]

The parties amended the Extradition Treaty in 1988, which the Senate ratified in 1990. *See* ECF 1 ¶ 2.  That amendment deleted Article 2, and replaced it, in relevant part, with the following:

> Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

*See* Ex. B.  Because the "Contracting Parties" are the United States and Canada, only "offense[s] punishable by the laws of both [the United States and Canada]" are covered by the treaties.[29]  *But see Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 & n.3 (9th Cir. 1981). Considering the Government's citation to contrary controlling authority, *see also* ECF at 10:3-8, Kollmar preserves the claim State law should not be applied to this case, and addresses the Government's reliance on California law.  As shall be shown, the statutes upon which the Government relies—18 U.S.C. §§ 2243 & 2244 and Cal. Penal Code §§ 261, 261.5 & 288, *see* ECF 39 at 2:5-6 & 13:1-3—do not support extradition in this case.

While Canada's statute may proscribe rape by false pretenses and indecent assault by false pretenses, *see* ECF 39-1 at 9 ¶ 20, 13 ¶ 37, the Court cannot sustain relief on that theory. For one, the Canadians have not offered any basis to obtain extradition on that theory.  ECF 39-1 at 8-15.  And dispositively, the Government has never identified any law, much less

---

[27] *But see* n.9, *supra*.

[28] But even then, that argument would likely have failed because "rape" refers to common law rape, which is defined as sexual intercourse obtained by force and against the will of another.  There were no such allegations in this case.  *See* ECF 1.

[29] *See Theron*, 832 F.2d at 498.

28

federal law, that sets forth any such offense.  Because there is no federal (and no California)

analog to rape or sexual contact obtained by false statements, this theory of Canadian law

cannot support extradition.[30]

Next, the Government's reliance on 18 U.S.C. §§ 2243 and 2244 are inapplicable.

Section 2243 addresses statutory rape where the proscription arises from the complainant's

age, and *not* from the use of force or the threat of force, which is the gravamen of the

Canadians' allegations here.  *See* Ninth Circuit Model Criminal Jury Instruction No. 8.174.

Section 2244 proscribes sexual offenses against federal prisoners.  The Canadians do not allege

either offense, *see generally* ECF 39-1, and thus neither can serve as the dual criminality basis

for extradition.  Put another way, the Court addresses "the extraditability of each *offense*"

alleged against the accused.  *Cucuzzella*, 638 F.2d at 107 (emphasis added).

As the Government has conceded, the Canadians have expressly withdrawn the prior

allegation of statutory rape.  *See* ECF 39 at 2 & n.4 (Government conceding same); *see also*

ECF 39-1 at 7 ¶ 10 ("The Crown is no longer pursuing charges for sexual intercourse with a

female aged 14-16"); *id.*, at 32 ¶ 43 ("Subsequent to the swearing of the information dated

November 28, 2018, a decision was made to amend the wording of the charges, and to remove

the charge of sexual intercourse with a female between 14 and 16 years old.  As a result, on

June 5, 2019, Detective Paul Cargill swore an information against KOLLMAR before the

Honourable Justice of the Peace P. Liu to replace the previous information dated November 28,

2018.  This information charges KOLLMAR with only indecent assault and rape. The Crown is

no longer pursuing a charge of sexual intercourse with a female between 14 and 16 years old").

In sum, because the Canadians expressly have abandoned seeking extradition on the ground of

---

[30] Because extradition may only be granted when the accused's "conduct … constitutes
an offense punishable by the laws of both Contracting Parties[,]" the accused contends that this
Court must evaluate the alleged conduct at the time of the alleged conduct, *viz.*, 1975-1979.  *See
United States v. Wathne*, 2008 WL 4344112 (N.D. Cal. Sept. 22, 2008) (Walker, J.) ("this court
concludes that the dual criminality requirement of the extradition treaty under Indian law
requires that the offense charged be punishable in both countries at the time of the conduct that
constitutes the offense").  *See also* n.31, *infra*.

statutory rape, the Government cannot obtain extradition to permit prosecution for statutory rape.[31]

For the same reason, the Court cannot sustain Count One—forcible indecent assault—because there is no state or federal analog of which Kollmar is aware, and the Government offered none in its request for extradition.

Which leaves one charge to assess: forcible rape as alleged in Count Two. Should the Court decline Kollmar's limitation of the Treaty to federal analogs and apply California law, as urged by the Government, *see e.g.*, ECF 39 at 13, the accused agrees that California proscribes forcible rape. Cal. Penal Code § 261.[32] As a result, the Court must determine whether, as required to sustain a charge of rape, the accused and the complainant (1) had sexual intercourse; (2) "[t]he act of intercourse was against the will of the alleged victim; and [3] [t]he act was accomplished by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury [to the complainant]." CALJIC 10.00 (Rape—Spouse and Non-Spouse—Force or Threats). California law further instructs that "'Against that person's will' means without the consent of the alleged victim[;] 'Menace' means any threat, declaration, or act that shows an intention to inflict an injury upon another[;] 'Duress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which [she] [he] would not otherwise have performed, or acquiesce in an act to which [she] [he] otherwise would not have submitted. The total

---

[31] The Canadians' abandonment makes sense because there was no federal analog for the crime in 1974-1977, and federal proscription did not arise until 1986. *See* 18 U.S.C. § 2243. So too, even then, section 2243 provides for a "reasonable mistake of age defense," *i.e.*, that the complainant "had attained the age of 16 years[,]" 18 U.S.C. § 2243(c)(1), while CCC § 146(2) expressly proscribes that defense and establishes a strict liability offense in all cases. At bottom, because the Canadians expressly have withdrawn request for extradition for the offense of statutory rape, the Government cannot extradite for that offense.

[32] But like 18 U.S.C. § 2243, the other California statutes the Government relies on—Cal. Penal Code §§ 261.5 and 288—address statutory rape, *viz.*, sex with a person under 18, and lewd conduct with minors aged 15 or less. Thus, those statutes have no application to this case alleging forcible rape and forcible indecent assault, especially considering that Canada's age of consent was raised to 16 from 14 in 2008. *See Tackling Violent Crime Act*, S.C. 2008, c. 6, s. 13). In sum, neither offense charge relates to the age of the alleged victim.

circumstances, including but not limited to [the age of the alleged victim,] [his or her relationship to the [perpetrator] [defendant],] [threats to harm the victim,] [physically controlling the victim when the victim attempts to resist,] [and] [warnings to the victim that revealing the perpetrator's conduct would result in jeopardizing the safety of the victim or the victim's family,] are factors to consider in appraising the existence of the duress[;] and that '[t]he fear of immediate and unlawful bodily injury must be actual and reasonable under the circumstances [, or if unreasonable, the perpetrator must have known of the victim's fear and taken advantage of it.]'" *Id.*; *see also* ECF 39 at 16 (the Government urging extradition on this theory).

As set forth below next, the totality of the evidence demonstrates that, when exercising "reasonable caution," *Lopez*, 482 F.3d at 1072, *Beck*, 379 U.S. at 91, the Court should find that there exists an insufficient probability that the accused forcibly raped the complainant on any occasion.

**B.    The evidence in this matter demonstrates insufficient cause to conclude that Donald Kolmar forcibly raped Baker.**

First, the Court should recognize the extraordinary circumstances that surround this case. The complaining witness delayed 20 years before making any report—six years after she "escaped" John Hanas and his cult, and 16 years *after* she escaped Don Kollmar's alleged control—and the Canadians then delayed more than 20 years before taking any action to bring these charges. So too, at the time Baker finally made her account, she came armed with a lengthy script detailing her allegations, apparently because she couldn't remember them. Even then, she could not rely on a bullet list of the events she wanted to recall, *e.g.*, "Buffalo Trip, Mother's Day, South Carolina trip, Keele Street/van."

It is likewise noteworthy that the complainant never raised any allegations of sexual assault at all until her cult leader *told* her and her parents that she was sexually assaulted, and that he and the cult needed her help. Only then did Baker recount any tale of sexual assault, and even then, she claims it took "several years" of consultation with Hanas and his advisors to get the "full story" out.

31

Both of these circumstances, standing alone, would give any reasonably cautious person great pause before accepting her account.

The Court also should recognize the improbable and fantastical nature of several parts of the complainant's accounts.  It is improbable that a man, for years on end, could verbally and physically assault a young woman in and around a home filled with other persons, with no one person catching on.  So too, the complainant's "Midnight Run"—*i.e.*, her account of the nearly naked, barefoot, hours-long highway run in South Carolina from a rest stop that was not on a highway and did not have a phone booth, onto a highway, where there were no persons, no cars, and no available telephones—smacks of confabulation.  It is likewise improbable.  So too, the complainant's explanation about being able to break off a wedding that had been planned, and rejecting her mother's direct inquiries, on multiple occasions, about her relationship with the accused, and instead, her mother's acceptance of silence, similarly presents an account that is difficult to credit.  In other words, that account is similarly improbable.

So too, the bases for Baker's claims of control are vague, and similarly improbable. How exactly did this occur?  According the Baker, she lived with her family nearly all the time. True enough, she made allegations on what happened on spring break, on summer trips, and on monthly (or bi-monthly) trips to Toronto, but that means that even by her own account, the complainant spent nearly all of her time with her parents and her close-in-age sisters at her family home, far from Toronto.  Those facts alone challenge the Canadians' account that the accused "controlled every aspect of[the complainant's] life.  Again, the Canadians fail to persuade how the accused obtained complete control over this person over this distance and based upon irregular interactions.  How did the accused "isolate" her from her parents and sisters when she was living with her parents and sisters?  There is no clear explanation offered: only the *ipse dixit* "I remember he controlled me."  This is not enough.

Equally important is the evidence that that explains, negates, and obliterates Baker's account.  The events of Buffalo 1975 clearly did not happen: the passport evidence shows Kollmar didn't travel as she claimed, the airport evidence shows that no commercial flights were then available, the complainant herself later contradicts this claim when she recognized

32

that Kollmar never flew, and only drove his van, the Harringtons (the accused's parents) didn't even own the house she described until more than a year later, and they confirm that the only occasion Kollmar used that home in their absence was in 1978, years later.  So too, the complainant contradicted her own account: she said this trip occurred a few months after she and her parents had first met the accused, but then claimed she did not report this first-time assault upon her return to her family home in Sudbury because she had witnessed cult-member exultations of Kollmar for a year.

Likewise, Baker's memory of abuse cannot be squared with the acquisition of the Keele Street property, which like the Buffalo home, came years *after* the complainant alleged she was suffering abuse at that location.  And then there's the van—the scene of most of Baker's account—and like the rest, she describes a vehicle that Kollmar didn't own during the years she claimed *she* (without training or a license) was driving him around the United States while he was molesting her breasts "for hours."

Important too is the lack of corroboration and the inferences the Court should draw from it.  First is the fact that the Canadians have withheld the March 1997 account from Baker's father.  One would expect this evidence to be presented as corroboration *if* it corroborated her account.  The simple fact that the Canadians continue to hide this evidence suggests that it would not support her account.  Just like the production of Baker's accounts permitted a far more robust examination of the allegations than Detective Speakman's affidavit—which the Government asserted told the whole story—this Court should infer that her father's account would explain away and negate parts of Baker's narrative.

And a great host of respected community members have come forward to say that the complainant's account bears absolutely no semblance to Don Kollmar, even though each of them was informed of the serious and inflammatory allegations that Baker had raised.  One representative witness, Marilyn Clements, declares that:

> These [Baker's] descriptions do not match my experiences and
> observations of Donald Kollmar. In all the time I have known
> Don, I found him to be a very gifted spiritual teacher with no
> claims to any special powers.  He has never shown any signs of

33

abusive behavior, mentally or physically. He has shown no sign
of being a narcissistic personality, nor is he prone to violence. He
is a gentle, considerate man with an easy sense of humor. Fasting
has never been an issue that has arisen with me, or any of the
other people who I have known over the many retreats I have
attended. He has never shown any signs of being prone to or
capable of demeaning another person before a group and I have
certainly spent time with him in a group setting. During the time
my husband was very ill and eventually died of cancer, Don was a
wonderful support to him and to me. It is impossible for me
knowing Don as I do that these allegations could be an accurate
reflection of his conduct.

Clement Decl. ¶ 5. Another representative witness, M'Lisse Ramsey, declares:

I have a lot of reverence for the teaching and [Don Kollmar] as a
teacher and trust him and experienced our times together to bring
peace and a sense of love of life for me which is such a value to me.
He is a kind teacher and there is always a good amount of laughter in
these gatherings…. Don is a wonderful guide through my inner
world! Based on all my interactions and observations of Donald
Kollmar over the past 29 years, I believe that I have a strong and
consistent knowledge and understanding of his behaviors and
characteristics…. [The complainant's] descriptions do not match my
experiences and observations in any way. . .
I have never seen any of these behaviors and have always been
treated with kindness and respect and seen others treated in the same
way, with kindness and respect. I also have not experienced him to
be narcissistic but rather a thoughtful man and humble in his
requests. He has delivered his teachings in a most humble way and
never asked to be worshipped or held higher than another. These
allegations do not in any way reflect my experience of Don Kollmar
and I do not believe them possible given my frequent and deep
experience of him as a teacher and a human being. There has never
been a single behavior of those described that resemble Don
Kollmar.

Ramsey Decl. ¶¶ 3 & 5. There are many more witnesses who have presented similar accounts

of Donald Kollmar. We urge the Court to consider them carefully. In sum, the complete

absence of the traits and behavior in Kollmar to the account Baker has provided themselves

refute, negate, and undermine the complainant's account of him.

Finally, even if the Court accepted complainant's allegations on their face, as the

Government has, they do not establish forcible rape. With respect to the allegation of forcible

34

1   rape, the Canadians agree that Baker only described one event in any detail: Mother's Day

2   1977. ECF 39-1 at 29.[33]  She claimed that while they were in the van—and after Kollmar had

3   demeaned her in some identified way, perhaps by calling her "stupid" or "incompetent" or "fat

4   and ugly," *see* ECF 55 at 43—she then said the accused "partially penetrated" her, but "did not

5   penetrate [her] fully" because it was very important that I remain a virgin" until the two wed.

6   *Id.,* at 47.  These allegations come nowhere near to establishing nonconsensual sex obtained by

7   force or threat of force.  And while the Canadians rely on the alleged demeaning statements,

8   lowering another person's self-esteem does not vitiate consent because it does not threaten

9   violence.

10          Tellingly, nowhere in her lengthy video-recorded or written statement did the

11   complainant claim rape, and nowhere did she link her consent to a fear of physical violence.

12   The only violence she alleged, *e.g.*, three slaps when she fell asleep while he was driving in the

13   van, were all separate in time and space from the alleged sexual conduct.  *See* ECF 55 at 151-

14   52.  That fact alone should really end the debate.  Consenting to sex because you've been told

15   you're "ugly" or "stupid" does not convert that sexual act to forcible rape.

16          But there's more.  Baker herself declared that the accused did not have the necessary

17   mens rea: "knowledge that the complainant did not consent."  *See* ECF 39-1 at 12 ¶ 33.  When

18   describing the sexual conduct the complainant alleged preceded this intercourse, she told the

19   authorities that she had concluded that the accused believed that she "had this special love for

20   him as well."  ECF 55 at 37.  In other words, according the Baker, the accused reasonably

21   believed she wanted to have a sexual relationship with him.  And Baker was projecting her

22   commitment to this relationship: a wedding had been planned, and even when Baker collapsed

23   in 1979, she claimed her parents never knew about the abuse because they also "believed that

24   [the complainant] wanted to marry Donald Kollmar."  *See id.*, at 62.

25

26          [33]Apart from that account, Baker said similar events occurred "on four of five"
27   occasions, but Baker provided no locations or dates, *see e.g.*, ECF 55 at 152, and thus neither
     the Canadians nor this Court can determine if they even took place in Canada and thus could
28   support a chargeable offense.

35

This perception makes sense.  As Baker explained to the authorities, she would agree to meet him for the sexual escapades she claims, and then should would do so voluntarily.  ECF 55 at 155.

In sum, on no occasion does she ever allege that the accused threatened her with physical violence if she did not engage in sexual activities with him.  On this record, the Court thus cannot sustain the allegation of forcible rape.

**C.     The Government may not extradite Kollmar based on the extreme passage of time and the prejudice he has suffered as a result.**

Article 4 of the Treaty provides that "(1) Extradition shall not be granted in any of the following circumstances . . . (ii) [w]hen the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State."  While the Canadian prosecutor notes that "prosecution on these offences is not barred by any limitations period[,]" ECF 39-1 at 16 ¶ 48, she omits mention of Canada's Charter of Rights and Freedoms.  But the laws of Canada, interpreting the rights of the accused, establish that the offenses charged have become barred by the lapse of time.  *See* Greenspan Decl.  Rather than repeat Attorney Greenspan's persuasive demonstration that the significant delay in advising Mr. Kollmar of the 1997 Information, which arose from events alleged to have occurred 20 years prior, and the significant delay leading to his arrest on the initial charges that were laid in 1997, "have violated [Kollmar's] rights under sections 7, 11(a), and 11(b) of the *Charter of Rights and Freedoms*[,]" Greenspan Decl. ¶ 3, we incorporate his declaration in full and ask the Court to sustain his conclusions and deny extradition here.

In addition, the Treaty's reference to California law, and California's jurisdictional bar with respect to this case, require denial of extradition here.  Article 10(1) of the Treaty provides as follows:

> Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

36

*See also In the Matter of the Extradition of Sylvester*, 2006 WL 6323514, *2 (M.D. PA Feb. 14, 2006).

Black letter California law establishes that the evidence offered in this case could not "justify his committal for trial if the offense[s] of which he is accused had been committed in its territory."[34]  This is so because "[i]n California, the statute of limitations is jurisdictional. *People v. McGee* (1934) 1 Cal.2d 611, 613–614; *see generally* 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 368, p. 421.)" *People v. Lopez*, 52 Cal.App.4th 233, 245 (1997) (parallel citation omitted from quotation).  As the *McGee* court explained: "[i]n criminal cases, the state, through its legislature, has declared that it will not prosecute crimes after the period has run, and hence has limited the power of the courts to proceed in the matter." 1 Cal.2d at 613.

Because the statute of limitations is jurisdictional, "the accusatory pleading must allege facts showing that the prosecution is not barred by the statute of limitations."  *Lopez*, 52 Cal. App.4th at 245 (citing *People v. Crosby*, 58 Cal.2d 713, 724 (1962)).

Here, the June 2019 Information provided by Canada alleges violations occurring in the 1970s, long after California's six-year statute of limitations had run.  *See* Cal. Penal Code § 261.  As a result, because the evidence presented is not sufficient to justify Kollmar's committal for trial in California, the Court must turn aside the Government's request for jurisdiction.  The Government will likely cite to Article Four, and counter that the Canadian, not the Californian, statute of limitations applies to the offenses charged.  For the same reasons that the *Sylvester* Court rejected that argument, so should this Court.

In brief, the accused in *Sylvester* challenged his extradition to Canada under Article 10 because "[u]nder Pennsylvania law, to bind an accused over for trial, at a preliminary hearing the Commonwealth must establish a *prima facie* case as to each element of the crime, including the element that the statute of limitations is not a bar to prosecution for the offense. *See Commonwealth v. Bethlehem,* 391 Pa. Super 162, 172, 570 A.2d 563 (1989)."  *In the*

---

[34] Because the Government has not identified any federal analog for the offenses alleged by Canada, this issue must be determined under California law.

*Matter of the Extradition of Sylvester*, 2006 WL at \*4.  Because the Pennsylvania statute of limitations had then run for the offenses at issue, the district court found it "impossible for the Government to meet its burden on the statute of limitations element of the prima facie case, and therefore he is not extraditable because the Government has not met its probable cause burden." *Id*. at \*5.

The *Sylvester* Court then rejected the Government's attempted interjection of Article 4 as follows:

> We find the Government's argument to be flawed.  The Government appears to disregard the portion of Article 10(1) of the Treaty that requires the evidence be sufficient to bind the accused over for trial "according to the laws of the place where the person sought shall be found."  Although the Government concedes that the statute of limitations is an element of  every criminal offense in Pennsylvania, in essence it argues that Article 4 of the Treaty trumps any other applicability of statute of limitations to the **extradition** proceeding.  However, we find that the Pennsylvania statute of limitations is a necessary element of the prima facie cases for the extraditable crimes, and it is clear that the running of the Pennsylvania statute of limitations operates as a bar to a showing of probable cause on the instant offenses.  To find otherwise renders the Treaty language entirely meaningless.

*Id*. at \*5-6.

The identical reasoning supports the identical relief here.  Similar to Pennsylvania, California requires the prosecution to establish the timeliness of the prosecution's allegations as a requirement to bind the defendant over to trial.  In this case, the applicable statute of limitations ran in the 1980s, many decades ago.   As a result, the Government has not satisfied Article 10(1)'s requirements, and the Court should thus deny its request for extradition.

////

////

////

////

## CONCLUSION

For the reasons set forth above, the Court should deny the Government's request for extradition and should dismiss this matter in its entirety.

Respectfully submitted,

DATED: December 12, 2019            COLEMAN & BALOGH LLP
                                    */s/ E A Balogh*
                                    ETHAN A. BALOGH
                                    235 Montgomery Street, Suite 1070
                                    San Francisco, CA 94104

                                    Attorneys for Arrestee
                                    DONALD KOLLMAR